Robert J. Nelson (Cal. Bar No. 132797)
*rnelson@lchb.com*
Michael Levin-Gesundheit (Cal. Bar No. 292930)
*mlevin@lchb.com@lchb.com*
Courtney J. Liss (Cal. Bar No. 339493)
*cliss@lchb.com*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM HUDLOW; ESTATE OF DAVID HUDLOW; JAIME BASKIN; BRIAN WITHEY; STACEY BOWEN; ESTATE OF JOHN BOWEN; VANESSA CHUPP; ESTATE OF KYLE CHUPP; CARLA VASS-SALGADO; RICARDO SALGADO; RON PERI; and INGRID PERI,<br><br>             Plaintiffs,<br><br>      v.<br><br>EXTHERA MEDICAL CORPORATION; QUADRANT MANAGEMENT LLC; QUADRANT CLINICAL CARE LLC; ALAN QUASHA; DEVON QUASHA; and JOHN PRESTON,<br><br>             Defendants. | Case No. _3:25-cv-02492_<br><br><br>**COMPLAINT; DEMAND FOR TRIAL BY JURY** |

3183891.20

1

**TABLE OF CONTENTS**

2

**Page**

3

NATURE OF THE ACTION.................................................................................................. 1

THE PARTIES .................................................................................................................... 4

4

    A.    Plaintiffs ............................................................................................................. 4

5

    B.    Defendants .......................................................................................................... 5

6

JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT................................................. 7

7

FACTUAL ALLEGATIONS ................................................................................................. 8

8

I.      ExThera develops a blood filter, which shows promise for COVID-19 treatment, but as the pandemic and the filter's financial promise waned, ExThera shifts its focus to cancer............................................................................................................. 8

9

II.     To more quickly reach profitability, ExThera and its backer, Quadrant, look abroad. ....................................................................................................................... 9

10

III.   Defendants falsely market ONCObind to Plaintiffs as a safe, effective treatment likely to cure cancer—to devastating effect. ....................................................... 12

11

    B.    David Hudlow (deceased victim) & Kim Hudlow (spouse) ................................. 14

12

    C.    Brian Withey (participant) & Jaime Baskin (spouse) .......................................... 25

13

    D.    John Bowen (deceased victim) & Stacey Bowen (spouse)................................... 28

    E.    Kyle Chupp (deceased victim) & Vanessa Chupp (spouse) ................................. 34

14

    F.    Ricardo Salgado (participant) & Carla Vass-Salgado (spouse) ........................... 41

15

    G.    Ingrid Peri (participant) & Ron Peri (spouse) ..................................................... 44

16

CIVIL CONSPIRACY ALLEGATIONS ................................................................................ 46

17

CLAIMS FOR RELIEF ....................................................................................................... 48

18

PRAYER FOR RELIEF ....................................................................................................... 56

DEMAND FOR A JURY TRIAL.......................................................................................... 56

19

20

21

22

23

24

25

26

27

28

Plaintiffs Kim Hudlow, Estate of David Hudlow, Jaime Baskin, Brian Withey, Stacey Bowen, Estate of John Bowen, Vanessa Chupp, Estate of Samuel Kyle Chupp, Carla Vass-Salgado, Ricardo Salgado, Ron Peri, and Ingrid Peri allege the following against Defendants ExThera Medical Corporation, Quadrant Management LLC, Quadrant Clinical Care LLC, Alan Quasha, Devon Quasha, and John Preston:

## NATURE OF THE ACTION

1.    This is a case about a promised medical miracle—a cure for metastatic cancer—backed by a billionaire investor that was, in reality, a dangerous medical experiment. Unwilling to wait for U.S. regulators to approve clinical trials of a novel blood filtration procedure, a biotechnology company, a billionaire investor, his private equity firm, his investment partner, and his physician daughter opened an improvised "clinic" on the island of Antigua. This operation was meant to be the first in a lucrative chain of cancer-curing clinics offering the procedure for $45,000. Within months, however, three Plaintiff victims had died, and three others saw their cancers, in one Plaintiff's words, "explode."[1]

2.    Defendants' explanation of the procedure was compelling: by removing individuals' blood, filtering it through a unique device, and returning it to the body in a process similar to hemodialysis, the procedure would remove circulating tumor cells and prevent further tumor metastases and, in doing so, substantially boost the body's immune system so that the body itself would attack their primary tumors.

3.    Defendants, many of whom touted impeccable credentials, repeatedly promised these desperate families a cure for cancers of all kinds, including lung cancer, breast cancer, colorectal cancer, esophageal cancer, and liposarcoma. They lied again and again to families in immediate need of a cure—or at least reduced pain and lengthened lives. But the purported "cure" they delivered exacerbated their victims' pain and disease, and in several cases, caused the victims' death.

---

[1] This medical fraud was recently featured in a 6,000-word *New York Times* article. *See* John Carreyrou, *A Start-Up Claimed Its Device Could Cure Cancer. Then Patients Began Dying.*, New York Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/business/exthera-cancer-blood-filtering-device.html.

3183891

1    4.    The story begins with ExThera, a San Francisco Bay Area medical device

2    company. The company's product, the Seraph 100 filter, had been used to treat sepsis in

3    critically ill military patients suffering from severe COVID-19.

4    5.    As the COVID-19 pandemic waned, ExThera quickly pivoted to another

5    lucrative market: cancer. In fall 2023, ExThera tested the Seraph 100 filter's ability to remove

6    circulating tumor cells from the blood of a small number of individuals in Zagreb, Croatia, a

7    location presumably chosen because such human experimentation would have been forbidden in

8    the United States. ExThera claimed that the procedure, now called "ONCObind," significantly

9    reduced the tumor size and pain and, for multiple individuals, rendered their cancers

10   undetectable. There is no evidence that any of these claims were grounded in fact.

11   6.    In December 2023, billionaire Alan Quasha learned of the Croatian trial

12   from John Preston, a long-time investment advisor at his private equity firm, Quadrant

13   Management, who was also an ExThera board member. Within ten days, Mr. Quasha, through

14   Quadrant Management, invested $3 million in ExThera. By the end of 2023, he had formed a

15   subsidiary, Quadrant Clinical Care, to market and administer the procedure in a clinic on the

16   island of Antigua. The location was presumably chosen because use of the filters for cancer was

17   not authorized in the United States. Mr. Quasha chose his daughter, Dr. Devon Quasha, a

18   Harvard-trained physician practicing in the world-renowned Mass General Brigham health

19   system, to serve as the clinic's medical director and chose another investment advisor employed

20   by his private equity firm to serve as the clinic's president. Mr. Quasha deployed his private jet to

21   pick up ExThera team members and Seraph 100 filters and landed in Antigua to witness the

22   procedure. The goal was to establish the first in what Quasha imagined would be a lucrative chain

23   of clinics providing the ONCObind procedure in the Caribbean—thereby accessible to North

24   American cancer patients.

25   7.    Defendants promised, time and time again, that the Croatian trial

26   demonstrated that ONCObind was a miracle and that the results would be replicated in a

27   sophisticated medical clinic in Antigua. This was false. Victims were advised that one

28   participant in the Croatian trial with Stage IV cancer was training for a marathon; others had

their tumors completely eliminated; and, in all but one case, tumor size was reduced by fifty percent or more. Individuals were told that only one participant in the Croatian trial had died—because that individual continued chemotherapy which allegedly interfered with ONCObind. These claimed results have never been published or otherwise verified.

8.     The price for unwitting cancer patients and their families was $45,000, but desperate families were told that ONCObind would soon be available in trials in the United States where individuals who received the filtration in Antigua would later be able to receive future filtrations at no cost under recent legislation. Victims were told there were no potential adverse effects and were *not* informed they were taking part in what was amounted to a medical experiment. No one signed any sort of consent form.

9.     Victims were also advised that they should stop—or, in one case, not begin—chemotherapy prior to traveling to Antigua because, victims were told, chemotherapy would weaken the immune system and limit the effectiveness of the blood filtering process. Victims were medically stable before their journeys to Antigua, and their discontinuation (or abstention from) chemotherapy worsened their conditions and also, in some cases, hastened their deaths.

10.    Instead of receiving the life-saving treatment they were promised in a medically appropriate facility, these cancer patients and their families arrived in Antigua to find a facility lacking essential medical equipment. For example, the area where the hours-long filtrations would be administered had no hospital beds, no sinks outside the two found in the restrooms, no hand sanitizer or tool sanitizing stations, and limited vitals monitoring equipment. The clinic was "overseen" by a single surgeon with no oncology experience who was often traveling abroad or absent because he was seeing his own patients about a quarter of a mile away in a separate building. No oncologist was present at any time. No oncologist was ever even employed by Quadrant Clinical Care. No oncologist serves on the Boards of ExThera or Quadrant Management.

11.    The ONCObind filtration was often torturous: the filters clogged so frequently that one victim lost a third of his blood volume in filters that were thrown away. That

victim lost consciousness with no physician present to treat him. During another victim's filtration, the victim's blood pressure fell so sharply while he vomited so intensely that nurses, who were administering ONCObind with no physician present, had to call in an emergency physician from another practice. A third victim was left so confused—and unsupervised—after filtration that he picked stitches out of his head, leaving an open wound that went unnoticed by Quandrant staff for hours despite profuse bleeding.

12.    After enduring these procedures, three victims died within days or weeks of leaving Antigua, and each surviving victim became sicker and saw their cancer markers increase significantly. No one provided informed consent before having the ONCObind procedure administered on them. Not a single individual experienced the promised tumor reduction. Not one. This lawsuit seeks to hold to account those who orchestrated this devastating medical fraud, which amounted to an unregistered, unmonitored human experiment.

## **THE PARTIES**

### A.    **Plaintiffs**[2]

13.    Plaintiff Kim Hudlow, an individual residing in Panama City, Florida, traveled to Antigua twice with her late husband David Hudlow for Mr. Hudlow to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr. Hudlow died less than a week after he received his second round of ONCObind filtration. The Estate of David Hudlow is also a party to this action, and Ms. Hudlow is the personal representative of that estate.

14.    Plaintiff Jaime Baskin and her husband, Plaintiff Brian Withey, are individuals residing in Northbrook, Illinois, who traveled to Antigua for Mr. Withey to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care.

15.    Plaintiff Stacey Bowen, an individual residing in Hawthorn Woods, Illinois, and her late husband John Bowen traveled to Antigua for Mr. Bowen to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr.

---

[2] The citizenship of each Plaintiff is provided within this section in compliance with Federal Rule of Civil Procedure 7.1(a)(2).

Bowen died ten days after returning from Antigua. The Estate of John Bowen is also a party to this action, and Ms. Bowen is the personal representative of that estate.

16.     Plaintiff Vanessa Chupp, an individual residing in Orillia, Ontario, Canada, and her late husband Kyle Chupp traveled to Antigua for Mr. Chupp to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr. Chupp died within two months after returning from Antigua. The Estate of Samuel Kyle Chupp is also a party to this action, and Ms. Chupp is the personal representative of that estate.

17.     Plaintiff Carla Vass-Salgado and her husband, Plaintiff Ricardo Salgado, individuals residing in Miami, Florida, traveled to Antigua for Mr. Salgado to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care.

18.     Plaintiff Ron Peri and his wife, Plaintiff Ingrid Peri, individuals residing in Windermere, Florida, traveled to Antigua for Ms. Peri to receive the ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care.

### B.     Defendants

19.     Defendant ExThera Medical Corporation is a Delaware corporation with its headquarters in Martinez, California. ExThera manufactures the Seraph 100 blood filter and promotes its use in cancer to this day, terming the procedure ONCObind. Through John Preston, a former member of its Board of Directors, and Dr. Sanja Ilic, its former Chief Regulatory Officer and Vice President for Clinical, Regulatory, and Medical Affairs, ExThera promoted the ONCObind filtration procedure administered by Quadrant Clinical Care to Plaintiffs.

20.     Defendant Quadrant Management LLC is incorporated in Delaware with its headquarters in New York, New York. On information and belief, Quadrant Management solely manages the wealth of billionaire investor Alan Quasha. Quadrant Management—directed by Mr. Quasha—made a significant investment in ExThera Medical Corporation shortly before promoting the use of the ExThera filters on late-stage cancer patients. Mr. Quasha and Quadrant Management created Quadrant Clinical Care LLC to implement the fraud on the ground in Antigua.

3183891

21.    Defendant Quadrant Clinical Care LLC[3] is incorporated in Delaware and, on information and belief, is a fully owned subsidiary of Quadrant Management and is operated as an arm of Quadrant Management without observing the corporate formalities necessary to maintain a separate identity. On information and believe, Quadrant Clinical Care was formed for the sole purpose of administering the ONCObind prceodure with ExThera Seraph 100 filters. Quadrant Management team member Tom Pontzius served as Quadrant Clinical Care's President, while Mr. Quasha's daughter, Dr. Devon Quasha, served as its Medical Director. Both promoted the ExThera ONCObind procedure in Antigua to Plaintiffs.

22.    Defendant Alan Quasha, an individual residing in the State of New York, is the founder of Quadrant Management. Mr. Quasha is responsible for Quadrant Management's investment in ExThera and Quadrant Management's creation of Quadrant Clinical Care. On information and belief, Mr. Quasha oversaw the fraud by directing these entities to create and promote a facility providing the ExThera ONCObind procedure prior to demonstration of clinical safety and efficacy.

23.    Defendant Dr. Devon Quasha, an individual residing in Massachusetts, is the daughter of Mr. Quasha and served as the Medical Director for Quadrant Clinical Care, an entity created to effectuate fraudulent medical experimentation on the victims. Dr. Quasha is a graduate Harvard Medical School, completed her medical residency at the Harvard-affiliated Brigham & Women's Hospital, and practices in the Mass General Brigham medical system, credentials Quadrant Clinical Care traded on to legitimize the fraud.

24.    Defendant John Preston, an individual residing in Massachusetts, is an investment team member at Quadrant Management and a former board member of ExThera Medical. Mr. Preston introduced Alan Quasha to ExThera and the ExThera Seraph 100 filters' potential use in the ONCObind procedure. Mr. Preston also spent 30 years working at

---

[3] Quadrant Management may also have formed an entity known as Quadrant Clinical Care Ltd. incorporated in the British Virgin Islands, which may have also been used to further the wrongful actions described in this Complaint. Plaintiffs reserve the right to seek leave to amend this Complaint under Rule 15 of the Federal Rules of Civil Procedure if such facts come to light during the course of the litigation, indicating that Quadrant Clinical Care Ltd. is an appropriate Defendant.

1   Massachusetts Institute of Technology and held himself out as a physicist, credentials he held to

2   legitimate the fraud.

3   **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

4   25.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action

5   because this is a civil action between citizens of different states and the matter in controversy

6   exceeds $75,000, exclusive of interest and costs.

7   26.   This Court has personal jurisdiction over Defendants because Defendants

8   are residents of and/or do business in the Northern District of California. Specifically, Defendant

9   ExThera Medical's headquarters is in Martinez, California. Further, all Defendants have

10  purposely availed themselves of the benefits, protections, and privileges of the laws of the State

11  of California in conducting their business, and have purposely directed their activities in this

12  State. Defendant ExThera markets its products, including the ExThera filters, in and from the

13  State of California. Defendant Quadrant Management is a significant investor in ExThera.

14  Defendants Quadrant Management and Quadrant Clinical Care are major purchasers and

15  distributors of the ExThera Seraph 100 filters designed and shipped from California, and in at

16  least one case, exported the filters from California to Antigua. All Defendants coordinated

17  among each other to promote the use of ExThera filters on cancer patients. Defendants have

18  sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court

19  permissible.

20  27.   Venue is proper in this Court because Defendant ExThera has its principal

21  place of business in within this District in Martinez, California, in Contra Costa County. Because

22  a substantial aprt of the events or omissions giving rise to the claims alleged occurred in Contra

23  Costa County, assignment to the San Francisco or Oakland Divisions is proper under Local Rule

24  3-2(c).

25

26

27

28

- 7 -

1

**FACTUAL ALLEGATIONS**

2

I.    **ExThera develops a blood filter, which shows promise for COVID-19 treatment, but
as the pandemic and the filter's financial promise waned, ExThera shifts its focus to
cancer.**

3

4

28.    ExThera was formed in 2007 and initially focused on antimicrobial drug

5

resistance. The company developed a blood filter, known as the "Seraph 100." The filter

6

contains tiny beads covered in heparin, a substance similar to a molecule found inside blood

7

vessels that binds pathogens. The beads are intended to mimic the inner walls of blood vessels

8

and capture viruses, bacteria, and fungi. The device works in tandem with a dialysis machine,

9

which pumps blood out of a patient's body and into the device before returning it, filtered of

10

pathogens, to the patient.

11

29.    In 2019, ExThera marketed its product in Europe for drug-resistant

12

bloodstream infections. Then, as the COVID-19 pandemic began in winter 2020, ExThera made

13

its Seraph filters available for treatment of severe COVID infections in Germany and Italy. In

14

April 2020, the U.S. Food and Drug Administration granted ExThera Emergency Use

15

Authorization for the treatment of severe COVID-19 disease with the Seraph filter. The filter

16

showed initial promise for treatment of COVID-19, but the COVID-19 pandemic would wane,

17

significantly reducing the commercial potential for this application.

18

30.    By September 2022, ExThera shifted gears. It announced that data from a

19

preliminary *in vitro* study (*i.e.*, in a laboratory using blood samples) demonstrated that the

20

Seraph filter could remove circulating tumor cells. ExThera announced plans to study the use of

21

the Seraph filters as a treatment to prevent further metastasis in cancer patients.[4]

22

31.    In July 2023, ExThera announced that it had received FDA investigational

23

device exemption for use of the Seraph filter for the removal of circulating tumor cells

24

("CTCs"). ExThera would market this treatment under the trade name "ONCObind." The

25

company announced that it would be able to enroll patients in a clinical trial in the fall of 2023

26

_____

27

[4] *See* ExThera Medical, *Extracorporeal Blood Filter Removes Circulating Tumor Cells: Dialysis-like Cell Removal Therapy to be Studied for Treating Metastatic Cancer* (Sep. 20, 2022),
https://extheramedical.com/extracorporeal-blood-filter-removes-circulating-tumor-cells-dialysis-like-cell-removal-therapy-to-be-studied-for-treating-metastatic-cancer/.

28

1    and disclosed that it was collaborating with "trusted health advisors" to launch an "exciting new

2    oncology initiative."[5]

3        32.    In August 2023, before a single patient had been enrolled in an ONCObind

4    clinical trial, ExThera's Head of Quality and Chief Operating Officer announced, in a press

5    release, that the company was "well-positioned to move forward with its plans toward global

6    commercialization."[6] But a U.S. clinical trial did not proceed as quickly as ExThera hoped.

7    ExThera would not enroll a patient in any U.S. ONCObind study until September 2024, long

8    after the Antigua episodes.[7] The trial was limited to patients with pancreatic ductal

9    adenocarcinoma cancer and, as of the time of filing, appears to have only enrolled five subjects.[8]

10   **II.    To more quickly reach profitability, ExThera and its backer, Quadrant, look**
         **abroad.**

11

12       33.    Unsatisfied with the pace of clinical development and commercialization in

13   the United States, in fall 2023, ExThera's Chief Medical & Regulatory Officer, Dr. Sanja Ilic,

14   conducted a trial in Zagreb, Croatia. ExThera provided Seraph 100 filters at no cost for the

15   study. This trial has been described by various ExThera and Quadrant executives and advisors as

16   testing the ONCObind procedure's efficacy on between 8 and 12 patients with late-stage,

17   metastatic disease. In early 2024, ExThera and Quadrant representatives would describe this

18   study to Plaintiffs as having not just prevented further metastases, but, in essence, *curing*

19   multiple individuals of cancer by reducing the size of existing tumors and in some cases

20

21   [5] *See* ExThera Medical, *ExThera Medical Announces FDA Approval of IDE Application for Use*
     *of the ONCObind™ Extracorporeal Procedure to Remove Circulating Tumor Cells in Patients*
     *with Pancreatic Cancer* (July 13, 2023), https://extheramedical.com/exthera-medical-announces-
22   fda-approval-of-its-ide-application-for-use-of-its-seraph-100-blood-filter-to-removing-circulating-
     tumor-cells-in-patients-with-pancreatic-cancer
23   [6] *See* ExThera Medical, *ExThera Medical Receives Certification for Medical Device Single Audit*
     *Program (MDSAP) and Recertification for International Organization for Standardization for*
24   *Medical Devices (ISO 13485)* (Aug. 13, 2023), https://extheramedical.com/exthera-medical-
     receives-certification-for-medical-device-single-audit-program-mdsap-and-recertification-for-
25   international-organization-for-standardization-for-medical-devices-iso-13485.
     [7] *See* ExThera Medical, *Revolutionary Trial Aims to Transform Pancreatic Cancer Treatment*
26   (Sep. 3, 2024), https://extheramedical.com/revolutionary-trial-aims-to-transform-pancreatic-
     cancer-treatment.
27   [8] *See* NIH, *OSCAR I Study – The ONCObind CTC Removal Study*,
     https://www.clinicaltrials.gov/study/NCT06481397#study-plan (last accessed March 5, 2025).
28   ("Enrollment (Actual) / 5").

rendering the patient's cancer undetectable. There is no indication that any of this was true. The results of the study were published in November 2024 in the journal *Blood Purification*. The article explains that the ExThera filters could remove pathogens and CTCs from the bloodstream but makes *no mention whatsoever* of whether patients' health improved as a result.[9]

34.     Nevertheless, ExThera pushed forward at rapid speed with a plan to sell the Seraph 100 filters and commercialize ONCObind for the large oncology market.

35.     In December 2023, John Preston, an ExThera board member and also an investment advisor employee of billionaire Alan Quasha's private equity firm, Quadrant Management, told Mr. Quasha about the Seraph 100 filters' new use in ONCObind. Within days, ExThera shared the data from their Croatian trial with Mr. Quasha. Mr. Quasha then invested $3 million dollars in the company.

36.     An investment in ExThera was not enough for Mr. Quasha. Mr. Quasha wanted to establish a lucrative chain of clinics providing ONBObind treatment.

37.     Therefore, Quadrant Management, under the direction of Mr. Quasha, soon formed a clinical division known as Quadrant Clinical Care, which it incorporated on December 26, 2023. Defendants quickly established a facility in an existing clinic on the Caribbean island of Antigua, where they could easily obtain approval to deploy ONCObind. Quadrant Clinical Care then paid ExThera an additional $10 million to become ExThera's exclusive Caribbean distributor.

---

[9] *See* Sanja Ilic & Verdan Premuzic, *First-In-Human Rapid Removal of Circulating Tumor Cells in Solid Metastatic Neoplasia by Microbind Affinity Blood Filter*, Blood Purification (Nov. 4, 2024), https://karger.com/bpu/article/54/2/138/915514/First-In-Human-Rapid-Removal-of-Circulating-Tumor.

3183891

1
2
3
4
5
6
7
8
9
10
11
12



13    38.    ExThera employees then loaded Mr. Quasha's private jet with a dialysis

14    machine and hundreds of Seraph 100 filters in San Diego, picked up Mr. Quasha in the

15    Bahamas, and arrived in Antigua ostensibly to train the local clinic's staff on usage of the filter.

16    ExThera and Quadrant Clinical Care began administering the ONCObind procedure on three

17    participants—likely in early January 2024—even though they had no oncologist on site. In at

18    least one instance, depicted above, Dr. Sanja Ilic (second from left), ExThera's then-Chief

19    Medical Officer, and Dr. Lakhmir "Mink" Chawla, ExThera's current Chief Medical Officer,

20    instructed clinical staff on administration of the procedure, while Mr. Quasha (far left) observed.

21    39.    Shortly after Mr. Quasha and Dr. Ilic set up the clinic, Quadrant Clinical

22    Care hired Mr. Quasha's daughter, Dr. Devon Quasha, an internist (not an oncologist), to

23    oversee the clinic as its Medical Director. Dr. Quasha did not hire any oncologists or, on

24    information and belief, engage in any efforts to ensure that the clinic in Antigua was medically

25    suitable for cancer patients.

26    40.    ExThera's then Director of Medical Affairs, Dr. Jonathan Chow, who

27    reported to Dr. Ilic, visited the clinic in Antigua in January 2024, arriving two days after Mr.

28    Quasha. On information and belief, he observed witnesses bleeding from catheter wounds and

screaming in pain. Dr. Chow immediately warned ExThera's executives, both in video calls and ultimately in a letter, that ExThera, in coordination with the other Defendants, was engaging in unethical and unsafe medical experimentation. Dr. Chow's warnings went unheeded.[10] ExThera and Quadrant Clinical Care successfully kept Dr. Chow's concerns from reaching the public or Plaintiffs.

### III.    Defendants falsely market ONCObind to Plaintiffs as a safe, effective treatment likely to cure cancer—to devastating effect.

41.    By January and February 2024, Plaintiffs, who were desperately searching for treatments for aggressive cancers, began hearing about the ONCObind procedure that Defendants were administering in Antigua and promoting as a cure for cancer.

42.    Plaintiffs began to investigate this new treatment. ExThera's website claimed the ONCObind procedure "demonstrated removal of metastatic circulating tumor cells in several *in vitro* models" in tests at the University of Southern California, that "two independent laboratories [had] confirmed the viability of efficient removal of circulating tumor cells from human blood with ExThera's Seraph 100 pathogen binding technology," and that the Seraph 100 had "an excellent safety record in more than 2,500 clinical treatments performed globally" (for sepsis and COVID-19).

43.    When Plaintiffs reached out to ExThera to learn more about the treatment, what they heard from ExThera and Quadrant Clinical Care representatives was that the opportunity was nothing short of groundbreaking.

44.    ExThera board member and Quadrant Management advisory team member John Preston and ExThera's Chief Medical Officer Dr. Sanja Ilic told Plaintiffs the ONCObind procedure worked by removing circulating tumor cells from the body, preventing metastases and ultimately allowing the immune system to reset and attack primary tumors themselves. Plaintiffs were told—falsely—ONCObind had cured the cancer of multiple participants in a European trial, and the few Plaintiffs who heard anything about ill effects were told that the only

---

[10] *See* John Carreyrou, *A Start-Up Claimed Its Device Could Cure Cancer. Then Patients Began Dying.*, New York Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/business/exthera-cancer-blood-filtering-device.html.

participant with adverse effects had died because the participant's physician insisted on continuing chemotherapy after filtration. Mr. Preston and Dr. Ilic also claimed that ONCObind would reduce pain. Mr. Preston and Dr. Ilic also suggested, without a basis for doing so, that ONCObind would be approved by the FDA for U.S. trials soon (but not soon enough to benefit Plaintiffs), and individuals who received ONCObind in Antigua would have automatic and free access to the U.S. trials. To benefit from this revolution in cancer care, individuals needed to discontinue or not begin chemotherapy or radiation and travel to a facility in Antigua where, for a $45,000 procedure, their lives could be saved.

45.    When Plaintiffs arrived in Antigua for treatment, they were surprised to find the Quadrant Clinical Care clinic was merely a portion of an existing outpatient clinic that lacked an oncologist on site and also lacked basic equipment, such as sufficient sinks for maintaining sanitation or hospital beds suitable for ill patients.

46.    Several Plaintiffs who met and observed Dr. Quasha noted that she appeared to be learning how the procedure worked while overseeing it. Plaintiffs also later learned that Dr. Quasha had not designed customized protocols for participants: instead, each participant received identical filtration procedures regardless of the participant's disease state or the kind of cancer one had.

47.    Below Plaintiffs summarize how Defendants lured each Plaintiff family to travel to Antigua for ONCObind treatment and detail the terrible consequences.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**B.    <u>David Hudlow (deceased victim) & Kim Hudlow (spouse)</u>**



16    48.    Plaintiff Kim Hudlow and her late husband David Hudlow (Mr. Hudlow,
17  pictured above in December 2023) were nearly two years into treatment of Mr. Hudlow's
18  esophageal cancer, diagnosed at Stage III in March 2022, when they first learned of the
19  ONCObind treatment. Mr. Hudlow had undergone several rounds of treatment, including
20  chemotherapy, radiation, and surgery at leading cancer clinics across the country (including at
21  the Mayo Clinic). In February 2022, the Hudlows learned that Mr. Hudlow's cancer had spread
22  to his lymph nodes—meaning his cancer was now Stage IV. In fall 2023, Mr. Hudlow
23  participated in a clinical trial that was ultimately unsuccessful and was terminated prematurely.

24    49.    Devastated by the clinical trial's failure, Ms. Hudlow was anxious to find
25  another means of treating her husband's cancer. A few different chemotherapy drug options
26  remained, but the Hudlows were concerned that they did not have the upper hand.

27    50.    In early 2024, Ms. Hudlow heard about ExThera's filtration treatment
28  through a friend of a friend of Plaintiff Jaime Baskin, with whom she had developed a friendship

3183891

from a cancer spouses support group. The individuals underwent ONCObind and initially believed it to have been very successful in treating her cancer. Ms. Hudlow and Ms. Baskin thus worked to find more information and became connected with ExThera's Chief Medical Officer, Dr. Sanja Ilic, and ExThera board member and Quadrant Management investment advisor John Preston.

51. Dr. Ilic spoke on the phone with Ms. Hudlow and Ms. Baskin on or around February 8, 2024, extolling the extraordinary accomplishments of the ExThera filters for treating metastatic cancer. Dr. Ilic explained how the filters utilized heparin sulfate to bind circulating tumor cells and remove them from the bloodstream. Dr. Ilic told Ms. Hudlow and Ms. Baskin about a Croatian trial she had overseen in which between eight and twelve patients were treated, all of whom she described as having advanced cancers of different types. She said that nearly all of them had positive results after filtration—further, she said several of the patients had no evidence of cancer after treatment, and the lowest reduction in primary tumor size was 49%. Dr. Ilic mentioned a single patient who passed away after filtration, but she insisted it was because the patient had undergone a lot of chemotherapy before the filtration and had gotten additional chemotherapy after the filtration.

52. Additionally, on February 8, Dr. Ilic suggested to Ms. Hudlow in a separate communication that she could get Mr. Hudlow and Mr. Withey (Ms. Baskin's husband) into the Antigua facility by recommending them as patients to Dr. Devon Quasha, whom she suggested was overseeing enrollment there.

53. On February 9, John Preston pitched the ONCObind procedures to Ms. Hudlow and Ms. Baskin in a telephone call. Mr. Preston shared that ExThera had been asked to send filters to the Walter Reed National Military Medical Center to treat patients with COVID-19 so severe they otherwise had nearly no chance of survival. Mr. Preston explained that ExThera's filters had saved them.

54. Mr. Preston told Ms. Hudlow and Ms. Baskin that ExThera had then tested whether the filters could be used to filter out circulating tumor cells and found, in patients with different tumor types, that the filters did indeed work. He said that the filter removed tumor cells

from the bloodstream, returning the blood in a "clean" state and preventing the cancer from metastasizing.

55.    Mr. Preston boasted of the Croatian study. He told Ms. Hudlow and Ms. Baskin that, on or around September 25, 2023, the company conducted a clinical trial on 8 individuals in Europe. He explained that as a result of the ONCObind treatment "resetting" the individuals' immune systems, their immune systems were able to attack their primary tumors. Not only did they feel better immediately, but their immune systems were also more robust, leading three individuals to completely recover, with their cancers undetectable. He explained that the treatment worked best when standard-of-care treatments, such as chemotherapy and radiation, were not used because of those treatments' suppress on the immune system. He told Plaintiffs that the only patient who had poor results died because his radiologist insisted on doing another round of chemotherapy after his ONCObind procedure.

56.    Mr. Preston also said that the procedure had incredible pain-relieving effects. He described a patient on heavy pain medication prior to filtration who then declined any pain medication after receiving her first procedure.

57.    Mr. Preston further told Ms. Hudlow and Ms. Baskin that there were no adverse effects of the ONCObind procedure. In fact, he explained that only "negatives" were the cost ($45,000 for a round of filtration) and the time required (a full week).

58.    Throughout the conversation, Mr. Preston emphasized the credentials of those who supported the ONCObind project. He emphasized his own experience as a physicist at the Massachusetts Institute of Technology for over thirty years. (In reality, Mr. Preston, who holds a bachelor's degree in physics and an MBA, worked in technology licensing.) He explained that billionaire investor Alan Quasha became involved because of the treatment's extraordinary promise. He noted that the procedure was now being overseen by Dr. Devon Quasha, who had attended Harvard Medical School and completed her medical training there.

59.    Both Dr. Ilic and Mr. Preston made it clear to Ms. Hudlow and Ms. Baskin that ONCObind had no adverse effects, so long as the patient receiving the filtration did not receive chemotherapy too close to the treatment which could weaken the immune system.

3183891

60. Both Dr. Ilic and Mr. Preston suggested they could help get Mr. Hudlow into the clinic quickly, which Ms. Hudlow understood to be critical given the advanced stage of her husband's cancer.

61. In these conversations, Dr. Ilic claimed—without a basis—that ONCObind would soon be available in the United States, and that under American law, Antigua ONCObind recipients would be eligible for free and guaranteed participation in upcoming clinical trials.

62. The Hudlows heard more about the ONCObind procedure from one of Mr. Hudlow's treating physicians, integrative care specialist Dr. Mark Rosenberg. Dr. Rosenberg had been in touch with Mr. Preston and Dr. Ilic around the same time as Ms. Hudlow and Ms. Baskin. Dr. Rosenberg also told the Hudlows and Ms. Baskin that he had spoken to Mr. Quasha about the procedure and that Mr. Quasha believed it to be extremely promising.

63. Within days, Mr. Preston told the Hudlows that Mr. Hudlow would be able to be one of the first patients to receive the ONCObind filtration in the Antigua clinic. The ONCObind procedure would begin in the end of February. The Hudlows were told to pay Quadrant Clinical Care $45,000, arrange their travel and stay in Antigua, and get a main line catheter in place prior to arrival. The rest would be handled by Quadrant Clinical Care once they were on the island.

64. Per Mr. Preston's instructions, the Hudlows worked with a radiologist to get a tunneled catheter placed. On Mr. Preston's advice, Mr. Hudlow paused his chemotherapy treatments for a "wash out" period to enable the ONCObind procedure to work.

65. On February 27, 2024, the Hudlows arrived in Antigua for Mr. Hudlow's three filtration sessions.

66. On February 28, the Hudlows arrived at the Quadrant Clinical Care clinic for Mr. Hudlow's first day of filtering. Ms. Hudlow immediately noticed the clinic did not appear to be equipped for patients with advanced cancer. For example, the area where the procedure was administered was not equipped with hospital beds. Instead, the facility only had examination beds that are painful for weakened, ill individuals to lie on for hours of treatment, causing multiple Plaintiffs (Mr. Hudlow and Mr. Bowen) to suffer skin breakdown. The clinic

only had two sinks, meaning that medical staff were unable to regularly wash their hands. And vitals monitoring equipment seemed to be in short supply.

67.    Shortly after arrival at the clinic, the Hudlows met Dr. Quasha, who told Ms. Hudlow she had given her 90-day notice at Mass General Brigham so that she could become the Medical Director of Quadrant Clinical Care Antigua. Dr. Quasha examined Mr. Hudlow. Dr. Quasha is pictured, below, with Mr. Hudlow before his first filtration on February 28.



68.    The first filtration went fairly smoothly. Partway through the treatment, Dr. Joseph John entered and introduced himself to the Hudlows and explained that he ran the clinic day to day.

69.    Mr. Hudlow's condition took a turn for the worse by the evening. Mr. Hudlow's legs and head were jerking repeatedly, and his pain increased significantly. His symptoms lasted throughout the night and into the next day. Dr. Quasha watched Mr. Hudlow's twitching and said that she would run labs but ensure Mr. Hudlow could continue filtration sessions.

70.    The next day, February 29, the Hudlows remained at the hotel because Mr. Hudlow was in severe pain. Mr. Hudlow's jerking and twitching increased so much that Mr. Hudlow could not hold a utensil to feed himself, which had never happened before.

71.    On March 1, the Hudlows returned to the clinic around 8 a.m.. Back on the painful examination table, Mr. Hudlow's symptoms continued. Dr. John had blood tests performed on Mr. Hudlow, which showed that his uric acid was high. Dr. John insisted that this was merely a side effects of how quickly his body was attacking the cancer. Given Mr. Hudlow's worsening condition, the Quadrant Clinical Care staff decided to keep Mr. Hudlow in the clinic for the remainder of the day. The staff partially emptied what appeared to be a janitorial closet to make room for Mr. Hudlow. To monitor Mr. Hudlow's vital signs, Ms. Hudlow herself had to drag the vitals monitoring machine into the makeshift room. Ms. Hudlow remained with Mr. Hudlow in the small room.

72.    During and following the second filtration on March 1, Mr. Hudlow's pain increased significantly.

73.    On March 2, Mr. Hudlow began bleeding profusely out of his catheter and had to return to the clinic for a dressing change. Ms. Hudlow observed, shocked, as the dressing with tools that were not sterile. Dr. John collected blood for labs and kept the Hudlows at the clinic for a number of hours.

74.    On March 3, Mr. Hudlow received his third filtration. Mr. Hudlow remained in extreme pain, and was not released from the clinic until approximately 10 p.m. Dr. John ordered certain lab tests, but he continued to insist that Mr. Hudlow's increased pain was merely a side effect of how effectively ONCObind had triggered his body to kill cancer cells.

75.    The Hudlows were scheduled to fly out the next day, but they had run out of pain medication. Dr. John repeatedly refused to prescribe or order Mr. Hudlow's medication, insisting that the dose was more than he was comfortable prescribing and refusing to speak to any of Mr. Hudlow's treating physicians about his medication dose.

76.    Finally, Dr. John ordered pain medication for Mr. Hudlow, after explaining again that any additional pain was likely a sign that the procedure had been successful and was causing tumor lysis syndrome, a condition that occurs when many tumor cells are killed and the body struggles to process them as they are released into the bloodstream. The medication he prescribed was insufficient to treat Mr. Hudlow's pain.

3183891

77.     Ms. Hudlow was concerned, but was assured that ONCObind was working and its success would be shown once the Hudlows received the results of the circulating tumor cell test Dr. Ilic and others relied on. The test ExThera and Quadrant Clinical Care relied upon, known as "Maintrac," was conducted by a laboratory in Germany and would require shipping blood samples there.

78.     The Hudlows would never receive results of the Maintrac test. Rather than drawing vials of blood for the test, the Quadrant Clinical Care team placed used filters in a freezer and then shipped them to the laboratory in Germany. By the time the filters arrived, the blood within them had coagulated and was unusable. Quadrant Clinical Care's president Tom Pontzius blamed this on the unreliability of shipping from Antigua, but Ms. Hudlow later learned that the laboratory categorically could not perform the test on blood left in filters, rather than collected in vials.

79.     On March 4, the Hudlows were headed to the airport to return to their home in Florida when Ms. Hudlow received a call from the clinic informing her that she needed to pay an additional bill of more than $3,000 before leaving the island for tests Dr. John had ordered, pain medication, and the day-long stay in the janitorial closet.

80.     Struggling to get Mr. Hudlow onto the plane in his poor condition, Ms. Hudlow informed the clinic she would pay when she arrived home. She was shocked, however. Mr. Preston and the Quadrant Clinical Care staff with whom she had coordinated ahead of the trip had assured her that costs would be fully covered by the $45,000 paid in advance.

81.     Upon arriving home, the Hudlows' problems accelerated. By March 5, Mr. Hudlow was in even more pain than when he was in Antigua. He became short of breath, his legs began taking on fluid, and he began displaying cognitive impairment unlike anything Ms. Hudlow had observed before. He was confused, wandered the halls of the Hudlow home at night and pulled his central lines out. Large, additional growths began appearing on Mr. Hudlow's head and body. Overall, Mr. Hudlow was in significantly worse health than he had been before the procedure.

82.     The Hudlows had regularly tracked Mr. Hudlow's cancer with a test known

as "Signatera." The results of the Signatera test performed following the treatment showed a dramatic increase in circulating tumor DNA in Mr. Hudlow's blood.

83.   In the days following their return home, Dr. Quasha, Mr. Preston, and Mr. Pontzius called Ms. Hudlow regularly to check on Mr. Hudlow's condition, though no one directed her to have any particular tests performed.

84.   Over the next week, Mr. Hudlow remained in pain. His Signatera results fluctuated somewhat, though they never returned to the levels they were before he went to Antigua. Ms. Hudlow was uncertain about whether ONCObind was working, but the team continued to reassure her that these were positive signs of an immune response.

85.   On March 12, Dr. Ilic called Ms. Hudlow to reassure her about the procedure's efficacy. Dr. Ilic told Ms. Hudlow that ExThera was beginning clinical trials in Oklahoma and at the MD Anderson Cancer Center in Texas. There is no evidence that ExThera has or had any clinical trial at MD Anderson Cancer Center, and the clinical trial at the University of Oklahoma is limited to testing the procedure on a specific kind of pancreatic cancer—Mr. Hudlow had esophageal cancer—and has only five patients.

86.   Dr. Ilic said she had just performed ONCObind on three individuals, including an advanced breast cancer patient whose circulating tumor cell count had been reduced to zero. Whether or not these were the patient's results remains unclear, however, upon information and belief, that patient is now deceased. Ms. Hudlow told Dr. Ilic that Mr. Hudlow did especially poorly for a week after receiving the treatment. Dr. Ilic insisted that this was a good sign: Mr. Hudlow was having a strong immune response to the treatment.

87.   On March 21, Mr. Hudlow had fluid in his legs and intermittent confusion, and began to have trouble breathing. Ms. Hudlow took Mr. Hudlow to the emergency department of a local hospital, and Mr. Hudlow was diagnosed with and treated for a pleural effusion—that is, fluid in his lungs. At the hospital, the medical team drained a full liter of bloody fluid from Mr. Hudlow's lungs, and the Hudlows' family doctor told Ms. Hudlow that it appeared Mr. Hudlow was entering the end stages of his life. Ms. Hudlow emailed the full Quadrant Clinical Care team, explaining what happened and asking whether what had been

observed could still be an immune response.

88.     The next night, March 22, Ms. Hudlow learned that the German lab was unable to run the MainTrac test, which Dr. Ilic insisted would demonstrate the success of ONCObind. The filters arrived days old and full of coagulated blood; the lab required standard blood samples (in vials) to run the test. Ms. Hudlow learned this by calling and emailing the German lab herself because the Quadrant Clinical Care team seemed to avoid discussing the issue altogether. Ms. Hudlow called Dr. Ilic. Dr. Ilic blamed the issue on the Quadrant Clinical Care team, but praised Dr. Quasha. Dr. Ilic told Ms. Hudlow about another patient from the European trial whom she described as even sicker than Mr. Hudlow who now was training for a marathon. Dr. Ilic told Ms. Hudlow that she would be the first to find out when the American clinics were able to open, that Mr. Hudlow would be able to receive treatment in Montana for free before any other patients, and that Ms. Hudlow should keep that secret. Dr. Ilic also insisted that the medical team of Princess Catherine of Wales, who suffers from cancer, had asked Dr. Ilic to provide the ONCObind treatment to the Princess. Dr. Ilic insisted that Mr. Hudlow needed an additional treatment. Again, Dr. Ilic brought up the patients she had allegedly brought back from the brink of death in Europe and explained that Mr. Hudlow's case might just require more filtration given how advanced it was.

89.     Desperate and believing Dr. Ilic's repeated insistence that more filtration was necessary to achieve ONCObind's effects, the Hudlows prepared to return to Antigua. Drs. Ilic and Quasha continued to insist that more filtration procedures would improve Mr. Hudlow's condition.

90.     On April 3, the Hudlows flew back to Antigua. Mr. Hudlow was taken to the clinic for placement of a central line through which the procedure could be administered. Mr. Hudlow now had multiple growths on his head, and Ms. Hudlow requested that one of the growths be biopsied. To Ms. Hudlow's surprise, Dr. John removed one of the growths entirely, cutting a ping-pong-ball-sized growth out and stitching the wound closed. Dr. John left the wound stitched closed, but not bandaged

91.     On April 4, Mr. Hudlow underwent the first filtration session of this second

3183891

visit to Antigua. Before the filtration, the nurses administered a blood transfusion. The staff did Mr. Hudlow's filtration in what it misleadingly described as its "ICU." The "ICU" was anything but: it was merely a series of beds with a curtain between patients. Like the rest of the hospital, there were no provisions for individuals undergoing long treatments or staying hours at a time and there was no food or water available.

92.    On April 5, Mr. Hudlow became very short of breath and had to go to the clinic, where additional tests were run and he was given oxygen.

93.    On April 6, the Quadrant Clinical Care team administered a second filtration procedure to Mr. Hudlow in the filtration area of the clinic—on the hard examination table. Mr. Hudlow required oxygen. Mr. Hudlow was kept overnight in a corner of the "ICU" facility, separated only by a shower curtain from a child with R.S.V. coughing, without a nurse to monitor him. Ms. Hudlow, not realizing Mr. Hudlow would not be monitored, returned to the hotel to attempt to sleep.

94.    Mr. Hudlow, extremely disoriented and confused, ripped out the stitches Dr. John had left in his head. Mr. Hudlow bled on the hospital pillow for hours without the staff noticing. The next morning, Ms. Hudlow arrived, noticed the blood, and was able to gauze wrap Mr. Hudlow's head. Mr. Hudlow is pictured after Ms. Hudlow covered the wound below.



3183891

1    95.    From April 6 to April 7, Mr. Hudlow continued to struggle to breathe and

2    was kept in the clinic. Ms. Hudlow suspected that Mr. Hudlow's breathing issues were caused by

3    pleural effusions.

4    96.    Ms. Hudlow requested a CT scan of Mr. Hudlow's lungs, but Dr. John

5    insisted that Mr. Hudlow did not require one. Ms. Hudlow later learned there was no CT scanner

6    in the clinic, though there is a hospital on the island equipped with one. Ms. Hudlow was never

7    informed that there was another hospital on the island with adequate equipment.

8    97.    Ms. Hudlow became increasingly concerned about how the Hudlows

9    would return home. Mr. Hudlow needed continuous oxygen support, which the Hudlows could

10   not bring on a commercial flight. On April 8, Dr. John, who informed them he was leaving the

11   island and flying to Florida the following day for a conference, informed Ms. Hudlow that Mr.

12   Hudlow was dying and suggested that the Hudlows could join him on his flight the next day so

13   he could inform the flight crew of a medical emergency and deliver oxygen to him via the

14   airplane's emergency oxygen masks.

15   98.    Ms. Hudlow, having lost faith in Dr. John, instead searched for hours to

16   find an airline, charter jet, or pilot to fly with Mr. Hudlow's necessary (but flammable) oxygen

17   tanks on board. By April 9, Ms. Hudlow was able to charter a jet to return to their home in

18   Florida with the oxygen support Mr. Hudlow needed.

19   99.    That same day, Mr. Pontzius texted Ms. Hudlow, telling her that he had

20   consulted with the team, and Mr. Hudlow should continue fighting cancer with ONCObind. Mr.

21   Pontzius told Ms. Hudlow that he had asked the laboratory in Germany to expedite Mr.

22   Hudlow's MainTrac test. Later that day, Mr. Pontzius falsely informed Ms. Hudlow that the

23   MainTrac test showed that Mr. Hudlow's circulating tumor cells had been cleared.

24   100.   On April 10, the Hudlows made it back to Florida. The Hudlows rushed to

25   the Mayo Clinic's Jacksonville, Florida, location, where Mr. Hudlow was immediately checked

26   into the emergency department. Mr. Hudlow's lungs continued to fill with fluid, and a tap was

27   put in so that the fluid can be more easily drained.

28   101.   On April 12, the Mayo medical team informed the Hudlows that Mr.

- 24 -

1    Hudlow's disease was end stage and recommended palliative care. The Hudlows prepared a do-

2    not-resuscitate. Ms. Hudlow took Mr. Hudlow home.

3        102.    Mr. Hudlow passed away on April 18, a mere 12 days after his last

4    ONCObind filtration.

5            **C.    Brian Withey (participant) & Jaime Baskin (spouse)**

6        103.    Jaime Baskin and her husband Brian Withey had been managing Mr.

7    Withey's colorectal cancer since Mr. Withey was diagnosed with Stage III colon cancer following

8    a colonoscopy in June 2019.

9        104.    Understanding that Mr. Withey would require aggressive treatment to

10   survive, Ms. Baskin and Mr. Withey pursued both the best standard-of-care treatment available

11   at Northwestern Memorial Hospital in Chicago and also sought out integrative care near their

12   home from Dr. Keith Block at the Block Center for Integrative Cancer Treatment (also in

13   Chicago).

14       105.    Although an initial round of chemotherapy stalled Mr. Withey's cancer, in

15   August 2020, Mr. Withey's cancer returned as Stage IV with additional tumors in Mr. Withey's

16   liver.

17       106.    From August 2020 into 2024, Mr. Withey's cancer was controlled through

18   repeated chemotherapy rounds and intensive integrative medicine regimens intended to support

19   Mr. Withey's immune system.

20       107.    Ms. Baskin heard about the ONCObind procedure from a friend and was

21   put in touch with Dr. Sanja Ilic, as described above in Paragraphs 50, 51, and 60, *supra*. Ms.

22   Baskin was hopeful after hearing Dr. Ilic's promises. Dr. Ilic further assured Ms. Baskin, who

23   worried about the family's ability to afford ongoing treatment, that Mr. Withey would receive

24   further filtrations in ExThera's upcoming clinical trials in Oklahoma associated with MD

25   Anderson. In fact, Dr. Ilic told Ms. Baskin that Mr. Withey could be the first patient enrolled in

26   an upcoming clinical trial for colorectal cancer.

27       108.    After hearing from John Preston, as described above in Paragraphs 53 to

28   60, *supra*, Ms. Baskin became more convinced the ONCObind filtration treatments might

- 25 -

1  improve Mr. Withey's condition, or at least would not harm Mr. Withey, as Mr. Preston assured

2  both Ms. Baskin and Ms. Hudlow that the "treatment" was risk-free.

3       109.  Given Mr. Withey's more stable condition, Mr. Withey was scheduled for

4  filtration to begin in April 2024 (later than Mr. Hudlow). Although Ms. Baskin, too, was told

5  that Mr. Withey should cease chemotherapy in the February calls with Mr. Preston and Dr. Ilic,

6  Ms. Baskin and Mr. Withey followed the advice of Mr. Withey's treating physician and paused

7  chemotherapy only two weeks before the couple flew to Antigua.

8       110.  Just before Ms. Baskin and Mr. Withey were to fly to Antigua, Ms. Baskin

9  learned that Dr. Quasha would not be present at the clinic. In fact, no physician associated with

10  Quadrant Clinical Care would be present in Antigua beyond April 8.

11       111.  On April 7, Ms. Baskin and Mr. Withey flew to Antigua to begin the

12  ONCObind filtrations.

13       112.  On April 8, Mr. Withey underwent his first filtration. During the first

14  session, two Seraph 100 filters clogged before a third finally seemed to work. Mr. Hudlow,

15  however, lost a significant amount of blood and felt very ill.

16       113.  Two days later, on April 10, Mr. Withey underwent his second—and

17  final—filtration session. The filtration was disastrous. The filters repeatedly clogged. Blaming

18  the clogged filters on Mr. Withey's blood thickness, Quadrant Clinical Care staff pushed 3,000

19  units of heparin intravenously into Mr. Withey to thin his blood.

20       114.  In total, six Seraph 100 filters clogged and were thrown away full of Mr.

21  Withey's blood. Mr. Withey *lost a third of his blood volume*.

22       115.  Around midnight, Mr. Withey was finally disconnected from his sixth

23  filter. He stood up to walk over to Ms. Baskin and immediately slumped to the floor unconscious

24  and began shaking. For ten minutes, a nurse attempted to resuscitate Mr. Withey before a doctor

25  arrived to transfer him to the "ICU." Ms. Baskin, shocked at what she had seen, also lost

26  consciousness.

27       116.  The next day, Dr. John, who was in Miami for a medical conference, called

28  Ms. Baskin to tell her that he believed her husband had heparin-induced thrombocytopenia

- 26 -

(HIT), Ms. Baskin doubted this was the cause, believing it significantly more likely that Mr. Withey was suffering because he had lost a third of his blood volume, but Dr. John continued to insist. Ms. Baskin was eventually able to convince Dr. John to give Mr. Withey two blood transfusions.

117.    Mr. Withey's condition was too poor after the second filtration for him to receive the planned third filtration.

118.    Mr. Withey and Ms. Baskin therefore returned to the United States, where Mr. Withey's health remained poor. Mr. Withey's treating physicians confirmed that Mr. Withey was not suffering from HIT, but rather from blood loss, as Ms. Baskin suspected.

119.    The Baskins were reassured to hear from Dr. Ilic that a test result (MainTrac) had shown a high number of dead cancer cells in his blood, suggesting ONCObind had been successful. Dr. Ilic said his body was attacking his primary tumors. There is no reason to believe this was true.

120.    Because of these reassurances, Ms. Baskin continued to hope the treatment might be successful, but neither Ms. Baskin nor Mr. Withey trusted that the treatment could be administered in Antigua.

121.    About two weeks later, Ms. Baskin accepted Quadrant Clinical Care's offer to cover one of Mr. Withey's future filter sessions because they had paid $45,000 for three filtration sessions but had only received two. Ms. Baskin and Mr. Withey planned to wait until a second Quadrant Clinical Care clinic in the Bahamas opened or a U.S. clinic could be opened to avoid a repeat of the Antigua experience, which Dr. Ilic and Dr. Quasha ensured them would not be an issue at new facilities.

122.    But within three weeks of Mr. Withey's return from Antigua, his blood tests indicated that his cancer was increasing substantially. Because of the effects of the ONCObind procedure, Mr. Withey could not undergo his recommended chemotherapy treatment at that time. While Mr. Withey did ultimately undergo further chemotherapy, his cancer markers have never returned to their pre-ONCObind levels.

123.    Months later, in July 2024, when Ms. Baskin asked for a refund for the cost

3183891

of the third filtration, Ms. Baskin learned that Quadrant Clinical Care had decided to use the balance remaining from their $45,000 payment to cover a $16,246 bill from Medical Surgical Associates, the clinic in which Quadrant Clinical Care operated, for "ICU" services Mr. Withey received after the filtration repeatedly failed and he lost a third of his blood volume.

124.    Mr. Withey endured significant pain and suffering in Antigua and afterwards due to the administration of ONCObind. His cancer spread significantly following his blood filtrations, and his pain never decreased as promised. Mr. Withey's cancer now presents a greater risk to his life than prior to receiving ONCObind.

125.    Mr. Withey and Ms. Baskin continue to suffer severe emotional distress as a result of the human experimentation Mr. Withey endured in Antigua.

**D.    <u>John Bowen (deceased victim) & Stacey Bowen (spouse)</u>**



126.    Plaintiff John Bowen (pictured above with his wife, Plaintiff Stacey Bowen in March 2024) was diagnosed with Stage IV colon cancer in September 2022. He and Ms.

3183891

Bowen immediately began pursuing standard-of-care treatment at Northwestern and integrative care through the Block Center for Integrative Cancer Treatment in hopes of treating the cancer and extending Mr. Bowen's life.

127. As the Bowens pursued treatment for Mr. Bowen's cancer, Ms. Bowen became connected with Plaintiffs Kim Hudlow and Jaime Baskin, communicating regularly both to provide each other with support and to exchange information and research about potential treatments.

128. By February 2024, the Bowens were nearly two years into fighting Mr. Bowen's cancer. Mr. Bowen was in stable condition.

129. When Ms. Hudlow and Ms. Baskin heard about the ONCObind procedure and its promise for both treating cancer and reducing cancer patients' pain from John Preston and Dr. Sanja Ilic, they shared the information with Ms. Bowen. Later, all three "Cancer Wives" were able to join a videoconference with a patient who had undergone the ONCObind procedure in Greece and who believed, at the time based on what she had heard from ExThera and Quadrant representatives, that the treatment was extremely promising.

130. Hearing the promises Dr. Ilic and Mr. Preston had made about the treatment (as described above) and hearing from the patient who had undergone the procedure made the Bowens optimistic that the procedure would help treat Mr. Bowen's cancer and at least reduce his pain. The Bowens were further reassured because Preston had told Ms. Hudlow and Ms. Baskin repeatedly that the only "negatives" were the expense of $45,000 and travel to Antigua.

131. The Bowens kept in touch with the Hudlows and kept apprised of their February 2024 trip to Antigua for the procedure. The Bowens heard that Dr. Ilic had reassured the Hudlows that ONCObind was working.

132. On April 3, the Bowens spoke to Tom Pontzius, who introduced himself as a representative of Quadrant Management with 30 years of healthcare experience. Mr. Pontzius described the science behind the procedure. He explained that heparin sulfate in the Seraph 100 filters removed circulating tumor cells from the blood, returning the blood to the body in a

cleaner state and allowing the immune system to reset and attack primary tumors. Mr. Pontzius also said that ONCObind had relieved previous patients' cancer pain. Mr. Pontzius disclosed two potential side effects—edema (swelling) and a risk of tumor lysis syndrome (described above)—but he reassured the Bowens that Dr. Joseph "Joey" John, with his ten years of experience working at Columbia University's medical facilities in New York City, would be monitoring patients and able to treat such effects. Mr. Pontzius told Ms. Bowen that tumor lysis syndrome would actually be a good sign, indicating Mr. Bowen's immune system was successfully killing off massive numbers of tumor cells.

133.    Mr. Pontzius told the Bowens that five individuals were returning for a second round of filtration four to six weeks after their first. He never mentioned any of the negative outcomes of individuals subjected to ONCObind. He also told the Bowens that Mr. Bowen should wait six weeks to get scans after filtration in order to see its effects. Mr. Pontzius assured the Bowens that Dr. Devon Quasha, Quadrant Clinical Care's Chief Medical Officer, was overseeing all patients' care and planning personalized regimens for each patient based on their medical needs.

134.    Before the Bowens traveled to Antigua, Dr. Ilic communicated with Ms. Bowen via text, confirming that, if Mr. Bowen were able to be filtered in Antigua, he would likely be able to enroll in an upcoming ONCObind clinical trial in Oklahoma, where he would receive further filtrations at no cost.

135.    Hopeful that ONCObind would at least relieve some of Mr. Bowen's pain as Mr. Pontzius had described, the Bowens decided to travel to Antigua. The Bowens understood that the worst case scenario was that Mr. Bowen would experience some additional swelling or tumor lysis syndrome, which they had been assured the Quadrant Clinical Care team would catch and treat. The Bowens planned to travel as a family, with their three children, to Antigua for filtration treatment beginning on April 8.

136.    But just before leaving for Antigua, Mr. Bowen needed a transfusion of two units of blood due to his chemotherapy regimen. Ms. Bowen reached out to Dr. Quasha via email to ask whether this would impact the treatment, and Dr. Quasha told her that it would not

1    be a problem.

2              137.    When the Bowens arrived at the clinic in Antigua, the only physician they

3    met was Dr. John, and he was leaving the next day to attend a conference in Miami, though he did

4    not disclose that to the Bowens. To the Bowens' knowledge at the time, no other physician was

5    present at the clinic.

6              138.    On April 8, Dr. John installed a catheter into Mr. Bowen's groin, which he

7    recommended instead of at the collarbone based on Mr. Bowen's existing ports. Dr. John

8    reassured the Bowens that this was a simple, easy procedure, that he had not encountered any

9    issues in performing the procedure, and anesthesia would not be needed. Mr. Bowen was in a

10   significant amount of pain during the procedure. Mr. Bowen then received his first filtration.

11             139.    That night, Mr. Bowen was extremely tired and his catheter insertion spot

12   began oozing a significant amount of blood. Ms. Bowen was alarmed. She contacted Ms.

13   Hudlow, a former nurse, who was also currently in Antigua for Mr. Hudlow's second round of

14   filtration. Ms. Hudlow was able to help bandage the site. Mr. Bowen was also in a significant

15   amount of pain and had to take more pain medication than he had ever before in his years of

16   cancer treatment.

17             140.    The next day, the Bowens returned to the clinic to have Mr. Bowen's

18   bandages changed. The nurses changed the bandages, but Ms. Bowen noticed that there was no

19   physician present and soon learned that Dr. John had left for Miami.

20             141.    At this point, there was no physician in the clinic, though there were

21   several very ill individuals in the clinic: Mr. Hudlow, who would leave on April 9 via an

22   emergency charter flight, Mr. Withey, who had just undergone his first filtration, and Mr. Bowen.

23             142.    The second filtration occurred on April 10. Mr. Bowen was again

24   extremely tired following filtration.

25             143.    On the day of the third filtration, April 12, unlike during the first two

26   treatments, no nurse drew Mr. Bowen's blood to establish a baseline. Ms. Bowen had been asking

27   for the first two days' results and did not receive them until this third treatment day. When Ms.

28   Bowen saw the blood test results from the first two days, she realized—based on her years

1  learning about her husband's care—that Mr. Bowen's uric acid had been high on both of the first

2  two filtration days. Nevertheless, the team proceeded with the third filtration.

3      144.    During his third filtration, Mr. Bowen's filter clogged and had to be

4  replaced, likely resulting in additional blood loss. Mr. Bowen began vomiting and felt very warm

5  to the touch. His blood pressure began dropping.

6      145.    There was still no physician assigned to oversee the clinic, and the nurse

7  attempting to treat Mr. Bowen was panicked. Ms. Bowen called Dr. John, who did not answer his

8  phone. She then called Mr. Pontzius, who also did not answer, and she ended up speaking to his

9  wife, who informed her that Mr. Pontzius was on a flight to Asia.

10     146.    At this point, the nurses attempted to remove Mr. Bowen's catheter, which

11  caused a significant additional bleed. The nurses then called in an emergency physician, whom

12  Ms. Bowen had never met before. The emergency physician treated Mr. Bowen with additional

13  intravenous fluids for his blood pressure, but because Mr. Bowen already had fluid in his stomach

14  and throughout his body, this caused additional pain and swelling. Mr. Bowen was given a blood

15  transfusion. Mr. Bowen eventually became stable and was kept overnight in the clinic's

16  misleadingly termed "ICU" (described, *supra*, at Paragraph 91) for further monitoring.

17     147.    The next day, April 13, with Mr. Bowen significantly weakened, the

18  Bowen family prepared to fly back home to Illinois the next morning. Around 9 p.m., Dr. John

19  finally called Ms. Bowen and told her that Mr. Bowen's platelet count was low after the third

20  filter and that he thought Mr. Bowen might have heparin-induced thrombocytopenia (HIT). When

21  Ms. Bowen told Dr. John that she was surprised to be receiving this information at this late time

22  given that Mr. Bowen had been in the "ICU" the full night before, Dr. John's story shifted. He

23  said Mr. Bowen probably did not have HIT, but that they should give him a blood thinner out of

24  an abundance of caution.

25     148.    Ms. Bowen asked Dr. John if he could get them a blood thinner that night,

26  and he said he was not sure how. Dr. John's story shifted again. He told Ms. Bowen around 10:15

27  p.m. that he believed Mr. Bowen was safe to travel home without the blood thinner.

28     149.    On April 14, the Bowens flew home. Mr. Bowen was vomiting, in pain,

and lethargic throughout the flight. Ms. Bowen became scared that Mr. Bowen would not survive the trip. After landing that evening, the Bowens went to a hospital emergency department early the next morning. Mr. Bowen was immediately admitted. Ms. Bowen would later learn that the medical staff had called Mr. Bowen's oncologist and informed her that they did not expect Mr. Bowen to live more than 48 hours.

150.    Mr. Bowen's labs demonstrated a number of potential causes for his sudden decline: his uric acid levels were again extremely high, he had a blood clot in his iliac vein (where the catheter for filtration had been inserted) that was likely aggravated by the travel, and he might have tumor lysis syndrome. The medical team informed Ms. Bowen that blood clots are a common adverse effect of the type of catheter Dr. John placed in Mr. Bowen in Antigua.

151.    None of these issues had been caught in the Antigua clinic, where there was no physician oversight during the week Mr. Bowen was receiving ONCObind.

152.    The medical team was able to stabilize Mr. Bowen somewhat but could not manage Mr. Bowen's pain. The team moved him to hospice, but while in hospice, on April 20, Mr. Bowen began to bleed profusely. Ms. Bowen observed her husband yelping in tremendous pain. Mr. Bowen (pictured below on April 22, 2024) was also bleeding so intensely that hospice staff had to remove him from the blood thinners he had received for his clot.



3183891

153.    On April 24, Mr. Bowen passed away, ten days after leaving Antigua. Mr. Bowen's medical team advised Ms. Bowen that they did not believe that his cancer would have caused such a rapid decline had he not received ONCObind.

**E.    Kyle Chupp (deceased victim) & Vanessa Chupp (spouse)**



154.    Plaintiff Kyle Chupp (pictured, above center, with his wife Vanessa Chupp and his three children in January 2024) was diagnosed with Stage IV liposarcoma on December 29, 2023. By the time of diagnosis, his cancer had already spread to his lungs, bones, liver, and lymph nodes.

155.    Mr. Chupp's oncologist informed Mr. Chupp and his wife, Vanessa Chupp, that in six months, after the first rounds of chemotherapy, she would be better able to establish how long Mr. Chupp could expect to survive.

156.    Because Mr. Chupp's primary tumor was on his left hip, it caused increased swelling and pain throughout Mr. Chupp's groin and leg. His oncologist therefore recommended beginning with an early round of radiation to shrink the tumor. His radiation was scheduled to begin on January 5, 2024.

157.    But on January 3, the Chupps received a message from a friend indicating that a physician in Florida, Dr. Eduardo Maristany, had connections to a medical team providing an innovative therapy that could benefit Mr. Chupp. On information and belief, Dr. Maristany was a Quadrant Clinical Care employee or business partner. The Chupps were soon put in touch with John Preston and Dr. Chad Prodromos, who operates the Prodromos Stem Cell Institute in Illinois and, per his website, maintains a practice location at the the Quadrant Clinical Care Antigua clinic. On information and belief, Dr. Prodromos, like Dr. Maristany, was a Quadrant Clinical Care employee or business partner.

158.    The Chupps soon had a call with Mr. Preston and Dr. Prodromos in which they promoted the ExThera Seraph 100 filters and the ONCObind procedure. Mr. Preston explained that patients would soon be treated with ONCObind in Antigua. Mr. Preston and Dr. Prodromos shared videos about the Seraph 100 filters' use on military patients with sepsis and claimed that ExThera had since begun using the filters to treat cancer.

159.    Mr. Preston and Dr. Prodromos explained that the treatment had already been tested on eight patients in September 2023 with Stage IV terminal cancers. They claimed that two of the patients were now completely free of cancer, and six had greatly reduced tumor sizes. Mr. Preston and Dr. Prodromos said that, following the first treatment, many of the patients experienced reduced pain and increased energy. There is no reason to believe any of these statements are true.

160.    Mr. Preston and Dr. Prodromos said the next set of patients would receive ONCObind in Antigua beginning on January 10, 2024, and that they could find room for Mr. Chupp to join.

161.    The Chupps mentioned that Mr. Chupp was scheduled to start radiation and chemotherapy shortly.

162.    Mr. Preston and Dr. Prodromos advised the Chupps _not_ to begin chemotherapy or radiation, as the two patients who fared the best in the Croatian trial and were now cancer free were the only two who had not had any radiation or chemotherapy treatment. Mr. Preston and Dr. Prodromos claimed—without a basis—that this was because the treatment improved the immune system's ability to attack the primary tumor, and traditional cancer treatments hindered the body's ability to do so.

163.    Relying on these representations, the Chupps agreed to participate. The Chupps spent the following days lining up travel from their home in Ontario, Canada to Antigua and arranging to pay the $45,000 required.

164.    But, on January 9, the Chupps received a voicemail from Dr. Prodromos informing them that Mr. Chupp's treatment would be delayed for two weeks and that the Chupps should not yet travel to Antigua. Dr. Prodromos again advised Mr. Chupp not to begin any chemotherapy or radiation. The Chupps were also told that Mr. Chupp should not receive any chemotherapy or radiation for a month following ONCObind.

165.    In the days and weeks subsequent to this advice, Mr. Chupp's left leg and groin continued to swell, and his right leg began to swell as well.

166.    Finally, on January 25, Tom Pontzius, emailed the Chupps informing them that the treatment would begin on February 19. The Chupps had not heard from Mr. Pontzius before. His email signature described him as the President of Quadrant Clinical Care Antigua. Eager to find relief for Mr. Chupps cancer, the Chupps held off on receiving chemotherapy or radiation and again prepared to travel to Antigua.

167.    But, on February 7, Mr. Chupp's pain was so significant that Ms. Chupp rushed him to the emergency department of Mount Sinai Hospital in Toronto, Canada. Mr. Chupp was admitted to the hospital, where the medical staff attempted to manage Mr. Chupp's pain and wounds resulting from his skin breaking down due to the significant swelling in Mr. Chupp's legs.

168.    While waiting for her husband to be admitted to the hospital, Ms. Chupp had tried to contact Quadrant Clinical Care. Unable to reach anyone, Ms. Chupp reached out to

the friend who had first connected them to Dr. Maristany. Ms. Chupp learned from Dr. Maristany that the delays were due to a lack of equipment and staff on site in Antigua needed to install a tunneled catheter necessary for the ONCObind filtration. Ms. Chupp then arranged to have the catheter inserted by Dr. Maristany for $8,000 on February 16 in Florida.

169.    On February 17, the Chupps flew to Antigua. They were then told that the first filtration would occur on February 21, rather than on February 19, as Mr. Pontzius had advised them weeks earlier. Those days before the February 21 filtration would be Mr. Chupp's last few days of mobility.

170.    On February 21, Mr. Chupp underwent the first filtration. Upon arrival at the clinic, Ms. Chupp was shocked by the clinic's condition. The Chupps met Mr. Pontzius and two individuals who had been hired by Quadrant Clinical Care to interview patients about their experience for a future Quadrant Clinical Care marketing video. Mr. Pontzius showed Ms. Chupp a brochure containing photo renderings of a much-improved clinic he said Quadrant Clinical Care was building.

171.    Following the filtration, Mr. Chupp was in significant pain and extremely fatigued. The next day, February 22, Mr. Chupp began hallucinating conversations and remained in extreme pain. Ms. Chupp reached out to Dr. Maristany, who told Ms. Chupp that he would speak with the clinic's day-to-day medical director, Dr. Joseph "Joey" John, but that these were likely merely side effects of opioids the medical team in Canada had prescribed Mr. Chupp weeks ago.

172.    On February 23, the Chupps arrived at the clinic for Mr. Chupp's second filtration. Mr. Chupp was extremely nauseated and began throwing up, at which point he had his blood drawn. It appeared that Mr. Chupp had low blood pressure, but he soon recovered, at which point, the team moved forward with the filtration.

173.    As Mr. Chupp finished his second filtration, Dr. John informed the Chupps that bloodwork indicated that Mr. Chupp's kidneys were failing and his uric acid was extremely high. Mr. Chupp was told he would have to stay overnight in the clinic. The clinic staff cleared out a closet for Mr. Chupp to stay in, where he was not connected to monitoring equipment. Ms.

Chupp was told she would not be able to stay with her husband. Ms. Chupp refused to leave. Quadrant Clinical Care staff ultimately allowed her to stay overnight. Ms. Chupp contacted Dr. Maristany, who insisted that continued filtration would lessen Mr. Chupp's kidney disease.

174.    On February 24, Mr. Chupp's bloodwork improved enough that the Chupps were allowed to return to the hotel.

175.    On February 25, Mr. Chupp underwent his third filtration. Mr. Chupp is pictured, below, during that filtration.



176.    By February 26, Mr. Chupp was in even more pain than before. Because Mr. Chupp had been in so much pain, the Chupps were running low on the opioid medication Mr. Chupp needed. When Ms. Chupp asked Dr. John (in person) and Dr. Maristany (by phone), for additional pain medication, they repeatedly said they would not give Mr. Chupp more medication

3183891

1  and that he could instead take 10 milligrams of morphine, which was significantly less than the

2  equivalent hydromorphone he had been prescribed by his medical team in Canada. Mr. Chupp

3  was then likely to enter opioid withdrawal. Dr. Maristany claimed that the pain could be the result

4  of the filtration working so well that Mr. Chupp's immune system was causing inflammation

5  because it was so successfully attacking his tumor. There is no reason to believe this claim was

6  true.

7           177.    On February 27, the Chupps were supposed to fly home to Canada.

8  However, Ms. Chupp was now nearly completely out of pain medication. From their hotel, Ms.

9  Chupp again contacted Dr. John and Dr. Maristany, at which point they informed her that the

10 clinic did not have any quantity of hydromorphone, which Mr. Chupp had been prescribed. Ms.

11 Chupp then contacted Mr. Chupp's medical team in Canada and received instructions for the

12 proper dose of morphine. A Quadrant Clinical Care nurse agreed to send the medication sent to

13 the hotel. Instead, the clinic sent a total of 30 milligrams of morphine to the hotel, to be given 10

14 milligrams at a time. This was an insufficient dose for a cancer patient on opioid therapy.

15          178.    Mr. Chupp was screaming in pain from the open wounds on his legs, which

16 had burst from the swelling and the tumor. Despite Ms. Chupp's pleas to him, Dr. John still

17 refused to provide any additional medication. Ms. Chupp then begged Dr. Maristany to tell Dr.

18 John to prescribe sufficient medication, so that the Chupps could leave the island. Dr. John finally

19 agreed and prescribed the medication the Chupps needed.

20          179.    On February 28, the Chupps arrived back in Canada.

21          180.    On February 29, the Chupps' family physician ordered bloodwork on Mr.

22 Chupp. Mr. Chupp still seemed very lethargic and was extremely confused.

23          181.    On March 1, Mr. Chupp's bloodwork came back showing that Mr. Chupp's

24 kidneys were failing. Mr. Chupp was admitted to the hospital, where he remained until March 23.

25          182.    Dr. Maristany repeatedly told Ms. Chupp that Mr. Chupp was undergoing

26 tumor lysis syndrome, and that another patient was currently experiencing the same issue. Dr.

27 Maristany blamed this on the large size of Mr. Chupp's tumor, but stated that this was a good

28 result and demonstrated how hard Mr. Chupp's body was attacking the tumor.

1    183.    Dr. Maristany also sent Ms. Chupp several emails attempting to convince

2    her to bring her husband to the United States where he believed he could find someone to

3    administer ONCObind.

4    184.    Mr. Chupp's treating physicians in Canada disagreed and advised that the

5    kidney failure was likely caused by filtrations. The physicians asked to perform a CT scan, but

6    Dr. Maristany insisted to Ms. Chupp that Mr. Chupp needed to wait four to six weeks after

7    ONCObind filtration before receiving a CT scan. Ms. Chupp decided not to follow Dr.

8    Maristany's advice. A CT scan was performed, and it showed that Mr. Chupp's tumor had grown

9    substantially. Dr. Maristany told her that this was why he did not want a CT scan to be

10   performed; he claimed the CT showed inflammation from the immune system attacking the

11   tumor, not tumor growth. (Mr. Chupp's treating physicians did not agree.)

12   185.    On April 1, after a brief few days at home, Mr. Chupp was readmitted to

13   the hospital until April 4.

14   186.    On April 5, Mr. Chupp returned home and his condition continued to

15   decline. He was unable to hold down food or water and required intravenous fluids and constant

16   monitoring.

17   187.    Dr. Maristany began encouraging Ms. Chupp to return to Antigua with Mr.

18   Chupp for additional filtering, telling her that this was the only way to help him. Ms. Chupp

19   quickly began arranging for urgent travel to Antigua.

20   188.    Dr. John then called Ms. Chupp and said that they would not be able to

21   administer further filtrations after all as Dr. John was planning to be away, and other physicians

22   would not cover for him given Mr. Chupp's condition.

23   189.    Mr. Chupp returned to the hospital on April 15, where he received a CT

24   scan, showing significant tumor growth. Mr. Chupp was advised he would likely die very soon.

25   Ms. Chupp, on the advice of Mr. Chupp's physicians, transferred Mr. Chupp to hospice.

26   190.    On April 17, hospice staff sedated Mr. Chupp. Mr. Chupp never woke up

27   again. Shortly after midnight, on April 18, Ms. Chupp saw an email from Dr. Maristany telling

28   her that Mr. Chupp's tumor had not actually grown very much and he could still be saved if Mr.

1  Chupp's kidneys were stabilized and he underwent further ONCObind filtration. Dr. Maristany

2  convinced Ms. Chupp to search for a nephrologist to administer the ONCObind filtration in

3  Canada. Dr. Maristany and Dr. Ilic insisted that this would be possible under a special exemption

4  for patients without other options, and Dr. Ilic sent Dr. Maristany paperwork to provide to Ms.

5  Chupp. Ms. Chupp spent hours—on what would be the second-to-last day of her husband's life—

6  trying to find a Canadian physician who would administer ONCObind. Mr. Pontzius also called

7  Ms. Chupp to describe all of the efforts Quadrant Clinical Care was making to coordinate a last-

8  minute filtration for Mr. Chupp.

9        191.    Later that day, April 18, Mr. Chupp remained in hospice. By this time, Ms.

10 Chupp had begun ignoring what amounted to harassing messages from Dr. Maristany because her

11 family physician, who Dr. Maristany and Dr. Ilic needed to include on the paperwork requesting

12 approval for an emergency filtration, had called Ms Chupp personally and told her these efforts

13 were unreasonable given Mr. Chupp's condition. Dr. Maristany then called Mr. Chupp's father

14 and told him that the medical team in Canada had not been honest, and all Mr. Chupp needed was

15 another filtration because the tumor was growing more slowly than it had been before, showing

16 that the treatment was working. Mr. Chupp's father, who had been convinced that Ms. Chupp

17 was, in essence, killing her husband his son, by denying him treatment, came to confront Ms.

18 Chupp and attempt to convince her to change her decision. Ultimately, Ms. Chupp kept Mr.

19 Chupp in hospice as he had expressed that was what he wanted while still conscious.

20       192.    The next day, April 19, in the early morning, Mr. Chupp passed away in

21 hospice.

22       **F.     Ricardo Salgado (participant) & Carla Vass-Salgado (spouse)**

23       193.    Plaintiff Ricardo Salgado and his wife, Plaintiff Carla Vass-Salgado (for

24 ease of reference, collectively, "the Salgados") received the news that Mr. Salgado's lung cancer,

25 which had been in remission for nearly two years, had recurred in late February 2023. His

26 cancer's recurrence included two brain metastases, a mass in his upper left lung, and evidence of

27 cancer on two lymph nodes near that mass.

28       194.    Since diagnosis, Mr. Salgado and Ms. Vass-Salgado had explored both

1   standard-of-care and integrative treatment for Mr. Salgado's cancer. The Salgados temporarily

2   relocated from Miami, Florida to Houston, Texas by the end of March 2023 in order to pursue

3   aggressive treatment with a specialty physician that included immunotherapy, three different

4   kinds of chemotherapy, and other targeted therapy.

5       195.    Mr. Salgado's disease responded to that treatment and was undetectable by

6   August 2023. The Salgados returned to Miami, and Mr. Salgado followed a maintenance routine,

7   including a targeted therapy, immunotherapy, and chemotherapy monthly or every other month.

8       196.    The Salgados monitored Mr. Salgado's Signatera tests (described, *supra*, at

9   Paragraph 82) for any evidence of cancer DNA.

10      197.    In December 2023 and January 2024, Mr. Salgado's Signatera numbers

11  began to creep up, suggesting that there was again cancer DNA within Mr. Salgado's blood.

12  Though other tests were still showing no evidence of disease, the Salgados were concerned cancer

13  would return shortly.

14      198.    The Salgados then consulted with Dr. Mark Rosenberg, who had

15  previously advised on Mr. Salgado's case. Mr. Rosenberg informed them of a novel treatment

16  being administered in Antigua, and connected them to John Preston to hear more.

17      199.    On the first call with Mr. Preston, the Salgados were impressed. Mr.

18  Preston explained his background in physics and his 30 years at MIT, mentioned Dr. Devon

19  Quasha, whom he descried as working at Massachusetts General Hospital (where Ricardo had

20  been treated), and explained the apparent science of ONCObind.

21      200.    Mr. Preston told the Salgados about the Croatian trial, described above, and

22  claimed that there were 12 to 16 people who had undergone ONCObind and all of them had

23  gotten better. That claim was categorically false.

24      201.    The Salgados asked how they would know if the treatment was working for

25  Mr. Salgado, given that he was currently showing no evidence of disease, and asked if there were

26  any risk to undergoing the procedure.

27      202.    Mr. Preston assured them that there was no risk to the procedure and that it

28  was completely safe. He explained that the filter had been used on COVID-19 patients without

adverse effects. Mr. Preston also assured them that Mr. Salgado would be able to know the treatment worked based on comparing results before and after filtration from MainTrac, a test provided by a German lab that the ExThera and Quadrant team recommended to test circulating tumor cell levels.

203.    Based on these misrepresentations, the Salgados decided that Mr. Salgado would try the ONCObind procedure.

204.    Mr. Preston put them in touch with Tom Pontzius, who accepted their required $45,000 payment and helped coordinate their stay.

205.    On February 28, 2024, the Salgados arrived at the Antigua clinic for Mr. Salgado's first filtration treatment. A catheter needed to be placed. Quadrant Clinical Care's day-to-day medical director, Dr. Joseph "Joey" John, emphasized that placing a main line catheter was not a serious procedure, but, in fact, it was extremely painful.

206.    That same day, the Salgados met Dr. Devon Quasha and Mr. Pontzius.

207.    Mr. Salgado's filtration went relatively smoothly. Afterward, Mr. Salgado was tired, but not in significant pain. Ms. Vass-Salgado asked whether Quadrant Clinical Care staff needed to draw Mr. Salgado's blood to send to Germany for the MainTrac test (*i.e.*, to determine his pre-treatment circulating tumor cell counts). The nurse assured them that she had put the filters in the freezer and would send them to Germany.

208.    Later the Salgados would learn that the German lab was unable to use blood remaining in filters to perform the tests. Another expert on circulating tumor cells would tell them that to run a circulating tumor cell test, the blood must go from the patient to a lab within one hour.

209.    Mr. Salgado's next two filtrations also went smoothly. The Salgados then returned to Miami to await the MainTrac test results, so they could learn whether the treatment had been successful.

210.    The Salgados waited and then learned around March 28, after over a week of unanswered emails, that the MainTrac tests had not been performed because the German lab could not work with blood collected from filters. Around April 12, Ms. Vass-Salgado requested a

refund of the $45,000 paid for ONCObind. Mr. Pontzius told her he would investigate but did not

get back to her. Ms. Vass-Salgado also had a call with Dr. Quasha regarding this request. Dr.

Quasha did not commit to refunding the Salgados on the call, instead repeatedly stating that the

procedure was completely safe.

211.    That spring, Mr. Salgado's routine Signatera tests started to show

increasing cancer DNA. Concerned, the Salgados reached out to Quadrant Clinical Care, which

told them that this was possible given that the Signatera test would track dead, as well as living,

cancer DNA. Unfortunately, by July, Mr. Salgado's cancer had grown enough to be visible in

scans. ONCObind had not lived up to its promise and had exacerbated Mr. Salgado's cancer.

212.    In late summer 2024, Ms. Vass-Salgado contacted Mr. Pontzius, Dr.

Quasha, and Dr. John and asked again for a refund, noting that Mr. Salgado's cancer had returned

and that they had begun to believe the procedure was actively harmful.

213.    Mr. Pontzius responded by calling Ms. Vass-Salgado's "threats and

demands" "unfounded defamatory statements" that were "inappropriate" and offered the Salgados

a $15,000 discount off an additional treatment series. The Salgados did not accept the offer.

214.    Mr. Salgado remains in treatment for the cancer recurrence that began

shortly following the filtration procedure. The threat from Mr. Salgado's cancer is significantly

greater than it was before receiving ONCObind.

**G.    Ingrid Peri (participant) & Ron Peri (spouse)**

215.    Plaintiff Ingrid Peri and her husband, Plaintiff Ron Peri, had been living

with Ms. Peri's colon cancer for nearly five years when they first learned about the ONCObind

blood filtration procedure.

216.    Ms. Peri's cancer had originally been diagnosed as Stage IIIB, but had

metastasized to Ms. Peri's lung and brain in 2021. After surgery, chemotherapy, and radiation,

Ms. Peri's brain tumor had been eliminated and her only remaining tumor, the tumor in her lung,

was well managed. In fact, by the end of 2023, her treating physicians considered her cancer

burden to be relatively low.

217.    But when Ms. Peri's physician connected the Peris with John Preston in

1    early 2024 to learn more about the ONCObind procedure, they were curious about how the new

2    procedure could potentially help Ms. Peri.

3         218.    Mr. Preston described the treatment as like dialysis with a different filter.

4    He explained that the Seraph 100 filter had been used to treat thousands of patients with sepsis, it

5    was proving very effective at treating COVID-19, and it was being tested for chronic Lyme

6    disease. He explained that the filter "worked even better with cancer." Mr. Preston did not

7    disclose any risks of the procedure.

8         219.    The Peris were interested. Mr. Preston connected them with Tom Pontzius,

9    who expressed enthusiasm about ONCObind and helped the Peris plan logistics to go to Antigua.

10   Mr. Pontzius informed the Peris that Quadrant Clinical Care had postponed a session in order to

11   upgrade some equipment but that Ms. Peri could go to Antigua for filtration in early March 2024.

12        220.    When the Peris arrived at the clinic, they observed sanitation issues, such

13   as poor handwashing/glove-changing requirements and that there did not appear to be a physician

14   actively overseeing the procedure. The Peris met Dr. Devon Quasha and Tom Pontzius in passing

15   in the foyer of the clinic, as the two were leaving the island.

16        221.    Ms. Peri received three rounds of ONCObind filtration on March 1, 3, and

17   5. The first filtration procedure took several extra hours because Ms. Peri's filters repeatedly

18   clogged, and the Peris were at the clinic until late at night. The second filtration procedure also

19   took several extra hours because of clogged filters.

20        222.    After the third filtration procedure, Dr. Joseph "Joey" John removed Ms.

21   Peri's central venous catheter by tugging it repeatedly his hands, causing Ms. Peri tremendous

22   pain.

23        223.    The Peris never received any test results or information about whether the

24   procedure had been successful. Instead, like the other participants, the Peris were told that there

25   had been a shipment issue that prevented the blood tests from being run.

26        224.    The Peris returned to Florida after the filtrations. For a couple of weeks,

27   Ms. Peri's condition seemed to have improved. But when the Peris received the results from Ms.

28   Peri's routine blood tests, the trend was negative. Within a week of returning, Ms. Peri's cancer

- 45 -

biomarkers had increased multiple times over the levels approximately two weeks before the journey to Antigua. By early May, those biomarkers more than doubled again.

225.    When Mr. Peri reached out to Mr. Preston about the increased cancer biomarkers, Mr. Preston told Mr. Peri that this was normal and merely showed that the procedure had worked: the increased numbers were representative of cancer die off and showed that Ms. Peri's immune system was working to destroy her tumors.

226.    These reassurances kept Ms. Peri from rushing to undergo chemotherapy, which the Peris had been told would interfere with the success of the filtration procedure.

227.    Mr. Peri reached back out to Mr. Preston after the numbers continued to increase, and he connected the Peris with Dr. Quasha. Dr. Quasha told the Peris, for the first time, that the procedure was experimental so results could not be guaranteed, that cancer numbers normally went up and down, and that it only demonstrated that Ms. Peri needed another filtration.

228.    But shortly after these conversations, Ms. Peri had a PET scan, which revealed that Ms. Peri's cancer had become hyperactive and was more resistant to chemotherapy than it had been before.

229.    Because of the ONCObind procedure, Ms. Peri had to restart chemotherapy from scratch against a cancer that had spread significantly. She now has three tumors in addition to the lung tumor that she had before the ONCObind procedure (an additional lung tumor and two small tumors in her brain). Ms. Peri's prognosis now is much worse than had she never undergone ONCObind.

## CIVIL CONSPIRACY ALLEGATIONS

230.    All Defendants engaged in a civil conspiracy and are liable for any of the torts committed by other Defendants. Therefore, all torts are alleged against all Defendants.

231.    All Defendants knew that ONCObind had not cured individuals of cancer in a Croatian trial conducted in fall 2023 or had no reason to believe that claims about this trial's success were true. Nevertheless, in December 2023, ExThera partnered with Alan Quasha and his investment firm, Quadrant Management, to establish a clinic in Antigua, outside the reach of U.S. regulators, to provide ONCObind to the lucrative cancer market and serve as a launch pad for a

3183891

1    chain of clinics. In particular, John Preston, then both a member of ExThera's Board of Directors
2    and an investment team member at Quadrant Management, served as a conduit between Mr.
3    Quasha, Quadrant Management, and ExThera. To advance the operation, these Defendants
4    established Quadrant Clinical Care and recruited Mr. Quasha's daughter, Dr. Devon Quasha, to
5    serve as the Medical Director. These Defendants also selected Quadrant Management investment
6    team member Tom Pontzius to be Quadrant Clinical Care's president and promote ONCObind to
7    potential participants. Mr. Preston, Dr. Quasha, Dr. Sanja Ilic (ExThera's former Chief
8    Regulatory Officer and Vice President for Clinical, Regulatory, and Medical Affairs), and Mr.
9    Pontzius then misrepresented the results of the Croatian trial to Plaintiffs—claiming it had shown
10   that ONBObind could cure cancer—in an effect to recruit participants to travel to Antigua to
11   undergo ONCObind. Defendants also misrepresented the facilities and level of medical
12   supervision available in Antigua despite their first-hand observation of the clinic's condition.
13   Defendants also consistently lied to Plaintiffs in advising them that any adverse effects of
14   ONCObind were actually proof that the procedure was effective and that further filtration were
15   necessary.

16          232.    Defendants falsely claimed that Dr. Quasha would develop individual
17   treatment protocols for Plaintiff participants, and Dr. Quasha interfaced with Plaintiffs, whether
18   by email or in-person in Antigua, in an effort to mislead Plaintiffs into believing they were
19   receiving individual case from an esteemed physician.

20          233.    In reality, all Defendants knew they were actually recruiting individuals for
21   what amounted to human experimentation, and no Defendant disclosed as much to any Plaintiff.

22          234.    As a result of the civil conspiracy, all Plaintiffs were harmed in the ways
23   detailed above and below.

24
25
26
27
28

3183891

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**FRAUD**

235.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

236.    As alleged herein, Defendants engaged in both affirmative misrepresentations about the clinical promise of ONCObind and material omissions of fact about the risks of ONCObind.

237.    Defendants knew the potential to cure cancer via blood filtration was extremely speculative. All Defendants knew that ONCObind had not cured patients of cancer in a Croatian trial conducted in fall 2023 or had no reason to believe that claims about this trial's success were true. All Defendants, either individually or through their agents, possessed a high level of scientific expertise. All Defendants knew that before they could reasonably make any claims about ONCObind's efficacy, the procedure needed to be tested on a larger group of individuals, and those individuals' outcomes needed to be observed over a significant length of time. In other words, any conclusion of efficacy could not be drawn by early 2024 when Defendants marketed ONCObind to Plaintiffs.

238.    To advance the goal of commercializing ONCObind before regulatory approval for testing could be obtained in the United States, Defendants established a clinic in Antigua. Defendants then lied to Plaintiffs to secure their participation in what amounted to unregistered, unmonitored human experimentation at a cost of $45,000 per filtration series. Defendants made the following false statements, among others, which are shown alongside reality.

| | *Defendants' Claim* | *Reality* |
|---|---|---|
| i. *Croatian study* | The ONCObind procedure reduced primary tumor size by a minimum of 49% in a recent trial and, in multiple participants, rendered their cancers undetectable. In other words, ONCObind offered a cure for cancer. | No data has been published corroborating that the Croatian study reduced participants' primary tumor sizes or rendered cancer undetectable. |

- 48 -

| | Defendants' Claim | Reality |
|---|---|---|
| ii. *Immune booster* | By filtering the blood, ONCObind supercharges the immune system, harnessing it to attack primary tumors themselves. | There is no evidence that ONCObind supercharges the immune system and allows the body to attack primary tumors themselves. |
| iii. *Stops cancer growth and reduces pain* | At a minimum, ONCObind will prevent further metastases and reduce pain. | Defendants did not have long-term data that would allow them to determine that ONCObind could prevent further metastases or substantially reduce pain, and, in fact, Plaintiffs' experiences were the opposite. |
| iv. *No risk* | With the exception of tumor lysis syndrome (the potential effects of which Defendants minimized), there are no serious risks to the ONCObind procedure. | Plaintiffs' experiences (*e.g.*, losing one-third of one's blood supply and in multiple cases dying shortly after the ONCObind procedure) illustrate that ONCObind was not risk free. |
| v. *Stop standard-of-care treatments* | The only obstacle to success is continued chemotherapy or radiation treatment and therefore patients should stop such treatment before receiving ONCObind and for some time afterwards. | There is no evidence that discontinuing or refraining from undergoing chemotherapy or radiation was advisable. |
| vi. *Individualized therapy* | Dr. Devon Quasha would provide individualized treatment regimens. | Defendants planned identical filtration regimens for all patients. |
| vii. *High-quality facility* | The Antigua clinic was fully equipped to treat individuals suffering from late-stage cancer, both in terms of facilities and medical personnel. | The Antigua clinic was not equipped to treat individuals suffering from late-stage cancer—no oncologist was on staff (nor even was a physician present at all for long stretches of time); the clinic had only two sinks, no available hospital beds, no CT scanner, limited pain medication, and poor hygiene/sanitation practices. |
| viii. *U.S. Clinical Trials* | Clinical trials of ONCObind will begin in the United States soon, and individuals who receive ONCObind in Antigua will able to enroll in these U.S.-based trials and receive no-cost filtrations going forward. | The U.S.-based "trials" participants were promised they could join after receiving ONCObind in Antigua was actually was a single trial for a particular type of pancreatic cancer that no Plaintiff participant had and appears to have only enrolled five participants. |
| ix. *More filtrations needed* | Any negative test results or adverse events are proof that ONCObind is working and that | Contrary to Defendants' claims, Plaintiff participants' negative test results and adverse events were |

- 49 -

| | Defendants' Claim | Reality |
|---|---|---|
| | further filtrations are needed. | confirmation that ONCObind was harming them, in some cases leading to death. |

239. Defendants also failed to disclose the true risks of ONCObind, including that the filtration treatment could increase their pain, lead to significant blood loss, and actually accelerate their cancers. Further, Defendants failed to advise Plaintiffs that, in January 2024, ExThera's then-Medical Director, Dr. Chow, had warned ExThera executives that the Antigua clinic was operating an unethical and unsafe human medical experiment.

240. Defendants expected Plaintiffs, who were late-stage cancer patients or their spouses in desperate search of effective therapies, to rely on their false promises and their failures to disclose ONCObind's risks.

241. Plaintiffs indeed relied on Defendants' misrepresentations and omissions, paying $45,000 per round of ONCObind and traveling to Quadrant Clinical Care's clinic in Antigua to receive ONCObind, an entirely unproven procedure. Plaintiffs discontinued or did not begin chemotherapy and radiation in reliance on Defendants' misrepresentations and omissions.

242. Plaintiffs were justified in their reliance for multiple reasons. Defendants had disclosed groundbreaking results of what Plaintiffs had no reason to believe was not an authentic clinical trial. Plaintiffs were, in fact, told that the results of the Croatian trial would be published soon. Defendants themselves marketed ONCObind through a lens of scientific expertise with highly credentialed individuals—e.g., Dr. Devon Quasha, a Harvard-trained physician practicing in the world-renowned Mass General Brigham medical system, and John Preston, an MIT physicist.

243. As a result of the fraud, all Plaintiffs were harmed. All lost money, and all lost much more. All Plaintiff participants suffered severe emotional distress and serious pain, whether from ONCObind itself or the failure of the Antigua clinic to provide appropriate palliative care. All Plaintiff spouses suffered severe emotional distress while tending to their suffering husbands and, in some cases, after their deaths. Contrary to Defendants' promises,

Plaintiff participants' cancers were actually accelerated. Some died painful deaths shortly after receiving ONCObind. One family struggled to find a means of returning to the United States from Antigua so that the Plaintiff participant could die at home. One Plaintiff spouse was told her husband simply needed further ONCObind filtration just as he was about to die after his return to Canada. For those who survived, they face greater risk from their cancers. For them, ONCObind will forever be a dark cloud hanging over their lives.

**SECOND CLAIM FOR RELIEF**
**NEGLIGENCE**

244.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

245.    At all times, Defendants had a duty of care not to engage in affirmative misconduct or cause foreseeable harm to Plaintiffs. In particular, Defendants owed a duty of care to Plaintiffs, which here meant not engaging in conduct that would put Plaintiff participants at risk of increased pain and accelerated cancer or would cause Plaintiff spouses emotional distress.

246.    Defendants breached their duty of care by recklessly encouraging Plaintiff participants to discontinue or fail to begin evidence-based chemotherapy and/or radiation treatment. Defendants also breached their duty of care by luring Plaintiffs to the island of Antigua with the false promise of future, no-cost access to medical trials within the United States; engaging in what amounted to an unregistered, unmonitored blood filtering experiment in Antigua; and failing to provide a clinical facility equipped for severely ill individuals. As alleged above, Defendants knew or should have known that the Croatian trial touted to Plaintiffs as evidence of ONCObind's promise had not tracked participants long enough to draw conclusions as to ONBObind's efficacy.

247.    As a proximate cause of Defendants' negligent or reckless acts, Plaintiffs suffered damages, including, but not limited to, economic and non-economic damages, including severe emotional distress.

3183891

1

2

### THIRD CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

3       248.    Plaintiffs incorporate the substantive allegations contained in all prior and

4  succeeding paragraphs as if fully set forth herein.

5       249.    Defendants engaged in extreme and outrageous conduct, including by

6  (i) misleading Plaintiffs into believing that ONCObind could cure or treat metastatic cancers; (ii)

7  misrepresenting that chemotherapy or radiation treatment would actually cause further harm to

8  Plaintiffs rather than treat Plaintiffs' cancer; (iii) luring Plaintiffs to a poorly equipped and often

9  unsupervised clinic in Antigua where Plaintiff participants underwent painful, dangerous, and

10  ineffective treatments under the guise of life-saving treatment; (iv) falsely assuring Plaintiffs that

11  ONCObind was working and traditional tests were merely failing to show the success of the

12  treatments; and (v) claiming that dying victims would improve rapidly if they were to pay

13  Defendants again and return for further filtration.

14       250.    Defendants undertook these actions intentionally and/or with reckless

15  disregard of the probability of causing severe and extreme emotional distress to Plaintiffs.

16       251.    Defendants' actions caused Plaintiffs to suffer extreme emotional distress.

17  Because of Defendants' actions, Plaintiffs were forced to either undergo or watch their loved ones

18  undergo painful and exhausting procedures with no demonstrated medical purpose, in some cases

19  accelerating Plaintiffs participants' disease progression and/or deaths.

20       252.    While emotional distress is common during cancer treatment, the severe

21  emotional distress Plaintiffs suffered as the result of Defendants' misconduct is of a different

22  nature. The emotional distress here stemmed not only from the disease's toll, but from the deceit

23  perpetuated by individuals who held themselves out as scientific experts offering a cutting-edge

24  cure for cancer that was in fact a dangerous medical experiment aimed at launching a commercial

25  enterprise. If not for Defendants' wrongful, extreme, and outrageous conduct, Plaintiffs would not

26  have suffered extreme and severe emotional distress of this nature.

27

28

3183891

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

253.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

254.    By and through their actions, Defendants ExThera Medical, Quadrant Clinical Care, and Dr. Devon Quasha acted as healthcare providers, under the direction of all members of the civil conspiracy describe above. As healthcare providers, these Defendants took on a duty of care to avoid emotional distress that may result from negligent care. This claim, however, is brought against all Defendants as members of a civil conspiracy.

255.    By establishing a substandard clinic in Antigua and offering medical care to individuals suffering from late-stage cancer with knowledge that such care would likely not be sufficient even to keep them medically stable, let alone out of severe emotional and physical distress, Defendants breached their duty of care to Plaintiff participants.

256.    By repeatedly administering ineffective and painful treatments to Plaintiff participants, which resulted in severe pain and suffering for some Plaintiffs during the treatment and for all Plaintiff participants afterward, Defendants breached their duty of care to Plaintiff participants and their Plaintiff spouses who cared for them. Spouses were forced to stand by and watch while their loved ones suffered throughout and/or following the ONCObind procedure; Plaintiff spouses thereby suffered severe and extreme emotional distress.

257.    Defendants' actions were the cause of both Plaintiff participants' and Plaintiff spouses' severe and extreme emotional distress, neither of which would have occurred but for Defendants' actions.

**FIFTH CLAIM FOR RELIEF**
**BATTERY**

258.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

259.    This claim is brought by Plaintiffs against all Defendants because, as described above, all engaged in a civil conspiracy, the purpose of which was to enroll Plaintiff

1  participants in what amounted to a medical experiment without their informed consent.

2  260.  Defendants' touching of Plaintiff participants—through use of

3  ONCObind—was extremely offensive because Defendants misrepresented what the medical

4  procedure was. Specifically, Defendants did not disclose that the procedure amounted to human

5  experimentation for which there was no clinical proof of efficacy, and, in fact, Defendants stated

6  just the opposite. No Plaintiff signed a consent form, and any verbal consent given was not—and

7  could not have been—*informed consent*. Therefore, use of the procedure constituted unwelcome

8  touching, which, here, caused severe injury.

9  261.  Defendants inserted large catheters into major veins and removed blood

10  from Plaintiff participants' bodies, all of which amounts to offensive touching in the context of

11  undisclosed human experimentation aimed at advancing a commercial enterprise.

12  262.  Defendants' contact with Plaintiffs was made with willful disregard of

13  Plaintiffs' rights to be free from such contact, given that Plaintiffs had been deprived of

14  information required to consent to such contact.

15  263.  Defendants' contact with Plaintiffs caused significant harm, including

16  physical and emotional pain; extreme side effects, including, but not limited to, vomiting,

17  lethargy, kidney failure, and blood loss; advancement of disease; and, in some cases, death.

18  **SIXTH CLAIM FOR RELIEF**
**PRODUCT LIABILITY (FAILURE TO WARN)**
19

20  264.  Plaintiffs incorporate the substantive allegations contained in all prior and

21  succeeding paragraphs as if fully set forth herein.

22  265.  ExThera Medical manufactures the Seraph 100 filters and developed the

23  ONCObind Extracorporeal Blood Filter Procedure using the Seraph 100 filters, which the

24  company markets on its website.

25  266.  In coordination with all other Defendants, Quadrant Clinical Care became a

26  distributor of Seraph 100 filters and provided them to its clinic in Antigua.

27  267.  Defendants knew or should have known of the risks that the Seraph 100

28  filters and their use in the ONCObind filtration procedure could be harmful when used in what

1  amounted to an experiment on individuals with late-stage cancer. In particular, Defendants knew

2  the procedure had not yet undergone rigorous clinical testing in cancer patients.

3      268.    The Seraph 100 filters as used in the ONCObind filtration procedure posed

4  substantial risks. For example, individuals could become ill with tumor lysis syndrome (about

5  which only one Plaintiff participant received a mild warning), develop heparin-induced

6  thrombocytopenia, or lose significant amounts of blood to clotted filters. Defendants also did not

7  have enough information to rule out the possibility that ONCObind could increase the speed of

8  tumor metastasis or lead to death.

9      269.    These risks were not obvious to ordinary consumers, who relied and trusted

10  both ExThera (a medical device manufacturer) and Quadrant Clinical Care (a medical device

11  distributor) to advise them of any risks.

12      270.    The Seraph 100 filters came with no warnings, and because manufacturer

13  ExThera Medical sold the Seraph 100 filters to Quadrant Clinical Care for distribution and use in

14  the ONCObind procedure by its own personnel in Antigua, rather than through independent

15  medical offices or physicians, Plaintiffs could not receive warnings through any other source.

16      271.    Had Plaintiffs received adequate warnings, Plaintiff participants would not

17  have undergone the ONCObind procedure. However, because they did undergo the procedure,

18  they experienced significant harm, including, but not limited to, severe emotional distress,

19  extreme pain, loss of blood, tumor lysis syndrome, kidney failure, rapid progression of cancer

20  metastasis, and, in three cases, death.

21  **SEVENTH CLAIM FOR RELIEF**
**WRONGFUL DEATH**

22

23      272.    Plaintiffs incorporate the substantive allegations contained in all prior and

24  succeeding paragraphs as if fully set forth herein.

25      273.    This claim is brought by Plaintiff spouses Kimberley Hudlow, Stacey

26  Bowen, and Vanessa Chupp and the Estates of David Hudlow, John Bowen, and Kyle Chupp.

27      274.    As alleged above, Defendants established a dangerous clinic in Antigua

28  where they subjected victims suffering from advanced cancer to blood filtrations with

- 55 -

ONCObind. The clinic's ONCObind procedure recklessly endangered the lives of all individuals treated there and caused (or hastened) the deaths of David Hudlow, John Bowen, and Kyle Chupp.

275.    Each Defendant engaged in affirmative misconduct, as described above, or, at a minimum, acted negligently by establishing the Quadrant Clinical Care clinic in Antigua; encouraging Plaintiff participants to discontinue and/or fail to start chemotherapy and/or radiation; encouraging Plaintiffs to travel to Antigua to receive ONCObind; and administering ONCObind to Plaintiff participants.

276.    After receiving ONCObind, as well as foregoing traditional chemotherapy and radiation per Defendants' instructions, Mr. Hudlow, Mr. Bowen, and Mr. Chupp each experienced rapid and unexpected progression of their disease. Each died painful deaths within weeks of leaving Antigua, at least in part because of complications caused by ONCObind.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, and seek:

i.    An award of past and future noneconomic damages—*e.g.*, pain and suffering, emotional distress, loss of consortium, loss of society;

ii.    An award of past and future economic damages, including, but not limited to, past and future medical expenses and past and future loss of earnings and impaired earning capacity;

iii.    An award of punitive or exemplary damages;

iv.    An award of restitution for money paid for the ONCObind procedure;

v.    An award of attorney's fees, costs, and expenses, to the extent allowable by law;

vi.    An award of pre- and post-judgment interest;

vii.    An order prohibiting Defendants from continuing to market ONCObind in the United States without regulatory approval; and

viii.    Such other and further relief as the Court deems appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

1  jury trial for all claims so triable.

2

3  Dated: March 12, 2025                By:        */s Robert J. Nelson*
                                              Robert J. Nelson

4
                                       Robert J. Nelson (Cal. Bar No. 132797)
5                                      *rnelson@lchb.com*
                                       Michael Levin-Gesundheit (Cal. Bar No. 292930)
6                                      *mlevin@lchb.com@lchb.com*
                                       Courtney J. Liss (Cal. Bar No. 339493)
7                                      *cliss@lchb.com*
                                       LIEFF CABRASER HEIMANN &
8                                      BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
9                                      San Francisco, CA  94111-3339
                                       Telephone:  415.956.1000

10                                     *Attorney for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3183891