1  Robert J. Nelson (Cal. Bar No. 132797)
   *rnelson@lchb.com*
2  Michael Levin-Gesundheit (Cal. Bar No. 292930)
   *mlevin@lchb.com@lchb.com*
3  Courtney J. Liss (Cal. Bar No. 339493)
   *cliss@lchb.com*
4  Annie M. Wanless (Cal. Bar No. 339635)
   *awanless@lchb.com*
5  LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
6  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
7  Telephone:  415.956.1000

8

   *Attorney for Plaintiffs*
9

10                    **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12
   KIM HUDLOW; ESTATE OF DAVID            Case No. 3:25-cv-02492-MMC
13 HUDLOW; JAIME BASKIN; BRIAN
   WITHEY; STACEY BOWEN; ESTATE OF
14 JOHN BOWEN; VANESSA CHUPP; ESTATE
   OF KYLE CHUPP; CARLA VASS-SALGADO;     **FIRST AMENDED COMPLAINT;**
15 RICARDO SALGADO; RON PERI; and         **DEMAND FOR TRIAL BY JURY**
   INGRID PERI,
16
              Plaintiffs,
17
        v.
18
   EXTHERA MEDICAL CORPORATION;
19 QUADRANT MANAGEMENT LLC;
   QUADRANT CLINICAL CARE LLC; ALAN
20 QUASHA; DEVON QUASHA; and JOHN
   PRESTON,
21
              Defendants.
22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
**Page**

3  NATURE OF THE ACTION ................................................................................. 1

THE PARTIES ..................................................................................................... 5
4
    A.    Plaintiffs ................................................................................. 5
5
    B.    Defendants .............................................................................. 6

6  JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT ........................ 8

7  FACTUAL ALLEGATIONS ................................................................................. 9

I.     ExThera develops a blood filter, which shows promise for COVID-19 treatment,
8       but as the pandemic and the filter's financial promise waned, ExThera shifts its
     focus to cancer ........................................................................................... 9
9
II.    To more quickly reach profitability, ExThera and its backer, Quadrant, look
10      abroad ........................................................................................................ 10

11 III.   Defendants falsely market ONCObind to Plaintiffs as a safe, effective treatment
     likely to cure cancer—to devastating effect ............................................. 15
12
    A.    David Hudlow (deceased victim) & Kim Hudlow (spouse) ............... 19
13
    B.    Brian Withey (participant) & Jaime Baskin (spouse) ........................ 32

14     C.    John Bowen (deceased victim) & Stacey Bowen (spouse) ................ 36

    D.    Kyle Chupp (deceased victim) & Vanessa Chupp (spouse) .............. 42
15
    E.    Ricardo Salgado (participant) & Carla Vass-Salgado (spouse) ......... 50
16
    F.    Ingrid Peri (participant) & Ron Peri (spouse) .................................... 54

17 CIVIL CONSPIRACY ALLEGATIONS .............................................................. 56

CLAIMS FOR RELIEF ....................................................................................... 57
18
    FIRST CLAIM FOR RELIEF ........................................................................ 57
19
    SECOND CLAIM FOR RELIEF ................................................................... 81

20     THIRD CLAIM FOR RELIEF ...................................................................... 82

    FOURTH CLAIM FOR RELIEF ................................................................... 85
21
    FIFTH CLAIM FOR RELIEF ........................................................................ 85
22
    SIXTH CLAIM FOR RELIEF ....................................................................... 86

23     SEVENTH CLAIM FOR RELIEF ................................................................. 87

    EIGHTH CLAIM FOR RELIEF .................................................................... 88
24
PRAYER FOR RELIEF ....................................................................................... 89
25
DEMAND FOR A JURY TRIAL .......................................................................... 90

26

27

28

1    Plaintiffs Kim Hudlow, Estate of David Hudlow, Jaime Baskin, Brian Withey, Stacey

2  Bowen, Estate of John Bowen, Vanessa Chupp, Estate of Samuel Kyle Chupp, Carla Vass-

3  Salgado, Ricardo Salgado, Ron Peri, and Ingrid Peri allege the following against Defendants

4  ExThera Medical Corporation, Quadrant Management LLC, Quadrant Clinical Care LLC, Alan

5  Quasha, Devon Quasha, and John Preston:

6                                **NATURE OF THE ACTION**

7    1.    This is a case about a promised medical miracle—a cure for metastatic cancer—

8  backed by a billionaire investor that was, in reality, a dangerous medical experiment. Unwilling to

9  wait for U.S. regulators to approve clinical trials of a novel blood filtration procedure, a

10  biotechnology company, a billionaire investor, his private equity firm, his investment partner, and

11  his physician daughter opened an improvised "clinic" on the island of Antigua. This operation

12  was meant to be the first in a lucrative chain of cancer-curing clinics offering the procedure for

13  $45,000. Within months, however, three Plaintiff victims had died, and three others saw their

14  cancers, in one Plaintiff's words, "explode."[1]

15    2.    Defendants' explanation of the procedure was compelling: by removing

16  individuals' blood, filtering it through a unique device, and returning it to the body in a process

17  similar to hemodialysis, the procedure would remove circulating tumor cells and prevent further

18  tumor metastases and, in doing so, substantially boost the body's immune system so that the body

19  itself would attack their primary tumors.

20    3.    Defendants, many of whom touted impeccable credentials, repeatedly promised

21  these desperate families a cure for cancers of all kinds, including lung cancer, breast cancer,

22  colorectal cancer, esophageal cancer, and liposarcoma. They also promised Plaintiffs that they

23  would be able to undergo the procedure safely in the Defendants' Antigua clinic. As described on

24  one Defendant's website homepage,[2] patients could receive "the clinically evaluated," "safe"

---

[1] This medical fraud was featured in a 6,000-word *New York Times* article. *See* John Carreyrou, *A Start-Up Claimed Its Device Could Cure Cancer. Then Patients Began Dying.*, New York Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/business/exthera-cancer-blood-filtering-device.html.

[2] Archived Quadrant Clinical Care homepage as of March 23, 2024, quadrantclinicalcare.com, as accessed February 5, 2025 through the WayBack Machine at https://web.archive.org/web/20240323131804/http://quadrantclinicalcare.com/.

"ONCObind™" and "Seraph® 100 MicroBind® Blood Filters" in the Antigua clinic, with a medical team including "licensed physicians, nurses, and specialists, all of whom provide a high level of care." The only disclaimer provided was that "While research and results are ongoing, early results support safety and effectiveness, offering hope and potentially improved quality of life to the patients treated."

4.      The *only* truth in Defendants' promises was that Defendants were "offering hope" to cancer patients and their families for a base price of $45,000. This is because despite knowing that their claims were false or completely unproven, Defendants lied again and again to families in immediate need of a cure—or at least reduced pain and lengthened lives. But the purported "cure" Defendants delivered exacerbated the victims' pain and disease, and in several cases, caused the victims' death.

5.      The story begins with ExThera, a San Francisco Bay Area medical device company. The company's product, the Seraph 100 filter, had been used to treat sepsis in critically ill military patients suffering from severe COVID-19.

6.      As the COVID-19 pandemic waned, ExThera quickly pivoted to another lucrative market: cancer. In fall 2023, ExThera tested the Seraph 100 filter's ability to remove circulating tumor cells from the blood of a small number of individuals in Zagreb, Croatia, a location presumably chosen because such human experimentation would have been forbidden in the United States. ExThera claimed that the procedure, now called "ONCObind," significantly reduced the tumor size and pain and, for multiple individuals, rendered their cancers undetectable. There is no evidence that any of these claims were grounded in fact.

7.      In December 2023, billionaire Alan Quasha learned of the Croatian trial from John Preston, a long-time investment advisor at Quasha's private equity firm, Quadrant Management, who was also an ExThera board member. Within ten days, Mr. Quasha, through Quadrant Management, invested $3 million in ExThera. By the end of 2023, he had formed a subsidiary, Quadrant Clinical Care, to market and administer the procedure in a clinic on the island of Antigua. The location was presumably chosen because use of the filters for cancer was not authorized in the United States. Mr. Quasha chose his daughter, Dr. Devon Quasha, a Harvard-

1   trained physician practicing in the world-renowned Mass General Brigham health system, to

2   serve as the clinic's medical director and chose another investment advisor employed by his

3   private equity firm to serve as the clinic's president.

4        8.     Mr. Quasha deployed his private jet to pick up ExThera team members and Seraph

5   100 filters in California, and landed in Antigua to witness the procedure. The goal was to

6   establish the first in what Quasha and ExThera imagined would be a lucrative chain of clinics

7   providing the ONCObind procedure in the Caribbean—a shorter, more accessible trip for North

8   American cancer patients.

9        9.     Defendants promised Plaintiffs, time and time again, that the Croatian trial

10   demonstrated that ONCObind was a miracle and that the results would be replicated in a

11   sophisticated medical clinic in Antigua. This was false. Victims were advised that one participant

12   in the Croatian trial with Stage IV cancer was training for a marathon; others had their tumors

13   completely eliminated; and, in all but one case, tumor size was reduced by fifty percent or more.

14   Individuals were told that only one participant in the Croatian trial had died—because that

15   individual got an infection from chemotherapy presumably because, they were told by

16   Defendants, the individual pursued chemotherapy after receiving ONCObind. These claimed

17   results from Croatia have never been published or otherwise verified.

18        10.     The price for unwitting cancer patients and their families was $45,000 per round,

19   but desperate families were told that ONCObind would soon be available in trials in the United

20   States where individuals who received the filtration in Antigua would later be able to receive

21   future filtrations at no cost under recent legislation. Victims were told there were no potential

22   adverse effects and were *not* informed they were taking part in what amounted to an

23   extraordinarily dangerous medical experiment. Upon information belief, no Plaintiff signed a

24   consent form that explained the nature of the human experimentation they were to receive.

25        11.     Victims were also advised that they should stop—or, in one case, not begin—

26   chemotherapy prior to traveling to Antigua because, victims were told, chemotherapy would

27   weaken the immune system and limit the effectiveness of the blood filtering process. Victims

28   were medically stable before their journeys to Antigua, and their discontinuation (or abstention

from) chemotherapy worsened their conditions, caused and/or significantly increased their pain and suffering, and also, in some cases, hastened their deaths.

12.    Instead of receiving the life-saving treatment they were promised in a medically appropriate facility, these cancer patients were advised to discontinue chemotherapy and/or radiation and their families arrived in Antigua to find a facility lacking essential medical equipment. For example, the area where the hours-long filtrations would be administered had no hospital beds when the first Plaintiffs arrived, no sinks outside the two found in the restrooms, no hand sanitizer or tool sanitizing stations, and limited vitals monitoring equipment. The clinic was "overseen" by a single surgeon with no oncology experience who was often traveling abroad or absent because he was seeing his own patients about a quarter of a mile away in a separate building. No oncologist was present at any time. No oncologist was ever even employed by Quadrant Clinical Care. No oncologist serves on the Boards of ExThera or Quadrant Management.

13.    The ONCObind filtration was often torturous: the filters clogged so frequently that one victim lost a third of his blood volume in filters that were thrown away. That victim lost consciousness with no physician present to treat him. During another victim's filtration, the victim's blood pressure fell so sharply while he vomited so intensely that nurses, who were administering ONCObind with no physician present, panicked and called in an emergency physician from another practice. A third victim was left so confused—and unsupervised—after filtration that he picked stitches out of his head, leaving an open wound that went unnoticed by Quadrant staff for hours despite profuse bleeding.

14.    After enduring these procedures, three victims died within days or weeks of leaving Antigua, and each surviving victim became sicker and saw their cancer markers increase significantly following the procedure. Upon information and belief, no Plaintiff provided (or could have provided) informed consent before having the ONCObind procedure administered on them. Not a single individual experienced the promised tumor reduction. Not one. This lawsuit seeks to hold to account those who orchestrated this devastating medical fraud, which amounted to an unregistered, unmonitored human experiment.

1

## THE PARTIES

2

### A.    Plaintiffs[3]

3      15.    Plaintiff Kim Hudlow, an individual residing in Panama City, Florida, traveled to

4   Antigua twice with her late husband David Hudlow for Mr. Hudlow to receive the ExThera

5   ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr. Hudlow died

6   less than a week after he received his second round of ONCObind filtration. The Estate of David

7   Hudlow is also a party to this action, and Ms. Hudlow is the personal representative of that estate.

8      16.    Plaintiff Jaime Baskin and her husband, Plaintiff Brian Withey, are individuals

9   residing in Northbrook, Illinois, who traveled to Antigua for Mr. Withey to receive the ExThera

10   ONCObind blood filtration procedure administered by Quadrant Clinical Care.

11      17.    Plaintiff Stacey Bowen, an individual residing in Hawthorn Woods, Illinois, and

12   her late husband John Bowen traveled to Antigua for Mr. Bowen to receive the ExThera

13   ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr. Bowen died

14   ten days after returning from Antigua. The Estate of John Bowen is also a party to this action, and

15   Ms. Bowen is the personal representative of that estate.

16      18.    Plaintiff Vanessa Chupp, an individual residing in Orillia, Ontario, Canada, and

17   her late husband Kyle Chupp traveled to Antigua for Mr. Chupp to receive the ExThera

18   ONCObind blood filtration procedure administered by Quadrant Clinical Care. Mr. Chupp died

19   within two months after returning from Antigua. The Estate of Samuel Kyle Chupp is also a party

20   to this action, and Ms. Chupp is the personal representative of that estate.

21      19.    Plaintiff Carla Vass-Salgado and her husband, Plaintiff Ricardo Salgado,

22   individuals residing in Miami, Florida, traveled to Antigua for Mr. Salgado to receive the

23   ExThera ONCObind blood filtration procedure administered by Quadrant Clinical Care.

24      20.    Plaintiff Ron Peri and his wife, Plaintiff Ingrid Peri, individuals residing in

25   Windermere, Florida, traveled to Antigua for Ms. Peri to receive the ExThera ONCObind blood

26   filtration procedure administered by Quadrant Clinical Care.

27

28
_____
[3] The citizenship of each Plaintiff is provided within this section in compliance with Federal Rule of Civil Procedure 7.1(a)(2).

**B.    Defendants**

21.    Defendant ExThera Medical Corporation is a Delaware corporation with its headquarters in Martinez, California. ExThera manufactures the Seraph 100 blood filter and promotes its use in cancer patients to this day, terming the procedure ONCObind. Through John Preston, a former member of its Board of Directors, and Dr. Sanja Ilic, its former Chief Regulatory Officer and Vice President for Clinical, Regulatory, and Medical Affairs, ExThera promoted the ONCObind filtration procedure administered by Quadrant Clinical Care to Plaintiffs.

22.    Defendant Quadrant Management LLC is incorporated in Delaware with its headquarters in New York, New York. On information and belief, Quadrant Management solely manages the wealth of billionaire investor Alan Quasha. Quadrant Management—directed by Mr. Quasha—made a significant investment in ExThera Medical Corporation shortly before promoting the use of the ExThera filters on late-stage cancer patients. This investment allowed ExThera to significantly increase production of the filters for use on cancer patients. Mr. Quasha and Quadrant Management created Quadrant Clinical Care LLC to implement the fraud on the ground in Antigua.

23.    Defendant Quadrant Clinical Care LLC[4] is incorporated in Delaware and, on information and belief, is a fully owned subsidiary of Quadrant Management and is operated as an arm of Quadrant Management without observing the corporate formalities necessary to maintain a separate identity. On information and belief, Quadrant Clinical Care was formed for the sole purpose of administering the ONCObind procedure with ExThera Seraph 100 filters. Quadrant Management team member Tom Pontzius served as Quadrant Clinical Care's President, while Mr. Quasha's daughter, Dr. Devon Quasha, served as its Medical Director and/or Chief Medical Officer. Both promoted the ExThera ONCObind procedure in Antigua to Plaintiffs.

---

[4] Quadrant Management may also have formed an entity known as Quadrant Clinical Care Ltd. incorporated in the British Virgin Islands, which may have also been used to further the wrongful actions described in this Complaint. Plaintiffs reserve the right to seek leave to amend this Complaint under Rule 15 of the Federal Rules of Civil Procedure if such facts come to light during the course of the litigation indicating that Quadrant Clinical Care Ltd. is an appropriate Defendant.

24. Defendant Alan Quasha, an individual residing in the State of Colorado, is the founder of Quadrant Management. Mr. Quasha is responsible for Quadrant Management's investment in ExThera and Quadrant Management's creation of Quadrant Clinical Care. On information and belief, Mr. Quasha oversaw the fraud by directing these entities to create and promote a facility providing the ExThera ONCObind procedure prior to demonstration of clinical safety and efficacy. Mr. Quasha also materially enabled the scheme by sending his private jet to transport hundreds of ExThera Seraph 100 filters, a dialysis machine, and several ExThera staff members to Antigua.

25. Defendant Dr. Devon Quasha, an individual residing in Massachusetts, is the daughter of Mr. Quasha and served as the Medical Director for Quadrant Clinical Care, an entity created to effectuate fraudulent medical experimentation on the victims. Dr. Quasha is a graduate Harvard Medical School, completed her medical residency at the Harvard-affiliated Brigham & Women's Hospital, and practices in the Mass General Brigham medical system, credentials ExThera and Quadrant Clinical Care traded on to legitimize the fraud.

26. Defendant John Preston, an individual residing in Massachusetts, is an investment team member at Quadrant Management and a former board member of ExThera Medical. Mr. Preston introduced Alan Quasha to ExThera and the ExThera Seraph 100 filters' potential use in the ONCObind procedure, and spoke to most Plaintiffs about the miraculous results of the ONCObind procedure. Mr. Preston also spent 30 years working at Massachusetts Institute of Technology and held himself out as a physicist, credentials he used to legitimate the fraud.

27. As detailed below, Defendants worked together to establish the Quadrant Clinical Care Antigua clinic, promote the ONCObind procedure and its use by Quadrant Clinical Care in Antigua to Plaintiffs including by repeatedly assuring Plaintiffs that such treatment was low-risk and had shown only positive results, that the ONCObind procedure could potentially cure metastatic cancer, and that the Quadrant Clinical Care facility could safely administer the procedure and care for the ill Plaintiffs.

1

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

2      28.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because

3  this is a civil action between citizens of different states and the matter in controversy exceeds

4  $75,000, exclusive of interest and costs.

5      29.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

6  18 U.S.C. §§ 1961, 1962, 1964, and 1965. Under 28 U.S.C. § 1367, this Court may exercise

7  supplemental jurisdiction over the state law claims because all of the claims are derived from a

8  common nucleus of operative facts such that Plaintiffs would expect to try them in one judicial

9  proceeding. There is no other single district in which all Defendants are subject to jurisdiction,

10  and the ends of justice in this multi-state, international conspiracy to commit wire fraud require

11  the trial of this case in a single forum.

12      30.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C.

13  § 1391 because Defendant ExThera, which is headquartered in Martinez, California, is subject to

14  personal jurisdiction in this judicial district and resides in this district. Because a substantial part

15  of the events or omissions giving rise to the claims alleged occurred in Contra Costa County,

16  assignment to the San Francisco or Oakland Divisions is proper under Local Rule 3-2(c).

17      31.    Independent of jurisdiction under 18 U.S.C. § 1965, this Court has personal

18  jurisdiction over Defendants because Defendants are residents of and/or do business in the

19  Northern District of California. Specifically, Defendant ExThera Medical's headquarters is in

20  Martinez, California. Further, all Defendants have purposely availed themselves of the benefits,

21  protections, and privileges of the laws of the State of California in conducting their business, and

22  have purposely directed their activities in this State. Defendant ExThera markets its products,

23  including the ExThera filters, in and from the State of California. Defendant Quadrant

24  Management is a significant investor in ExThera. Defendants Quadrant Management and

25  Quadrant Clinical Care are major purchasers and distributors of the ExThera Seraph 100 filters

26  designed and shipped from California, and in at least one case, exported the filters from

27  California to Antigua. All Defendants coordinated among each other to promote the use of

28

- 8 -

ExThera filters on cancer patients. Defendants have sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court permissible.

## FACTUAL ALLEGATIONS

I.      **ExThera develops a blood filter, which shows promise for COVID-19 treatment, but as the pandemic and the filter's financial promise waned, ExThera shifts its focus to cancer.**

32.     ExThera was formed in 2007 and initially focused on antimicrobial drug resistance. The company developed a blood filter, known as the "Seraph 100." The filter contains tiny beads covered in heparin, a substance similar to a molecule found inside blood vessels that binds pathogens. The beads are intended to mimic the inner walls of blood vessels and capture viruses, bacteria, and fungi. The device works in tandem with a dialysis machine, which pumps blood out of a patient's body and into the device before returning it, filtered of pathogens, to the patient.

33.     In 2019, ExThera marketed its product in Europe for drug-resistant bloodstream infections. Then, as the COVID-19 pandemic began in winter 2020, ExThera made its Seraph filters available for treatment of severe COVID infections in Germany and Italy. In April 2020, the U.S. Food and Drug Administration granted ExThera Emergency Use Authorization for the treatment of severe COVID-19 disease with the Seraph filter. The filter showed initial promise for treatment of COVID-19, but the COVID-19 pandemic would wane, significantly reducing the commercial potential for this application.

34.     By September 2022, ExThera shifted gears. It announced that data from a preliminary *in vitro* study (*i.e.*, in a laboratory using blood samples) demonstrated that the Seraph filter could remove circulating tumor cells. ExThera announced plans to study the use of the Seraph filters as a treatment to prevent further metastasis in cancer patients.[5]

35.     In July 2023, ExThera announced that it had received FDA investigational device exemption for use of the Seraph filter for the removal of circulating tumor cells ("CTCs").

---

[5] See ExThera Medical, *Extracorporeal Blood Filter Removes Circulating Tumor Cells: Dialysis-like Cell Removal Therapy to be Studied for Treating Metastatic Cancer* (Sep. 20, 2022), https://extheramedical.com/extracorporeal-blood-filter-removes-circulating-tumor-cells-dialysis-like-cell-removal-therapy-to-be-studied-for-treating-metastatic-cancer/.

1    ExThera would market this treatment under the trade name "ONCObind." The company

2    announced that it would be able to enroll patients in a clinical trial in the fall of 2023 and

3    disclosed that it was collaborating with "trusted health advisors" to launch an "exciting new

4    oncology initiative."[6]

5           36.    In August 2023, before a single patient had been enrolled in an ONCObind clinical

6    trial, ExThera's Head of Quality and Chief Operating Officer announced, in a press release, that

7    the company was "well-positioned to move forward with its plans toward global

8    commercialization."[7] But a U.S. clinical trial did not proceed as quickly as ExThera hoped.

9    ExThera would not enroll a patient in any U.S. ONCObind study until September 2024, long after

10   the Antigua episodes.[8] The trial was limited to patients with pancreatic ductal adenocarcinoma

11   cancer and, as of the time of filing, appears to have only enrolled five subjects.[9]

12   **II.    To more quickly reach profitability, ExThera and its backer, Quadrant, look abroad.**

13

14          37.    Unsatisfied with the pace of clinical development and commercialization in the

15   United States, in the fall of 2023, ExThera's Chief Medical & Regulatory Officer, Dr. Sanja Ilic,

16   conducted a trial in Zagreb, Croatia. ExThera provided Seraph 100 filters at no cost for the study.

17   This trial has been described by various ExThera and Quadrant executives and advisors as testing

18   the ONCObind procedure's efficacy on between 8 and 12 patients with late-stage, metastatic

19   disease. In early 2024, ExThera and Quadrant representatives would describe this study to

20   _____

     [6] See ExThera Medical, *ExThera Medical Announces FDA Approval of IDE Application for Use of the ONCObind™ Extracorporeal Procedure to Remove Circulating Tumor Cells in Patients with Pancreatic Cancer (July 13, 2023)*, https://extheramedical.com/exthera-medical-announces-fda-approval-of-its-ide-application-for-use-of-its-seraph-100-blood-filter-to-remove-circulating-tumor-cells-in-patients-with-pancreatic-cancer.

21

22

23   [7] See ExThera Medical, *ExThera Medical Receives Certification for Medical Device Single Audit Program (MDSAP) and Recertification for International Organization for Standardization for Medical Devices (ISO 13485)* (Aug. 13, 2023), https://extheramedical.com/exthera-medical-receives-certification-for-medical-device-single-audit-program-mdsap-and-recertification-for-international-organization-for-standardization-for-medical-devices-iso-13485.

24

25   [8] See ExThera Medical, *Revolutionary Trial Aims to Transform Pancreatic Cancer Treatment* (Sep. 3, 2024), https://extheramedical.com/revolutionary-trial-aims-to-transform-pancreatic-cancer-treatment.

26

27   [9] See NIH, *OSCAR I Study – The ONCObind CTC Removal Study*, https://www.clinicaltrials.gov/study/NCT06481397#study-plan (last accessed March 5, 2025). ("Enrollment (Actual) / 5").

28

Plaintiffs as having not just prevented further metastases, but, in essence, *curing* multiple individuals of cancer by reducing the size of existing tumors and in some cases rendering the patient's cancer undetectable. There is no indication that any of this was true. The results of the study were published in November 2024 in the journal *Blood Purification*. The article explains that the ExThera filters could remove pathogens and CTCs from the bloodstream but makes *no mention whatsoever* that patients' health or overall cancer burden improved as a result.[10]

38.     Nevertheless even without any actual data, ExThera pushed forward at rapid speed with a plan to use and market the Seraph 100 filters and commercialize ONCObind for the large oncology market.

39.     In December 2023, John Preston, an ExThera board member and also an investment advisor[11] of billionaire Alan Quasha's private equity firm, Quadrant Management, told Mr. Quasha about the Seraph 100 filters' new use in ONCObind. Mr. Preston, a long-time advisor to Mr. Quasha, explained ExThera's ONCObind procedure. Within days of Mr. Preston's pitch on its behalf, ExThera shared "results" from their Croatian trial with Mr. Quasha. Mr. Quasha then invested $3 million dollars in the company.

40.     Both Mr. Preston and Mr. Quasha (the latter the founder of Quadrant Management) either reviewed the data from the Croatian study – and should therefore have known that the data as to the 10 patients that had undergone the treatment was extremely limited and demonstrated no long term results– or should have requested and reviewed the clinical data before making a multimillion dollar investment and creating a company to deploy the ONCObind procedure on humans.

41.     But the possibility of profit was too enticing. An investment in ExThera was not enough for Mr. Quasha and Quadrant Management. Mr. Quasha sought to commercialize ONCObind by creating a lucrative chain of clinics providing ONCObind treatment. ExThera,

---

[10] *See* Sanja Ilic & Verdan Premuzic, *First-In-Human Rapid Removal of Circulating Tumor Cells in Solid Metastatic Neoplasia by Microbind Affinity Blood Filter*, Blood Purification (Nov. 4, 2024), https://karger.com/bpu/article/54/2/138/915514/First-In-Human-Rapid-Removal-of-Circulating-Tumor.

[11] *See* Quadrant Management, *Investment Team*, https://quadrantmgt.com/investment-team/ (accessed May 26, 2025) (listing John Preston with Mr. Preston's headshot, and stating that "The average tenure of our investment team members is in excess of 15 years.").

1   including board member Mr. Preston, agreed to the plan to subject humans, at a substantial price,

2   to this extremely dangerous and entirely unproven procedure.

3          42.     Therefore, Quadrant Management, a private fund under the direction of Mr.

4   Quasha, soon formed a clinical division known as Quadrant Clinical Care, which it incorporated

5   on December 26, 2023. Defendants rushed to establish a facility in an existing clinic on the

6   Caribbean island of Antigua, where they could easily obtain approval to use the Seraph 100 filters

7   for ONCObind. Quadrant Clinical Care then paid ExThera an additional $10 million to become

8   ExThera's exclusive Caribbean distributor. To the extent it operated separately from Mr. Quasha

9   and Quadrant Management, Quadrant Clinical Care—a purported medical provider—also knew

10  or willfully ignored facts that would have demonstrated the ONCObind procedure was not ready

11  to be marketed as a safe and effective cancer treatment. Mr. Quasha sent his private jet to San

12  Diego, where ExThera and Quadrant Clinical Care employees loaded the private jet with at least

13  one dialysis machine and hundreds of Seraph 100 filters, picked up Mr. Quasha in the Bahamas,

14  and arrived in Antigua, ostensibly to train the local clinic's staff on use of the filter.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12



13    43.    ExThera and Quadrant Clinical Care immediately began administering the

14  ONCObind procedure on three participants—likely in early January 2024—even though they had

15  no oncologist on site. In at least one instance, depicted above, Dr. Sanja Ilic (second from left),

16  ExThera's then-Chief Regulatory Officer and Vice President of Clinical, Regulatory, and Medical

17  Affairs, and Dr. Lakhmir "Mink" Chawla, ExThera's current Chief Medical Officer, instructed

18  clinical staff on administration of the procedure, while Mr. Quasha (far left) observed.

19    44.    After these participants underwent the ONCObind procedure, ExThera and

20  Quadrant Clinical Care representatives discouraged the participants from having scans or other

21  tests done for an extended amount of time following the procedure to determine if the procedure

22  had shrunk their tumors or had any other effect on the individual's cancer burden. When patients

23  finally did get such other scans or tests done, ExThera and Quadrant Clinical Care representatives

24  disclaimed any negative results, insisting that only the results of a particular test done by a

25  particular lab in Germany could be trusted as to the impact of the ONCObind procedure. For

26  example, one of these three participants had not gotten an MRI after undergoing the procedure in

27  Antigua because Dr. Ilic advised the participant that the MRI could cause cancer.

28

1    45.    In other words, ExThera and Quadrant Clinical Care prevented or highly

2    discouraged the participants from getting sound clinical data on the success or failure of the

3    ONCObind procedure, and from properly treating any complications or harm resulting from the

4    procedure. This also allowed Defendants to avoid getting further information on whether the

5    procedure was actually effective and safe, and could instead remain willfully blind when

6    promoting the ONCObind procedure.

7    46.    At least two of the three ONCObind procedure participants who underwent

8    ONCObind in Antigua in January 2024 are now deceased.

9    47.    Shortly after Mr. Quasha and Dr. Ilic set up the clinic, Quadrant Clinical Care

10   hired Mr. Quasha's daughter, Dr. Devon Quasha, an internist (not an oncologist), to oversee the

11   clinic as its Chief Medical Officer. On information and belief, Dr. Quasha was aware of Mr.

12   Quasha, Quadrant Management, Mr. Preston, and ExThera's plan to establish a chain of lucrative

13   clinics and to market the clinics and the ONCObind procedure as a safe and effective cancer

14   treatment, even though, as a practicing medical doctor, she knew or should have known that there

15   was insufficient evidence to support these promises. Dr. Quasha, despite her medical training,

16   apparently did not ask any questions that would have revealed the truth about the ONCObind

17   procedure's total lack of efficacy. If she had, for example, reviewed the Croatian study with any

18   detail, she should have known that the statements the Defendants were making about ONCObind

19   were not true.

20   48.    After she joined the team, Dr. Quasha did not hire any oncologists or, on

21   information and belief, engage in any efforts to ensure that the clinic in Antigua was medically

22   suitable for cancer patients.

23   49.    ExThera's then Director of Medical Affairs, Dr. Jonathan Chow, who reported to

24   Dr. Ilic, visited the clinic in Antigua in January 2024, arriving two days after Mr. Quasha. On

25   information and belief, he observed witnesses bleeding from catheter wounds and screaming in

26   pain. Dr. Chow immediately warned ExThera's executives, both in video calls and ultimately in a

27   letter, that ExThera, in coordination with the other Defendants, was engaging in unethical and

28

1   unsafe medical experimentation. Dr. Chow's warnings went unheeded.[12] ExThera and Quadrant

2   Clinical Care successfully kept Dr. Chow's concerns from reaching the public or Plaintiffs.

3       50.    After Mr. Chow raised concerns, ExThera, Mr. Preston (an ExThera board

4   member), and Quadrant Clinical Care knew both that the clinic was woefully unsuitable to serve

5   cancer patients and that the filter was being used in a manner that would not safely and effectively

6   cure cancer. On information and belief, Mr. Quasha, Quadrant Management, and Dr. Quasha

7   were also aware of Mr. Chow's concerns. Despite this knowledge, Defendants took no corrective

8   action, and instead deliberately acted to ignore the truth and push forward with the scheme to

9   fraudulently induce cancer patients to pay to receive the unproven ONCObind procedure in an

10  unsuitable offshore clinic.

11      51.    Even after Mr. Chow raised concerns, Quadrant Clinical Care's website, as

12  captured via digital archive, stated in March and May 2024 (and likely for a longer period) that

13          Quadrant Clinical Care-Antigua provides hemoperfusion blood
            filter treatment to patients diagnosed with Cancer and Blood Stream
14          Infections (BSI). Utilizing the ONCOBind™ and the Seraph® 100
            Microbind® Blood Filters, the clinically evaluated treatment is
15          safe. The medical team on the island includes licensed physicians,
            nurses, and specialists, all of whom provide a high level of care.
16          While research and results are ongoing, early results support safety
            and effectiveness, offering  hope and potentially improved quality
17          of life to the patients treated.

18
19  **III.    Defendants falsely market ONCObind to Plaintiffs as a safe, effective treatment
            likely to cure cancer—to devastating effect.**

20      52.    By January and February 2024, Plaintiffs, who were desperately searching for

21  treatments for aggressive cancers, began hearing about the ONCObind procedure that Defendants

22  were administering in Antigua and promoting as a cure for cancer.

23   Plaintiffs began to investigate this new treatment. ExThera's website claimed the ONCObind

24  procedure "demonstrated removal of metastatic circulating tumor cells in several *in vitro* models"

25  in tests at the University of Southern California, that "two independent laboratories [had]

26  confirmed the viability of efficient removal of circulating tumor cells from human blood with

27  ―――――――――
[12] *See* John Carreyrou, *A Start-Up Claimed Its Device Could Cure Cancer. Then Patients Began
Dying.*, New York Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/23/business/exthera-
28  cancer-blood-filtering-device.html.

FIRST AMENDED COMPLAINT;
                                                                      DEMAND FOR TRIAL BY JURY
                                                                      CASE NO. 3:25-CV-02492-MMC

ExThera's Seraph 100 pathogen binding technology," and that the Seraph 100 had "an excellent safety record in more than 2,500 clinical treatments performed globally" (for sepsis and COVID-19).

53.    When Plaintiffs reached out to ExThera to learn more about the treatment, what they heard from ExThera and Quadrant Clinical Care representatives was that the opportunity was nothing short of groundbreaking. ExThera board member and Quadrant Management advisory team member John Preston and ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory, and Medical Affairs Dr. Sanja Ilic told Plaintiffs the ONCObind procedure worked by removing circulating tumor cells from the body, preventing metastases and ultimately allowing the immune system to reset and attack primary tumors themselves. Over the phone and via text, beginning in February 2024 and continuing even after several Plaintiffs had died, Plaintiffs Kim Hudlow, Jaime Baskin, Ricardo Vass-Salgado, Carla Vass-Salgado, Stacey and John Bowen, and Ron and Ingrid Peri were told—falsely—by ExThera's Chief Regulatory Officer Sanja Ilic and John Preston, ExThera board member and Quadrant Management investment team member, that ONCObind had cured the cancer of multiple participants in a European trial. The few Plaintiffs who heard anything about ill effects were told that the only participant with adverse effects had died because the participant's physician insisted on continuing chemotherapy after filtration, which led to the patient developing an infection at the chemo port and dying. Mr. Preston and Dr. Ilic also claimed, over the phone between February 7 and February 14, 2024 that ONCObind would reduce pain.

54.    On these same calls, Mr. Preston and Dr. Ilic also suggested, without a basis for doing so, that ONCObind would be approved by the FDA for U.S. trials soon (but not soon enough to benefit Plaintiffs), and individuals who received ONCObind in Antigua would have automatic and free access to the U.S. trials. To benefit from this revolution in cancer care, individuals needed to discontinue or not begin chemotherapy or radiation and travel to a facility in Antigua where, for a $45,000 procedure, their lives could be saved.

55.    Around the same time, in January and February 2024, Quadrant Management, Quadrant Clinical Care, and ExThera Medical representatives, including Mr. Preston, Alan

Quasha, Devon Quasha, and Sanja Ilic, began and/or continued to speak with certain physicians in the United States via phone, Zoom, and, upon information and belief, email, including Dr. Mark Rosenberg, an integrative cancer treatment practitioner in Boca Raton, Florida, and Dr. Eduardo Maristany, a functional medicine practitioner in Punta Gorda, Florida, about the promise of the ONCObind procedure for treating all forms of metastatic cancer.

56.     These conversations were strategic: Defendants showed these physicians limited data from the Croatian ONCObind study and suggested the physicians would have opportunities to join the company in the future and be part of an exciting – and lucrative– medical breakthrough; and in return the physicians, excited about this purportedly promising new treatment, would refer patients to the Antigua clinic. Upon information and belief, instead of providing detailed data or information about ONCObind, Mr. Quasha and Mr. Preston set up video calls to promote the treatment. Mr. Quasha and Mr. Preston had one such video call with Dr. Rosenberg.

57.     For example, on February 7, 2024, Dr. Rosenberg told one Plaintiff and another physician that he was "intimately involved with developing the protocols," that he would potentially be joining the company on the clinical side, and that the preliminary data looked "very exciting."  And just a few weeks later, on March 1, 2024, Tom Pontzius, Quadrant Clinical Care's President and "investment team" member at Quadrant Management[13] told another Plaintiff that "our Chief Medical Officer and Dr. Rosenberg" would complete a "medical record review" before the patient arrived in Antigua. At the same time, Dr. Ilic and others prevented Dr. Rosenberg from reviewing the data from the Croatian patients, falsely claiming that it would soon be published in the New England Journal of Medicine.[14]

58.     Once Plaintiffs had heard about the ONCObind procedure, and been convinced of its efficacy and safety by ExThera and Quadrant Management representatives, Plaintiffs were

---

[13]  *See* Quadrant Management, *Investment Team*, https://quadrantmgt.com/investment-team/ (accessed May 26, 2025) (listing Tom Pontzius with Mr. Pontzius's headshot, and stating that "The average tenure of our investment team members is in excess of 15 years.").

[14] Later, Dr. Rosenberg's patients returned from Antigua after the ONCObind procedure and Dr. Rosenberg was thus able to see ONCObind's effect on his patients. Upon information and belief, this caused Dr. Rosenberg to stop sending patients to Antigua and working with Quadrant Clinical Care.

referred to one of the doctors that had been in communication with Dr. Ilic, Mr. Preston, Mr. Quasha, or Dr. Quasha about the ONCObind procedure. Several of the patient Plaintiffs were referred to Dr. Rosenberg, who Mr. Preston and Dr. Ilic told Plaintiffs could get them included on the Quadrant Clinical Care Antigua ONCObind schedule.

59.     When several Plaintiffs arrived in Antigua for treatment in February 2024, they were surprised to find the Quadrant Clinical Care clinic was merely a portion of an existing outpatient clinic that lacked an oncologist on site and also lacked basic equipment, such as sufficient sinks for maintaining sanitation or hospital beds suitable for ill patients.

60.     Several Plaintiffs met and observed Dr. Quasha in February 2024 and noted that she appeared to be learning how the procedure worked while at the same time was charged with overseeing it. Plaintiffs also later learned that Dr. Quasha had not designed customized protocols for participants; instead, each participant received identical filtration procedures regardless of the participant's disease state or the kind of cancer one had. On information and belief, it is unlikely that each participant would have received identical filtration procedures if Dr. Quasha had indeed designed customized protocols given that each patient had a different form of cancer, a different disease burden, and different recent medical histories.

61.     Below Plaintiffs summarize how Defendants lured each Plaintiff family to travel to Antigua for ONCObind treatment and detail the terrible consequences.

1

**A.**    **David Hudlow (deceased victim) & Kim Hudlow (spouse)**



62.    Plaintiff Kim Hudlow and her late husband David Hudlow (Mr. Hudlow, pictured above in December 2023) were nearly two years into treatment of Mr. Hudlow's esophageal cancer, diagnosed at Stage III in March 2022, when they first learned of the ONCObind treatment. Mr. Hudlow had undergone several rounds of treatment, including chemotherapy, radiation, and surgery at leading cancer clinics across the country (including at the Mayo Clinic). In February 2022, the Hudlows learned that Mr. Hudlow's cancer had spread to his lymph nodes—meaning his cancer was now Stage IV. In fall 2023, Mr. Hudlow participated in a clinical trial that was ultimately unsuccessful and was terminated prematurely.

63.    Devastated by the clinical trial's failure, Ms. Hudlow was anxious to find another means of treating her husband's cancer. A few different chemotherapy drug options remained, but the Hudlows were concerned that they did not have the upper hand.

64.    In early 2024, Ms. Hudlow heard about ExThera's filtration treatment through a friend of a friend of Plaintiff Jaime Baskin, with whom she had developed a friendship from a

cancer spouses support group. The individual underwent ONCObind and initially believed it to have been very successful in treating her cancer. Ms. Hudlow and Ms. Baskin thus worked to find more information and became connected with ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs, Dr. Sanja Ilic, and ExThera board member and Quadrant Management investment advisor John Preston.

65.    ExThera Chief Regulatory Officer Dr. Ilic spoke on the phone with Ms. Hudlow and Ms. Baskin on or around February 8, 2024, extolling the extraordinary accomplishments of the ExThera filters for treating metastatic cancer. Dr. Ilic explained how the filters utilized heparin sulfate to bind circulating tumor cells and remove them from the bloodstream. Dr. Ilic told Ms. Hudlow and Ms. Baskin about a Croatian trial she had overseen in which between eight and twelve patients were treated, all of whom she described as having advanced cancers of different types. She said that nearly all of them had positive results after filtration—further, she said several of the patients had no evidence of cancer after treatment, and the lowest reduction in primary tumor size was 49%. Dr. Ilic mentioned a single patient who passed away after filtration, but she insisted it was because the patient had undergone a lot of chemotherapy before the filtration and had gotten additional chemotherapy after the filtration. Dr. Ilic explained to Ms. Hudlow and Ms. Baskin that the only way for their husbands to receive the filter would be for their husbands to travel to Antigua to receive filtration through Quadrant Clinical Care.

66.    Additionally, on February 8, Dr. Ilic suggested to Ms. Hudlow in a separate communication that she could get Mr. Hudlow and Mr. Withey (Ms. Baskin's husband) into the Antigua facility by recommending them as patients to Dr. Devon Quasha, whom she suggested was overseeing enrollment at the Quadrant Clinical Care facility.

67.    On February 9, John Preston, acting on behalf of ExThera, Quadrant Management, and new entity Quadrant Clinical Care in furtherance of Defendants' plan to enroll patients at the Antigua clinic, pitched the ONCObind procedures to Ms. Hudlow and Ms. Baskin in a telephone call. Mr. Preston shared that ExThera had been asked to send filters to the Walter Reed National Military Medical Center to treat patients with COVID-19 so severe they otherwise had nearly no chance of survival. Mr. Preston explained that ExThera's filters had saved them. Mr. Preston

specifically told Ms. Hudlow and Ms. Baskin that "one of the things that Alan Quasha did was he made a major infusion of money into ExThera to enable them to scale up production," because before "*we* created Quadrant Clinical Care, they could only produce 300 filters a month, and now they're going to be up around 3,000 a month."

68.    Mr. Preston told Ms. Hudlow and Ms. Baskin that ExThera had then tested whether the filters could be used to filter out circulating tumor cells and found, in patients with different tumor types, that the filters did indeed work. He said that the filter removed tumor cells from the bloodstream, returning the blood in a "clean" state and preventing the cancer from metastasizing. These claims were unsupported by *any* published evidence, let alone peer-reviewed evidence, and appear to have been based on Dr. Ilic (the then-ExThera Chief Regulatory Officer and Vice President of Clinical, Regulatory, and Medical Affairs)'s representations alone.

69.    Mr. Preston boasted of the Croatian study. He told Ms. Hudlow and Ms. Baskin that, on or around September 25, 2023, the company conducted a clinical trial on 8 individuals in Europe. He explained that as a result of the ONCObind treatment "resetting" the individuals' immune systems, their immune systems were able to attack their primary tumors. Not only did they feel better immediately, but their immune systems were also more robust, leading three individuals to completely recover, with their cancers undetectable. He explained that the treatment worked best when standard-of-care treatments, such as chemotherapy and radiation, were not used because of those treatments' suppress on the immune system. He told Plaintiffs that the only patient who had poor results died because he got an infection during chemotherapy treatment after the ONCObind procedure, and that stopping chemotherapy is required. Plaintiffs are aware of no reason that Mr. Preston had to believe this information was true at the time, and in the months following these representations, upon information and belief, most of these patients in the Croatia study experienced significantly more aggressive metastases following the ONCObind procedure and several of these patients died.

70.    Mr. Preston also said that the procedure had incredible pain-relieving effects. He described a patient on heavy pain medication prior to filtration who then declined any pain medication after receiving her first procedure. Again, Plaintiffs are aware of nothing suggesting

1  Mr. Preston actually believed this at the time. But even if Mr. Preston had believed this, Mr.

2  Preston, who repeatedly represented himself as a "MIT-trained physicist," knew or should have

3  known that a single patient's reported experience might not be attributable to the procedure.

4      71.    Mr. Preston further told Ms. Hudlow and Ms. Baskin that there were no adverse

5  effects of the ONCObind procedure. In fact, on a February 9 he explained on a phone call that

6  "the one negative is its expensive" ($45,000 for a round of filtration) and it takes "a full week."

7  Mr. Preston also stated that "right now, thirteen patients that have been treated, we have no

8  adverse effects."

9      72.    Throughout this conversation, Mr. Preston emphasized the credentials of those

10  who supported the ONCObind project. He emphasized his own experience as a physicist at the

11  Massachusetts Institute of Technology for over thirty years. (In reality, Mr. Preston, who holds a

12  bachelor's degree in physics and an MBA, worked in technology licensing.) He explained that

13  billionaire investor Alan Quasha, "who has three degrees from Harvard" and had been Mr.

14  Preston's "business partner for the last fifteen years," became involved because of the treatment's

15  extraordinary promise. He noted that the procedure was now being overseen by Dr. Devon

16  Quasha, who had attended Harvard Medical School and completed her medical training there, and

17  that the procedure was so promising that Devon Quasha, "our Chief Medical Officer" at Quadrant

18  Clinical Care "actually quit Mass General Hospital where she was one of the top doctors at Mass

19  General and ran the integrated medicine for Mass General Hospital." All Defendants understood

20  that their credentials and backgrounds, framed in this manner, would lend credence to the claims

21  made to patients to encourage them to agree to pay for the ONCObind procedure at the Antigua

22  clinic.

23      73.    Both Dr. Ilic and Mr. Preston made it clear to Ms. Hudlow and Ms. Baskin that

24  ONCObind had no adverse effects, so long as the patient receiving the filtration did not receive

25  chemotherapy too close to the treatment which could weaken the immune system.

26      74.    Both Dr. Ilic and Mr. Preston suggested they could help get Mr. Hudlow into the

27  clinic quickly, which Ms. Hudlow understood to be critical given the advanced stage of her

28  husband's cancer. On February 8, Dr. Ilic informed Ms. Hudlow via text messaging that she had

- 22 -

"already sen[t] all your information to Dr in charge of Clinic," and that "They will get both your and Jai[m]e's husband in." On February 9, Dr. Ilic informed Ms. Hudlow via text that she had contacted Dr. Quasha and that "it is up t[o] Dr Quasha to set up logistics" in Antigua. She further suggested that Ms. Hudlow could work with one of Mr. Hudlow's consulting physicians, Dr. Mark Rosenberg, who Dr. Ilic had already spoken to about ONCObind. And on February 9, Mr. Preston told Ms. Hudlow and Ms. Baskin that "if your doctor wants you to get in, then we will figure out a way to make that happen."

75.     In these conversations, Dr. Ilic and Mr. Preston claimed—without a basis—that ONCObind would soon be available in the United States to treat all kinds of cancer and that under American law, Antigua ONCObind recipients would be eligible for free and guaranteed participation in upcoming clinical trials.

76.     The Hudlows heard more about the ONCObind procedure from one of Mr. Hudlow's treating physicians, integrative care specialist Dr. Mark Rosenberg. Dr. Rosenberg had been in touch with Mr. Preston and Dr. Ilic around the same time as Ms. Hudlow and Ms. Baskin. Dr. Rosenberg also told the Hudlows and Ms. Baskin that he had spoken to Mr. Quasha about the procedure and that Mr. Quasha believed it to be extremely promising.

77.     Within days, Mr. Preston told the Hudlows that Mr. Hudlow would be able to be one of the first patients to receive the ONCObind filtration in the Antigua clinic. The ONCObind procedure would begin at the end of February. The Hudlows were told to pay Quadrant Clinical Care $45,000, arrange their travel and stay in Antigua, and get a main line catheter in place prior to arrival. The rest would be handled by Quadrant Clinical Care once they were on the island.

78.     Per Mr. Preston's instructions, the Hudlows worked with a radiologist to get a tunneled catheter placed. On Mr. Preston's advice, Mr. Hudlow paused his chemotherapy treatments for a "wash out" period to enable the ONCObind procedure to work.

79.     On February 27, 2024, the Hudlows arrived in Antigua for Mr. Hudlow's three filtration sessions.

80.     On February 28, the Hudlows arrived at the Quadrant Clinical Care clinic for Mr. Hudlow's first day of filtering. Ms. Hudlow immediately noticed the clinic did not appear to be

equipped for patients with advanced cancer. For example, the area where the procedure was

administered was not equipped with hospital beds. Instead, in February, the facility only had

examination beds that are painful for weakened, ill individuals to lie on for hours of treatment,

causing multiple Plaintiffs (Mr. Hudlow and Mr. Bowen) to suffer skin breakdown. The clinic

only had two sinks, meaning that medical staff were unable to regularly wash their hands. And

vitals monitoring equipment seemed to be in short supply.

81.     Shortly after arrival at the clinic, the Hudlows met Dr. Quasha, who told Ms.

Hudlow she had given her 90-day notice at Mass General Brigham so that she could become the

Medical Director of Quadrant Clinical Care Antigua. Such statements further convinced Plaintiffs

of the validity of the ONCObind procedure – as Defendants expected it would. Mr. Preston and

Dr. Ilic repeatedly told Plaintiffs of Dr. Quasha's credentials and education in an effort to

legitimize the ONCObind procedure. Dr. Quasha examined Mr. Hudlow. Dr. Quasha is pictured,

below, with Mr. Hudlow before his first filtration on February 28.



82.     The first filtration went fairly smoothly. Partway through the treatment, Dr. Joseph

John entered and introduced himself to the Hudlows and explained that he ran the clinic day to

day.

83.     Mr. Hudlow's condition took a turn for the worse by the evening. Mr. Hudlow's legs and head were jerking repeatedly, and his pain increased significantly. His symptoms lasted throughout the night and into the next day. Dr. Quasha watched Mr. Hudlow's twitching and said that she would run labs but ensure Mr. Hudlow could continue filtration sessions.

84.     The next day, February 29, the Hudlows remained at the hotel because Mr. Hudlow was in severe pain. Mr. Hudlow's jerking and twitching increased so much that Mr. Hudlow could not hold a utensil to feed himself, which had never happened before.

85.     On March 1, the Hudlows returned to the clinic around 8 a.m. Back on the painful examination table, Mr. Hudlow's symptoms continued. Dr. John had blood tests performed on Mr. Hudlow, which showed that his uric acid was high. Dr. John insisted that this was merely a side effects of how quickly his body was attacking the cancer. Given Mr. Hudlow's worsening condition, the Quadrant Clinical Care staff decided to keep Mr. Hudlow in the clinic for the remainder of the day. The staff partially emptied what appeared to be a janitorial closet to make room for Mr. Hudlow. To monitor Mr. Hudlow's vital signs, Ms. Hudlow herself had to drag the vitals monitoring machine into the makeshift room. Ms. Hudlow remained with Mr. Hudlow in the small room.

86.     During and following the second filtration on March 1, Mr. Hudlow's pain increased significantly.

87.     On March 2, Mr. Hudlow began bleeding profusely out of his catheter and had to return to the clinic for a dressing change. Ms. Hudlow observed, shocked, as the dressing was changed with tools that were not sterile. Dr. John collected blood for labs and kept the Hudlows at the clinic for a number of hours.

88.     On March 3, Mr. Hudlow received his third filtration. Mr. Hudlow remained in extreme pain, and was not released from the clinic until approximately 10 p.m. Dr. John ordered certain lab tests, but he continued to insist that Mr. Hudlow's increased pain was merely a side effect of how effectively ONCObind had triggered his body to kill cancer cells.

89.     The Hudlows were scheduled to fly out the next day, but they had run out of pain medication. Dr. John repeatedly refused to prescribe or order Mr. Hudlow's medication, insisting

1  that the dose was more than he was comfortable prescribing and refusing to speak to any of Mr.

2  Hudlow's treating physicians about his medication dose.

3      90.    Finally, Dr. John ordered pain medication for Mr. Hudlow, after explaining again

4  that any additional pain was likely a sign that the procedure had been successful and was causing

5  tumor lysis syndrome, a condition that occurs when many tumor cells are killed and the body

6  struggles to process them as they are released into the bloodstream. The medication he prescribed

7  was insufficient to treat Mr. Hudlow's pain.

8      91.    Ms. Hudlow was concerned, but was assured that ONCObind was working and its

9  success would be shown once the Hudlows received the results of the circulating tumor cell test

10  Dr. Ilic and others relied on. The test ExThera and Quadrant Clinical Care relied upon, known as

11  "Maintrac," was conducted by a laboratory in Germany and would require shipping blood

12  samples there.

13      92.    The Hudlows would never receive results of the Maintrac test. Rather than

14  drawing vials of blood for the test, the Quadrant Clinical Care team placed used filters in a freezer

15  and then shipped them to the laboratory in Germany. By the time the filters arrived, the blood

16  within them had coagulated and was unusable. Quadrant Clinical Care's president Tom Pontzius

17  blamed this on the unreliability of shipping from Antigua, but Ms. Hudlow later learned that the

18  laboratory categorically could not perform the test on blood left in filters, rather than collected in

19  vials.

20      93.    On March 4, the Hudlows were headed to the airport to return to their home in

21  Florida when Ms. Hudlow received a call from the clinic informing her that she needed to pay an

22  additional bill of more than $3,000 before leaving the island for tests Dr. John had ordered, pain

23  medication, and the day-long stay in the janitorial closet.

24      94.    Struggling to get Mr. Hudlow onto the plane in his poor condition, Ms. Hudlow

25  informed the clinic she would pay when she arrived home. She was shocked, however. Mr.

26  Preston and the Quadrant Clinical Care staff with whom she had coordinated ahead of the trip had

27  assured her that costs would be fully covered by the $45,000 paid in advance.

28

95.     Upon arriving home, the Hudlows' problems accelerated. By March 5, Mr. Hudlow was in even more pain than when he was in Antigua. He became short of breath, his legs began taking on fluid, and he began displaying cognitive impairment unlike anything Ms. Hudlow had observed before. He was confused, wandered the halls of the Hudlow home at night and pulled his central lines out. Large, additional growths began appearing on Mr. Hudlow's head and body. Overall, Mr. Hudlow was in significantly worse health than he had been before the procedure. It was the first time Mr. Hudlow had ever exhibited such dramatic symptoms.

96.     The Hudlows had regularly tracked Mr. Hudlow's cancer with a test known as "Signatera," a blood test that measures circulating tumor DNA and is covered by Medicare for multiple solid tumor indications. The results of the Signatera test performed following the treatment showed a dramatic increase in circulating tumor DNA in Mr. Hudlow's blood.

97.     In the days following their return home, Dr. Quasha, Mr. Preston, and Mr. Pontzius called Ms. Hudlow regularly to check on Mr. Hudlow's condition, though no one directed her to have any particular tests performed.

98.     Over the next week, Mr. Hudlow remained in pain. His Signatera results fluctuated somewhat, though they never returned to the levels they were before he went to Antigua. Ms. Hudlow was uncertain about whether ONCObind was working, but the team continued to reassure her that these were positive signs of an immune response.

99.     On March 12, Dr. Ilic called Ms. Hudlow to reassure her about the procedure's efficacy. Dr. Ilic told Ms. Hudlow that ExThera was beginning clinical trials in Oklahoma and at the MD Anderson Cancer Center in Texas. There is no evidence that ExThera has or had any clinical trial at MD Anderson Cancer Center, and the clinical trial at the University of Oklahoma is limited to testing the procedure on a specific kind of pancreatic cancer—Mr. Hudlow had esophageal cancer—and has only five patients.

100.    Dr. Ilic said she had just performed ONCObind on three individuals, including an advanced breast cancer patient whose circulating tumor cell count had been reduced to zero. Whether or not these were the patient's results remains unclear, however, upon information and belief, that patient is now deceased. Ms. Hudlow told Dr. Ilic that Mr. Hudlow did especially

1    poorly for a week after receiving the treatment. Dr. Ilic insisted that this was a good sign: Mr.

2    Hudlow was having a strong immune response to the treatment.

3         101.    On March 19, Ms. Hudlow emailed Dr. Quasha, Mr. Preston, Dr. Rosenberg, Dr.

4    John and Tom Pontzius to update them on Mr. Hudlow's test results which indicated a significant

5    and exponential increase in his cancer markers. Nevertheless, Dr. Quasha emailed Ms. Hudlow

6    back reaffirming that he should return to Antigua: "This is scary – but I remain hopeful.  As you

7    have noted, David is among the very, very first to get this treatment (and likely one of the patients

8    with the highest burden of disease).  Please keep us as up to date as possible.  If you feel that

9    David is safe to travel for another treatment, then we will look forward to seeing you both again

10    in Antigua.  The more you share about how he is doing, the more Dr. John and I can prepare to

11    care for him there."

12         102.    On March 21, Mr. Hudlow had fluid in his legs and intermittent confusion, and

13    began to have trouble breathing. Ms. Hudlow took Mr. Hudlow to the emergency department of a

14    local hospital, and Mr. Hudlow was diagnosed with and treated for a pleural effusion—that is,

15    fluid in his lungs. At the hospital, the medical team drained a full liter of bloody fluid from Mr.

16    Hudlow's lungs, and the Hudlows' family doctor told Ms. Hudlow that it appeared Mr. Hudlow

17    was entering the end stages of his life. Ms. Hudlow emailed the full Quadrant Clinical Care team,

18    explaining what happened and asking whether what had been observed could still be an immune

19    response.

20         103.    The next night, March 22, Ms. Hudlow learned that the German lab was unable to

21    run the MainTrac test, which Dr. Ilic insisted would demonstrate the success of ONCObind. The

22    filters arrived days old and full of coagulated blood; the lab required standard blood samples (in

23    vials) to run the test. Ms. Hudlow learned this by calling and emailing the German lab herself

24    because the Quadrant Clinical Care team seemed to avoid discussing the issue altogether. Ms.

25    Hudlow called Dr. Ilic. Dr. Ilic blamed the issue on the Quadrant Clinical Care team, but praised

26    Dr. Quasha. Dr. Ilic told Ms. Hudlow about another patient from the European trial whom she

27    described as even sicker than Mr. Hudlow who now was training for a marathon. Dr. Ilic told Ms.

28    Hudlow that she would be the first to find out when the American clinics were able to open, that

1    Mr. Hudlow would be able to receive treatment in Montana for free before any other patients, and

2    that Ms. Hudlow should keep that secret. Dr. Ilic also insisted that the medical team of Princess

3    Catherine of Wales, who suffers from cancer, had asked Dr. Ilic to provide the ONCObind

4    treatment to the Princess. Dr. Ilic insisted that Mr. Hudlow needed an additional treatment. Again,

5    Dr. Ilic brought up the patients she had allegedly brought back from the brink of death in Europe

6    and explained that Mr. Hudlow's case might just require more filtration given how advanced it

7    was.

8          104.    Desperate and believing Dr. Ilic's repeated insistence that more filtration was

9    necessary to achieve ONCObind's effects, the Hudlows prepared to return to Antigua. Drs. Ilic

10   and Quasha continued to insist that more filtration procedures would improve Mr. Hudlow's

11   condition.

12         105.    On April 3, the Hudlows flew back to Antigua. Mr. Hudlow was taken to the clinic

13   for placement of a central line through which the procedure could be administered. Mr. Hudlow

14   now had multiple growths on his head, and Ms. Hudlow requested that one of the growths be

15   biopsied. To Ms. Hudlow's surprise, Dr. John removed one of the growths entirely, cutting a

16   ping-pong-ball-sized growth out and stitching the wound closed.

17         106.    On April 4, Mr. Hudlow underwent the first filtration session of this second visit to

18   Antigua. Before the filtration, the nurses administered a blood transfusion. The staff did Mr.

19   Hudlow's filtration in what it misleadingly described as its "ICU." The "ICU" was anything but:

20   it was merely a series of beds with a curtain between patients. Like the rest of the hospital, there

21   were no provisions for individuals undergoing long treatments or staying hours at a time and there

22   was no food or water available.

23         107.    On April 5, Mr. Hudlow became very short of breath and had to go to the clinic,

24   where additional tests were run and he was given oxygen.

25         108.    On April 6, the Quadrant Clinical Care team administered a second filtration

26   procedure to Mr. Hudlow in the filtration area of the clinic—on the hard examination table. Mr.

27   Hudlow required oxygen. Mr. Hudlow was kept overnight in a corner of the "ICU" facility,

28   separated only by a shower curtain from a child with R.S.V. coughing, without a nurse to monitor

him. Ms. Hudlow, not realizing Mr. Hudlow would not be monitored, returned to the hotel to attempt to sleep.

109. Mr. Hudlow, extremely disoriented and confused, ripped out the stitches Dr. John had left in his head. Mr. Hudlow bled on the hospital pillow for hours without the staff noticing. The next morning, Ms. Hudlow arrived, noticed the blood, and was able to gauze wrap Mr. Hudlow's head. Mr. Hudlow is pictured after Ms. Hudlow covered the wound below. When Ms. Hudlow realized Mr. Hudlow had been left with his head wound bleeding onto the pillow for several hours by Quadrant Clinical Care's "ICU" staff, she was extremely distressed.



110. From April 6 to April 7, Mr. Hudlow continued to struggle to breathe and was kept in the clinic. Ms. Hudlow suspected that Mr. Hudlow's breathing issues were caused by pleural effusions.

111. Ms. Hudlow requested a CT scan of Mr. Hudlow's lungs, but Dr. John insisted that Mr. Hudlow did not require one. Ms. Hudlow later learned there was no CT scanner in the clinic, though there is a hospital on the island equipped with one. Ms. Hudlow was never informed that there was another hospital on the island with adequate equipment.

112. Ms. Hudlow became increasingly concerned about how the Hudlows would return home. Mr. Hudlow needed continuous oxygen support, which the Hudlows could not bring on a commercial flight. On April 8, Dr. John, who informed them he was leaving the island and flying

to Florida the following day for a conference, informed Ms. Hudlow that Mr. Hudlow was dying and suggested that the Hudlows could join him on his flight the next day so he could inform the flight crew of a medical emergency and deliver oxygen to him via the airplane's emergency oxygen masks.

113.    Ms. Hudlow, having lost faith in Dr. John, instead searched for hours to find an airline, charter jet, or pilot to fly with Mr. Hudlow's necessary (but flammable) oxygen tanks on board. By April 9, Ms. Hudlow was able to charter a jet to return to their home in Florida with the oxygen support Mr. Hudlow needed.

114.    That same day, Mr. Pontzius (in his role as the president of Quadrant Clinical Care) texted Ms. Hudlow, telling her that he had consulted with the team, and Mr. Hudlow should continue fighting cancer with ONCObind. Mr. Pontzius told Ms. Hudlow that he had asked the laboratory in Germany to expedite Mr. Hudlow's MainTrac test. Later that day, Mr. Pontzius falsely informed Ms. Hudlow that the MainTrac test showed that Mr. Hudlow's circulating tumor cells had been cleared.

115.    On April 10, the Hudlows made it back to Florida. The Hudlows rushed to the Mayo Clinic's Jacksonville, Florida, location, where Mr. Hudlow was immediately checked into the emergency department. Mr. Hudlow's lungs continued to fill with fluid, and a tap was put in so that the fluid can be more easily drained.

116.    On April 12, the Mayo medical team informed the Hudlows that Mr. Hudlow's disease was end stage and recommended palliative care. The Hudlows prepared a do-not-resuscitate. Ms. Hudlow took Mr. Hudlow home.

117.    Mr. Hudlow passed away on April 18, a mere 12 days after his last ONCObind filtration. The lack of adequate care in Antigua was a direct cause of his death.

118.    Ms. Hudlow suffered extreme emotional distress, not only because her husband suffered so much in Antigua and because her husband passed away, but because she had to witness him being treated extremely poorly multiple times throughout the process – for example, when he was put into what appeared to be a closet for an overnight stay or when in the ICU he appeared to have been bleeding from his head wound for several hours without anyone noticing.

Further, Ms. Hudlow experienced several instances where Quadrant Clinical Care staff treated her outrageously – including when Dr. John called her while she was at the airport to say she needed to pay an exorbitant additional bill before leaving the island, when Dr. John refused to order Mr. Hudlow's necessary pain medication, and when Dr. John insisted Ms. Hudlow should bring Mr. Hudlow on a commercial flight off the island that he happened to be taking to go to a medical conference so that he could call a medical emergency if Mr. Hudlow needed oxygen.

### B.    Brian Withey (participant) & Jaime Baskin (spouse)

119.    Jaime Baskin and her husband Brian Withey had been managing Mr. Withey's colorectal cancer since Mr. Withey was diagnosed with Stage III colon cancer following a colonoscopy in June 2019.

120.    Understanding that Mr. Withey would require aggressive treatment to survive, Ms. Baskin and Mr. Withey pursued both the best standard-of-care treatment available at Northwestern Memorial Hospital in Chicago and also sought out integrative care near their home from Dr. Keith Block at the Block Center for Integrative Cancer Treatment (also in Chicago).

121.    Although an initial round of chemotherapy stalled Mr. Withey's cancer, in August 2020, Mr. Withey's cancer returned as Stage IV with additional tumors in Mr. Withey's liver.

122.    From August 2020 into 2024, Mr. Withey's cancer was controlled through repeated chemotherapy rounds and intensive integrative medicine regimens intended to support Mr. Withey's immune system.

123.    Ms. Baskin heard about the ONCObind procedure from a friend and was put in touch with Dr. Sanja Ilic, the Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs for ExThera,, as described above in Paragraphs 64 to 66, *supra*. Ms. Baskin was hopeful after hearing Dr. Ilic's promises. Dr. Ilic further assured Ms. Baskin, who worried about the family's ability to afford ongoing treatment that Mr. Withey would be eligible to receive further filtrations in ExThera's upcoming clinical trials in Oklahoma associated with MD Anderson for free. In fact, Dr. Ilic told Ms. Baskin that Mr. Withey could be the first patient enrolled in an upcoming clinical trial for colorectal cancer.

124.    And after hearing from John Preston, as described above in Paragraphs 67 to 73, *supra*, Ms. Baskin became more convinced the ONCObind filtration treatments might improve Mr. Withey's condition, or at least would not harm Mr. Withey, as Mr. Preston assured both Ms. Baskin and Ms. Hudlow that the "treatment" was risk-free.

125.    On April 2, Mr. Pontzius responded to an email Ms. Baskin sent with questions regarding the treatment, copying Dr. Quasha, Quadrant Clinical Care, Mr. Preston, and Dr. Rosenberg, including by informing her that "The treatment protocol is established by the treating physician in consult with our Chief Medical Officer. This initial treatment protocol has been established as a 3-filter treatment." The Chief Medical Officer was Dr. Quasha.

126.    In Ms. Baskin's email, she also asked whether Dr. Quasha would be present at the clinic when Mr. Withey received ONCObind, noting she understood that "Dr. John is great, but he is a surgeon and these are stage 4 cancer patients;" and she was "not sure a surgeon would be sufficient alone . . . ." In the same April 2 email back to Ms. Baskin, copying Mr. Preston, Dr. Quasha, Dr. Rosenberg, and Quadrant Clinical Care, Mr. Pontzius replied stating that "Unfortunately, Dr. Quasha will not be present. I can assure you, having witnessed this myself, Dr. John and his team of physician's are more than capable of monitoring and responding to any type of event that would require medical attention. The clinic is prepared for this, and the medical team is very good."

127.    In fact, no physician associated with Quadrant Clinical Care would be present in Antigua beyond April 8. Given Mr. Withey's more stable condition, Mr. Withey was scheduled for filtration to begin in April 2024 (later than Mr. Hudlow). Although Ms. Baskin, too, was told that Mr. Withey should cease chemotherapy in the February calls with Mr. Preston and Dr. Ilic, Ms. Baskin and Mr. Withey followed the advice of Mr. Withey's treating physician and paused chemotherapy only two weeks before the couple flew to Antigua.

128.    On April 7, Ms. Baskin and Mr. Withey flew to Antigua to begin the ONCObind filtrations.

129.    On April 8, Mr. Withey underwent his first filtration. During the first session, two Seraph 100 filters clogged before a third finally seemed to work. Mr. Hudlow, however, lost a significant amount of blood and felt very ill.

130.    Two days later, on April 10, Mr. Withey underwent his second—and final—filtration session. The filtration was disastrous. The filters repeatedly clogged. Blaming the clogged filters on Mr. Withey's blood thickness, Quadrant Clinical Care staff pushed 3,000 units of heparin intravenously into Mr. Withey to thin his blood.

131.    In total, six Seraph 100 filters clogged and were thrown away full of Mr. Withey's blood. Mr. Withey *lost a third of his blood volume*.

132.    Around midnight, Mr. Withey was finally disconnected from his sixth filter. He stood up to walk over to Ms. Baskin and immediately slumped to the floor unconscious and began shaking. For ten minutes, a nurse attempted to resuscitate Mr. Withey before a doctor arrived to transfer him to the "ICU."

133.    Ms. Baskin, shocked at what she had seen, also lost consciousness.

134.    The next day, Dr. John, who was in Miami for a medical conference, called Ms. Baskin to tell her that he believed her husband had heparin-induced thrombocytopenia (HIT), Ms. Baskin doubted this was the cause, believing it significantly more likely that Mr. Withey was suffering because he had lost a third of his blood volume, but Dr. John continued to insist. Ms. Baskin was eventually able to convince Dr. John to give Mr. Withey two blood transfusions.

135.    Mr. Withey's condition was too poor after the second filtration for him to receive the planned third filtration.

136.    Mr. Withey and Ms. Baskin therefore returned to the United States, where Mr. Withey's health remained poor. Mr. Withey's treating physicians confirmed that Mr. Withey was not suffering from HIT, but rather from blood loss, as Ms. Baskin suspected.

137.    The Baskins were reassured to hear from Dr. Ilic that a test result (MainTrac) had shown a high number of dead cancer cells in his blood, suggesting ONCObind had been successful. Dr. Ilic said his body was attacking his primary tumors. There is no reason to believe this was true.

138.    Because of these reassurances, Ms. Baskin continued to hope the treatment might be successful, but neither Ms. Baskin nor Mr. Withey trusted that the treatment could be administered in Antigua.

139.    About two weeks later, Ms. Baskin accepted Quadrant Clinical Care's offer to cover one of Mr. Withey's future filter sessions because they had paid $45,000 for three filtration sessions but had only received two. Ms. Baskin and Mr. Withey planned to wait until a second Quadrant Clinical Care clinic in the Bahamas opened or a U.S. clinic could be opened to avoid a repeat of the Antigua experience, which Dr. Ilic and Dr. Quasha ensured them would not be an issue at new facilities.

140.    But within three weeks of Mr. Withey's return from Antigua, his blood tests indicated that his cancer was increasing substantially. Because of the effects of the ONCObind procedure, Mr. Withey could not undergo his recommended chemotherapy treatment at that time. While Mr. Withey did ultimately undergo further chemotherapy, his cancer markers have never returned to their pre-ONCObind levels.

141.    Months later, in July 2024, when Ms. Baskin asked for a refund for the cost of the third filtration, Ms. Baskin learned that Quadrant Clinical Care had decided to use the balance remaining from their $45,000 payment to cover a $16,246 bill from Medical Surgical Associates, the clinic in which Quadrant Clinical Care operated, for "ICU" services Mr. Withey received after the filtration repeatedly failed and he lost a third of his blood volume.

142.    Mr. Withey endured significant pain and suffering in Antigua and afterwards due to the administration of ONCObind. His cancer spread significantly following his blood filtrations, and his pain never decreased as promised. Mr. Withey's cancer now presents a greater risk to his life than prior to receiving ONCObind.

143.    Mr. Withey and Ms. Baskin continue to suffer severe emotional distress as a result of the human experimentation Mr. Withey endured in Antigua.

1

**C.**    **John Bowen (deceased victim) & Stacey Bowen (spouse)**

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16    144.    Plaintiff John Bowen (pictured above with his wife, Plaintiff Stacey Bowen in

17  March 2024) was diagnosed with Stage IV colon cancer in September 2022. He and Ms. Bowen

18  immediately began pursuing standard-of-care treatment at Northwestern and integrative care

19  through the Block Center for Integrative Cancer Treatment in hopes of treating the cancer and

20  extending Mr. Bowen's life.

21    145.    As the Bowens pursued treatment for Mr. Bowen's cancer, Ms. Bowen became

22  connected with Plaintiffs Kim Hudlow and Jaime Baskin, communicating regularly both to

23  provide each other with support and to exchange information and research about potential

24  treatments.

25    146.    By February 2024, the Bowens were nearly two years into fighting Mr. Bowen's

26  cancer. Mr. Bowen was in stable condition.

27

28

147.    When Ms. Hudlow and Ms. Baskin heard about the ONCObind procedure and its promise for both treating cancer and reducing cancer patients' pain from John Preston and Dr. Sanja Ilic, they shared the information with Ms. Bowen. Later, all three "Cancer Wives" were able to join a videoconference with a patient who had undergone the ONCObind procedure in Greece and who believed, at the time based on what she had heard from ExThera and Quadrant representatives, that the treatment was extremely promising.

148.    Hearing the promises Dr. Ilic and Mr. Preston had made about the treatment (as described above) and hearing from the patient who had undergone the procedure made the Bowens optimistic that the procedure would help treat Mr. Bowen's cancer and at least reduce his pain. The Bowens were further reassured because Preston had told Ms. Hudlow and Ms. Baskin repeatedly that the only "negatives" were the expense of $45,000 and travel to Antigua.

149.    The Bowens kept in touch with the Hudlows and kept apprised of their February 2024 trip to Antigua for the procedure. The Bowens heard that Dr. Ilic had reassured the Hudlows that ONCObind was working.

150.    On April 1, 2024, a Quadrant Clinical Care employee, emailing from info@quadrantclinicalcare.com, sent Ms. Bowen further information, including that the clinic had "seen positive outcomes because of treatment" and stating, "We have not yet received John's medical records and Dr. Quasha (our Chief Medical Officer) reviews each file prior to treatment and discusses the right protocol with your referring physician… After Dr. Quasha reviews John's records and discusses with Dr. Rosenberg, we will have a better idea….  Dr. Quasha, in consultation with your physician, will continue to monitor the post treatment journey, identifying trends and when/if a subsequent treatment should take place."

151.    On April 3, the Bowens spoke to Tom Pontzius, who introduced himself as a representative of Quadrant Management with 30 years of healthcare experience. Mr. Pontzius described the science behind the procedure. He explained that heparin sulfate in the Seraph 100 filters removed circulating tumor cells from the blood, returning the blood to the body in a cleaner state and allowing the immune system to reset and attack primary tumors. Mr. Pontzius also said that ONCObind had relieved previous patients' cancer pain. Mr. Pontzius disclosed two potential

side effects—edema (swelling) and a risk of tumor lysis syndrome (described above)—but he reassured the Bowens that Dr. Joseph "Joey" John, with his ten years of experience working at Columbia University's medical facilities in New York City, would be monitoring patients and able to treat such effects. Mr. Pontzius told Ms. Bowen that tumor lysis syndrome would actually be a good sign, indicating Mr. Bowen's immune system was successfully killing off massive numbers of tumor cells. These statements were false, as demonstrated by the other Plaintiffs' experiences.

152.    Mr. Pontzius told the Bowens that five individuals were returning for a second round of filtration four to six weeks after their first. He never mentioned any of the negative outcomes of individuals subjected to ONCObind. He also told the Bowens that Mr. Bowen should wait six weeks to get scans after filtration in order to see its effects. Mr. Pontzius assured the Bowens that Dr. Devon Quasha, Quadrant Clinical Care's Chief Medical Officer, was overseeing all patients' care and planning personalized regimens for each patient based on their medical needs. Again, this was not true.

153.    Before the Bowens traveled to Antigua, Dr. Ilic communicated with Ms. Bowen via text, confirming that, if Mr. Bowen were able to be filtered in Antigua, he would likely be able to enroll in an upcoming ONCObind clinical trial in Oklahoma, where he would receive further filtrations at no cost. In reality, there was no reason to believe Mr. Bowen would be able to enter such a trial.

154.    Hopeful that ONCObind would at least relieve some of Mr. Bowen's pain as Mr. Pontzius had described, the Bowens decided to travel to Antigua. The Bowens understood that the worst case scenario was that Mr. Bowen would experience some additional swelling or tumor lysis syndrome, which they had been assured the Quadrant Clinical Care team would catch and treat. The Bowens planned to travel as a family, with their three children, to Antigua for filtration treatment beginning on April 8.

155.    But just before leaving for Antigua, Mr. Bowen needed a transfusion of two units of blood due to his chemotherapy regimen. Ms. Bowen reached out to Dr. Quasha via email to ask whether this would impact the treatment as Dr. Quasha was reported to be in charge of

1   designing the protocols, and Dr. Quasha told her that it would not be a problem. The Bowens

2   understood Dr. Quasha to again be vouching for the effectiveness of the treatment, as described

3   by the other Defendants, and to be in charge of making the decisions about patient treatment in

4   Antigua.

5          156.    When the Bowens arrived at the clinic in Antigua, the only physician they met was

6   Dr. John, and he was leaving the next day to attend a conference in Miami, though he did not

7   disclose that to the Bowens. To the Bowens' knowledge at the time, no other physician was

8   present at the clinic.

9          157.    On April 8, Dr. John installed a catheter into Mr. Bowen's groin, which he

10  recommended instead of at the collarbone based on Mr. Bowen's existing ports. Dr. John

11  reassured the Bowens that this was a simple, easy procedure that he had not encountered any

12  issues in performing the procedure, and anesthesia would not be needed. Mr. Bowen was in a

13  significant amount of pain during the procedure. Mr. Bowen then received his first filtration.

14         158.    That night, Mr. Bowen was extremely tired and his catheter insertion spot began

15  oozing a significant amount of blood. Ms. Bowen was alarmed. She contacted Ms. Hudlow, a

16  former nurse, who was also currently in Antigua for Mr. Hudlow's second round of filtration. Ms.

17  Hudlow was able to help bandage the site. Mr. Bowen was also in a significant amount of pain

18  and had to take more pain medication than he had ever before in his years of cancer treatment.

19         159.    The next day, the Bowens returned to the clinic to have Mr. Bowen's bandages

20  changed. The nurses changed the bandages, but Ms. Bowen noticed that there was no physician

21  present and soon learned that Dr. John had left for Miami.

22         160.    At this point, there was no physician in the clinic, though there were several very

23  ill individuals in the clinic: Mr. Hudlow, who would leave on April 9 via an emergency charter

24  flight, Mr. Withey, who had just undergone his first filtration, and Mr. Bowen.

25         161.    The second filtration occurred on April 10. Mr. Bowen was again extremely tired

26  following filtration.

27         162.    On the day of the third filtration, April 12, unlike during the first two treatments,

28  no nurse drew Mr. Bowen's blood to establish a baseline. Ms. Bowen had been asking for the first

- 39 -

two days' results and did not receive them until this third treatment day. When Ms. Bowen saw the blood test results from the first two days, she realized—based on her years learning about her husband's care—that Mr. Bowen's uric acid had been high on both of the first two filtration days. Nevertheless, the team proceeded with the third filtration.

163. During his third filtration, Mr. Bowen's filter clogged and had to be replaced, likely resulting in additional blood loss. Mr. Bowen began vomiting and felt very warm to the touch. His blood pressure began dropping.

164. There was still no physician assigned to oversee the clinic, and the nurse attempting to treat Mr. Bowen was panicked. Ms. Bowen called Dr. John, who did not answer his phone. She then called Mr. Pontzius, who also did not answer, and she ended up speaking to his wife, who informed her that Mr. Pontzius was on a flight to Asia.

165. At this point, the nurses attempted to remove Mr. Bowen's catheter, which caused a significant additional bleed. The nurses then called in an emergency physician, whom Ms. Bowen had never met before. The emergency physician treated Mr. Bowen with additional intravenous fluids for his blood pressure, but because Mr. Bowen already had fluid in his stomach and throughout his body, this caused additional pain and swelling. Mr. Bowen was given a blood transfusion. Mr. Bowen eventually became stable and was kept overnight in the clinic's misleadingly termed "ICU" (described, *supra*, at Paragraph 108) for further monitoring.

166. The next day, April 13, with Mr. Bowen significantly weakened, the Bowen family prepared to fly back home to Illinois the next morning. Around 9 p.m., Dr. John finally called Ms. Bowen and told her that Mr. Bowen's platelet count was low after the third filter and that he thought Mr. Bowen might have heparin-induced thrombocytopenia (HIT). When Ms. Bowen told Dr. John that she was surprised to be receiving this information at this late time given that Mr. Bowen had been in the "ICU" the full night before, Dr. John's story shifted. He said Mr. Bowen probably did not have HIT, but that they should give him a blood thinner out of an abundance of caution.

167.    Ms. Bowen asked Dr. John if he could get them a blood thinner that night, and he said he was not sure how. Dr. John's story shifted again. He told Ms. Bowen around 10:15 p.m. that he believed Mr. Bowen was safe to travel home without the blood thinner.

168.    On April 14, the Bowens flew home. Mr. Bowen was vomiting, in pain, and lethargic throughout the flight. Ms. Bowen became scared that Mr. Bowen would not survive the trip. After landing that evening, the Bowens went to a hospital emergency department early the next morning. Mr. Bowen was immediately admitted. Ms. Bowen would later learn that the medical staff had called Mr. Bowen's oncologist and informed her that they did not expect Mr. Bowen to live more than 48 hours.

169.    Mr. Bowen's labs demonstrated a number of potential causes for his sudden decline: his uric acid levels were again extremely high, he had a blood clot in his iliac vein (where the catheter for filtration had been inserted) that was likely aggravated by the travel, and he might have tumor lysis syndrome. The medical team informed Ms. Bowen that blood clots are a common adverse effect of the type of catheter Dr. John placed in Mr. Bowen in Antigua.

170.    None of these issues had been caught in the Antigua clinic, where there was no physician oversight during the week Mr. Bowen was receiving ONCObind.

171.    The medical team was able to stabilize Mr. Bowen somewhat but could not manage Mr. Bowen's pain. The team moved him to hospice, but while in hospice, on April 20, Mr. Bowen began to bleed profusely. Ms. Bowen observed her husband yelping in tremendous pain. Mr. Bowen (pictured below on April 22, 2024) was also bleeding so intensely that hospice staff had to remove him from the blood thinners he had received for his clot.

1
2
3
4
5
6
7
8
9



10
11      172.    On April 24, Mr. Bowen passed away, ten days after leaving Antigua. Mr.

12  Bowen's medical team advised Ms. Bowen that they did not believe that his cancer would have

13  caused such a rapid decline had he not received ONCObind.

14      173.    Ms. Bowen was extremely traumatized by the ordeal.

15          **D.    Kyle Chupp (deceased victim) & Vanessa Chupp (spouse)**

16
17
18
19
20
21
22
23
24
25
26
27
28

174.    Plaintiff Kyle Chupp (pictured, above center, with his wife Vanessa Chupp and his three children in January 2024) was diagnosed with Stage IV liposarcoma on December 29, 2023. By the time of diagnosis, his cancer had already spread to his lungs, bones, liver, and lymph nodes.

175.    Mr. Chupp's oncologist informed Mr. Chupp and his wife, Vanessa Chupp, that in six months, after the first rounds of chemotherapy, she would be better able to establish how long Mr. Chupp could expect to survive.

176.    Because Mr. Chupp's primary tumor was on his left hip, it caused increased swelling and pain throughout Mr. Chupp's groin and leg. His oncologist therefore recommended beginning with an early round of radiation to shrink the tumor. His radiation was scheduled to begin on January 5, 2024.

177.    But on January 3, the Chupps received a message from a friend indicating that a physician in Florida, Dr. Eduardo Maristany, had connections to a medical team providing an innovative therapy that could benefit Mr. Chupp. On information and belief, and based on his communication with Ms. Chupp using a "qcca.health" email address, through which intake documentation for Quadrant Clinical Care Antigua was transmitted, Dr. Maristany was a Quadrant Clinical Care employee or business partner. The Chupps were soon put in touch with John Preston and Dr. Chad Prodromos, who operates the Prodromos Stem Cell Institute in Illinois and, per his website, maintains a practice location at the Quadrant Clinical Care Antigua clinic. On information and belief, Dr. Prodromos, like Dr. Maristany, was a Quadrant Clinical Care employee or business partner.

178.    The same day, Ms. Chupp had a call with Mr. Preston, who explained that "pathogens want to bind with the heparin" in the filter, and that "in the case of cancer," though it was "only done in 8 patients so far, and we're doing another group of 8 next week, in filtering pathogens out of the blood, it allows the immune system to now fight the primary tumors. We've got really good results on the first 8 patients. They were all late stage, stage 4, they had metastasized, and three of them, we can't even find the tumor three weeks later. So very good results. So if you're up for trying it, I'd be happy to put him in next week, we have the first

1   opening, it's going to be on Thursday in Antigua." Mr. Preston asked her if she would like him to

2   connect her "with Dr. Prodromos who will tee everything up" and help them find hotel rooms."

3   Mr. Preston told Ms. Chupp that "the treatment is a pretty simple one," and reassured her that

4   "it's just like dialysis – there are millions of dialysis procedures every year. We use the same

5   machine, it's just a totally different filter." Further, Mr. Preston stated that he would be in

6   Antigua at the clinic on the day the Chupps arrived and could meet them and introduce them to

7   the rest of the Quadrant Clinical Care Antigua team before returning to Boston.

8          179.    That same day, Mr. Preston scheduled and joined a call with Ms. Chupp, Dr.

9   Prodromos and his then-staff member at Quadrant Clinical Care Antigua, in which Dr. Prodromos

10  and Mr. Preston gathered basic information about Mr. Chupp and scheduled Mr. Chupp's

11  filtrations.

12         180.    Mr. Preston and Dr. Prodromos said the next set of patients would receive

13  ONCObind in Antigua beginning on January 10, 2024, and that they could find room for Mr.

14  Chupp to join.

15         181.    The Chupps mentioned that Mr. Chupp was scheduled to start radiation and

16  chemotherapy shortly.

17         182.    Mr. Preston and Dr. Prodromos advised the Chupps _not_ to begin chemotherapy or

18  radiation, as the two patients who fared the best in the Croatian trial and were now cancer free

19  were the only two who had not had any radiation or chemotherapy treatment. Mr. Preston and Dr.

20  Prodromos claimed—without a basis—that this was because the treatment improved the immune

21  system's ability to attack the primary tumor, and traditional cancer treatments hindered the body's

22  ability to do so.

23         183.    Relying on these representations, the Chupps agreed to participate. The Chupps

24  spent the following days lining up travel from their home in Ontario, Canada to Antigua and

25  arranging to pay the $45,000 required.

26         184.    But, on January 9, the Chupps received a voicemail from Dr. Prodromos informing

27  them that Mr. Chupp's treatment would be delayed for two weeks and that the Chupps should not

28  yet travel to Antigua. Dr. Prodromos again advised Mr. Chupp not to begin any chemotherapy or

radiation. The Chupps were also told that Mr. Chupp should not receive any chemotherapy or radiation for a month following ONCObind.

185.    In the days and weeks subsequent to this advice, Mr. Chupp's left leg and groin continued to swell, and his right leg began to swell as well.

186.    Finally, on January 25, Tom Pontzius, emailed the Chupps informing them that the treatment would begin on February 19. The Chupps had not heard from Mr. Pontzius before. His email signature described him as the President of Quadrant Clinical Care Antigua. Eager to find relief for Mr. Chupps cancer, the Chupps held off on receiving chemotherapy or radiation and again prepared to travel to Antigua.

187.    But, on February 7, Mr. Chupp's pain was so significant that Ms. Chupp rushed him to the emergency department of Mount Sinai Hospital in Toronto, Canada. Mr. Chupp was admitted to the hospital, where the medical staff attempted to manage Mr. Chupp's pain and wounds resulting from his skin breaking down due to the significant swelling in Mr. Chupp's legs.

188.    While waiting for her husband to be admitted to the hospital, Ms. Chupp had tried to contact Quadrant Clinical Care. Unable to reach anyone, Ms. Chupp reached out to the friend who had first connected them to Dr. Maristany. Ms. Chupp learned from Dr. Maristany that the delays were due to a lack of equipment and staff on site in Antigua needed to install a tunneled catheter necessary for the ONCObind filtration. Ms. Chupp then arranged to have the catheter inserted by Dr. Maristany for $8,000 on February 16 in Florida.

189.    On February 17, the Chupps flew to Antigua. They were then told that the first filtration would occur on February 21, rather than on February 19, as Mr. Pontzius had advised them weeks earlier. Those days before the February 21 filtration would be Mr. Chupp's last few days of mobility.

190.    On February 21, Mr. Chupp underwent the first filtration. Upon arrival at the clinic, Ms. Chupp was shocked by the clinic's condition. The Chupps met Mr. Pontzius and two individuals who had been hired by Quadrant Clinical Care to interview patients about their experience for a future Quadrant Clinical Care marketing video. Mr. Pontzius showed Ms. Chupp

a brochure containing photo renderings of a much-improved clinic he said Quadrant Clinical Care was building.

191.    Following the filtration, Mr. Chupp was in significant pain and extremely fatigued. The next day, February 22, Mr. Chupp began hallucinating conversations and remained in extreme pain. Ms. Chupp reached out to Dr. Maristany, who told Ms. Chupp that he would speak with the clinic's day-to-day medical director, Dr. Joseph "Joey" John, but that these were likely merely side effects of opioids the medical team in Canada had prescribed Mr. Chupp weeks ago.

192.    On February 23, the Chupps arrived at the clinic for Mr. Chupp's second filtration. Mr. Chupp was extremely nauseated and began throwing up, at which point he had his blood drawn. It appeared that Mr. Chupp had low blood pressure, but he soon recovered, at which point, the team moved forward with the filtration.

193.    As Mr. Chupp finished his second filtration, Dr. John informed the Chupps that bloodwork indicated that Mr. Chupp's kidneys were failing and his uric acid was extremely high. Mr. Chupp was told he would have to stay overnight in the clinic. The clinic staff cleared out a closet for Mr. Chupp to stay in, where he was not connected to monitoring equipment. Ms. Chupp was told she would not be able to stay with her husband. Ms. Chupp refused to leave. Quadrant Clinical Care staff ultimately allowed her to stay overnight. Ms. Chupp contacted Dr. Maristany, who insisted that continued filtration would lessen Mr. Chupp's kidney disease.

194.    On February 24, Mr. Chupp's bloodwork improved enough that the Chupps were allowed to return to the hotel.

195.    On February 25, Mr. Chupp underwent his third filtration. Mr. Chupp is pictured, below, during that filtration.

1
2
3
4
5
6
7
8
9
10
11
12



13    196.    By February 26, Mr. Chupp was in even more pain than before. Because Mr.

14  Chupp had been in so much pain, the Chupps were running low on the opioid medication Mr.

15  Chupp needed. When Ms. Chupp asked Dr. John (in person) and Dr. Maristany (by phone), for

16  additional pain medication, they repeatedly said they would not give Mr. Chupp more medication

17  and that he could instead take 10 milligrams of morphine, which was significantly less than the

18  equivalent hydromorphone he had been prescribed by his medical team in Canada. Mr. Chupp

19  was then likely to enter opioid withdrawal. Dr. Maristany claimed that the pain could be the result

20  of the filtration working so well that Mr. Chupp's immune system was causing inflammation

21  because it was so successfully attacking his tumor. There is no reason to believe this claim was

22  true.

23    197.    On February 27, the Chupps were supposed to fly home to Canada. However, Ms.

24  Chupp was now nearly completely out of pain medication. From their hotel, Ms. Chupp again

25  contacted Dr. John and Dr. Maristany, at which point they informed her that the clinic did not

26  have any quantity of hydromorphone, which Mr. Chupp had been prescribed. Ms. Chupp then

27  contacted Mr. Chupp's medical team in Canada and received instructions for the proper dose of

28  morphine. A Quadrant Clinical Care nurse agreed to send the medication sent to the hotel.

1    Instead, the clinic sent a total of 30 milligrams of morphine to the hotel, to be given 10 milligrams

2    at a time. This was an insufficient dose for a cancer patient on opioid therapy.

3        198.    Mr. Chupp was screaming in pain from the open wounds on his legs, which had

4    burst from the swelling and the tumor. Despite Ms. Chupp's pleas to him, Dr. John still refused to

5    provide any additional medication. Ms. Chupp then begged Dr. Maristany to tell Dr. John to

6    prescribe sufficient medication, so that the Chupps could leave the island. Dr. John finally agreed

7    and prescribed the medication the Chupps needed.

8        199.    On February 28, the Chupps arrived back in Canada.

9        200.    On February 29, the Chupps' family physician ordered bloodwork on Mr. Chupp.

10    Mr. Chupp still seemed very lethargic and was extremely confused.

11        201.    On March 1, Mr. Chupp's bloodwork came back showing that Mr. Chupp's

12    kidneys were failing. Mr. Chupp was admitted to the hospital, where he remained until March 23.

13        202.    Dr. Maristany repeatedly told Ms. Chupp that Mr. Chupp was undergoing tumor

14    lysis syndrome, and that another patient was currently experiencing the same issue. Dr. Maristany

15    blamed this on the large size of Mr. Chupp's tumor, but stated that this was a good result and

16    demonstrated how hard Mr. Chupp's body was attacking the tumor.

17        203.    Dr. Maristany also sent Ms. Chupp several emails attempting to convince her to

18    bring her husband to the United States where he believed he could find someone to administer

19    ONCObind.

20        204.    Mr. Chupp's treating physicians in Canada disagreed and advised that the kidney

21    failure was likely caused by filtrations. The physicians asked to perform a CT scan, but Dr.

22    Maristany insisted to Ms. Chupp that Mr. Chupp needed to wait four to six weeks after

23    ONCObind filtration before receiving a CT scan. Ms. Chupp decided not to follow Dr.

24    Maristany's advice. A CT scan was performed, and it showed that Mr. Chupp's tumor had grown

25    substantially. Dr. Maristany told her that this was why he did not want a CT scan to be

26    performed; he claimed the CT showed inflammation from the immune system attacking the

27    tumor, not tumor growth. (Mr. Chupp's treating physicians did not agree.)

28

- 48 -

205.    On April 1, after a brief few days at home, Mr. Chupp was readmitted to the hospital until April 4. The same day, Mr. Preston sent Ms. Chupp an email stating, "I have been talking regularly with Eddie Maristany about Kyle and timing for another filter treatment.  Please let me know a convenient time to discuss.  I don't have your cell phone number.  Mine is below.  I am available most of the day today."

206.    On April 5, Mr. Chupp returned home and his condition continued to decline. He was unable to hold down food or water and required intravenous fluids and constant monitoring.

207.    Dr. Maristany began encouraging Ms. Chupp to return to Antigua with Mr. Chupp for additional filtering, telling her that this was the only way to help him. Ms. Chupp quickly began arranging for urgent travel to Antigua.

208.    Dr. John then called Ms. Chupp and said that they would not be able to administer further filtrations after all as Dr. John was planning to be away, and other physicians would not cover for him given Mr. Chupp's condition.

209.    Mr. Chupp returned to the hospital on April 15, where he received a CT scan, showing significant tumor growth. Mr. Chupp was advised he would likely die very soon. Ms. Chupp, on the advice of Mr. Chupp's physicians, transferred Mr. Chupp to hospice.

210.    On April 17, hospice staff sedated Mr. Chupp. Mr. Chupp never woke up again. Shortly after midnight, on April 18, Ms. Chupp saw an email from Dr. Maristany – copying Dr. Quasha, Mr. Preston, Tom Pontzius, and Mr. Chupp's father-- telling her that Mr. Chupp's tumor had not actually grown very much and he could still be saved if Mr. Chupp's kidneys were stabilized and he underwent further ONCObind filtration. Dr. Maristany convinced Ms. Chupp to search for a nephrologist to administer the ONCObind filtration in Canada. Dr. Maristany and Dr. Ilic insisted that this would be possible under a special exemption for patients without other options, and Dr. Ilic sent Dr. Maristany paperwork to provide to Ms. Chupp. Ms. Chupp spent hours—on what would be the second-to-last day of her husband's life—trying to find a Canadian physician who would administer ONCObind. Mr. Pontzius also called Ms. Chupp to describe all of the efforts Quadrant Clinical Care was making to coordinate a last-minute filtration for Mr. Chupp.

211.    Later that day, April 18, Mr. Chupp remained in hospice. By this time, Ms. Chupp had begun ignoring what amounted to harassing messages from Dr. Maristany because her family physician, who Dr. Maristany and Dr. Ilic needed to include on the paperwork requesting approval for an emergency filtration, had called Ms. Chupp personally and told her these efforts were unreasonable given Mr. Chupp's condition. Dr. Maristany then called Mr. Chupp's father and told him that the medical team in Canada had not been honest, and all Mr. Chupp needed was another filtration because the tumor was growing more slowly than it had been before, showing that the treatment was working. Mr. Chupp's father, who had been convinced that Ms. Chupp was, in essence, killing her husband, his son, by denying him treatment, came to confront Ms. Chupp and attempt to convince her to change her decision. Ultimately, Ms. Chupp kept Mr. Chupp in hospice as he had expressed that was what he wanted while still conscious. All of Defendants' actions in Mr. Chupp's final days--from trying to get Ms. Chupp to book flights and come to Antigua to trying to get Ms. Chupp to find doctors willing to administer the procedure in Canada or the United States, to attempting to turn Mr. Chupp's father against Ms. Chupp in Mr. Chupp's final hours—were outrageous and caused Ms. Chupp significant distress.

212.    The next day, April 19, in the early morning, Mr. Chupp passed away in hospice.

213.    Ms. Chupp was extremely distressed by the Defendants' conduct, both because she was forced to watch as her husband's condition worsened and deteriorated rapidly in Antigua, including both because of the filtration specifically and because of the lack of adequate equipment in Antigua which caused significant skin breakdown for Mr. Chupp. She was also emotionally distressed by Quadrant Clinical Care's repeated suggestions that she was killing Mr. Chupp by giving him the painkillers prescribed by his doctors.

### E.    Ricardo Salgado (participant) & Carla Vass-Salgado (spouse)

214.    Plaintiff Ricardo Salgado and his wife, Plaintiff Carla Vass-Salgado (for ease of reference, collectively, "the Salgados") received the news that Mr. Salgado's lung cancer, which had been in remission for nearly two years, had recurred in late February 2023. His cancer's recurrence included two brain metastases, a mass in his upper left lung, and evidence of cancer on two lymph nodes near that mass.

215.    Since diagnosis, Mr. Salgado and Ms. Vass-Salgado had explored both standard-of-care and integrative treatment for Mr. Salgado's cancer. The Salgados temporarily relocated from Miami, Florida to Houston, Texas by the end of March 2023 in order to pursue aggressive treatment with a specialty physician that included immunotherapy, three different kinds of chemotherapy, and other targeted therapy.

216.    Mr. Salgado's disease responded to that treatment and was undetectable by August 2023. The Salgados returned to Miami, and Mr. Salgado followed a maintenance routine, including a targeted therapy, immunotherapy, and chemotherapy monthly or every other month.

217.    The Salgados monitored Mr. Salgado's Signatera tests (described, *supra*, at Paragraph 96) for any evidence of cancer DNA.

218.    In December 2023 and January 2024, Mr. Salgado's Signatera numbers began to creep up, suggesting that there was again cancer DNA within Mr. Salgado's blood. Though other tests were still showing no evidence of disease, the Salgados were concerned cancer would return shortly.

219.    The Salgados then consulted with Dr. Mark Rosenberg, who had previously advised on Mr. Salgado's case. Mr. Rosenberg informed them of a novel treatment being administered in Antigua, and connected them to John Preston to hear more.

220.    Mr. Preston sent the Salgados an email on February 4, 2024 copying Mr. Pontzius and providing them more information about the filtration process and offering a call, noting that "The following website has a lot of information on the technology: www.extheramedical.com  60 Minutes did a short segment https://www.youtube.com/watch?v=a5x4BTirSyk showing a patient being treated with the technology.  The filter used for sepsis/covid patients is the same as the one used for cancer patients."

221.    On the first call with Mr. Preston on or around February 4, 2024, the Salgados were impressed. Mr. Preston explained his background in physics and his 30 years at MIT, mentioned Dr. Devon Quasha, whom he descried as working at Massachusetts General Hospital (where Ricardo had been treated), and explained the apparent science of ONCObind.

222.    Mr. Preston told the Salgados about the Croatian trial, described above, and claimed that there were 12 to 16 people who had undergone ONCObind and all of them had gotten better. That claim was categorically false.

223.    The Salgados asked how they would know if the treatment was working for Mr. Salgado, given that he was currently showing no evidence of disease, and asked if there were any risk to undergoing the procedure.

224.    Mr. Preston assured them that there was no risk to the procedure and that it was completely safe. He explained that the filter had been used on COVID-19 patients without adverse effects. Mr. Preston also assured them that Mr. Salgado would be able to know the treatment worked based on comparing results before and after filtration from MainTrac, a test provided by a German lab that the ExThera and Quadrant team recommended to test circulating tumor cell levels.

225.    Based on these misrepresentations, the Salgados decided that Mr. Salgado would try the ONCObind procedure.

226.    Mr. Preston put them in touch with Tom Pontzius, who accepted their required $45,000 payment via wire to New York and helped coordinate their stay.

227.    On February 28, 2024, the Salgados arrived at the Antigua clinic for Mr. Salgado's first filtration treatment. A catheter needed to be placed. Quadrant Clinical Care's day-to-day medical director, Dr. Joseph "Joey" John, emphasized that placing a main line catheter was not a serious procedure, but, in fact, it was extremely painful.

228.    That same day, the Salgados met Dr. Devon Quasha and Mr. Pontzius.

229.    Mr. Salgado's filtration went relatively smoothly. Afterward, Mr. Salgado was tired, but not in significant pain. Ms. Vass-Salgado asked whether Quadrant Clinical Care staff needed to draw Mr. Salgado's blood to send to Germany for the MainTrac test (*i.e.*, to determine his pre-treatment circulating tumor cell counts). The nurse assured them that she had put the filters in the freezer and would send them to Germany.

230.    Later the Salgados would learn that the German lab was unable to use blood remaining in filters to perform the tests. Another expert on circulating tumor cells would tell them

1    that to run a circulating tumor cell test, the blood must go from the patient to a lab within one

2    hour.

3        231.    Mr. Salgado's next two filtrations also went smoothly. The Salgados then returned

4    to Miami to await the MainTrac test results, so they could learn whether the treatment had been

5    successful.

6        232.    The Salgados waited and then learned around March 28, after over a week of

7    unanswered emails, that the MainTrac tests had not been performed because the German lab

8    could not work with blood collected from filters. Around April 12, Ms. Vass-Salgado requested a

9    refund of the $45,000 paid for ONCObind. Mr. Pontzius told her he would investigate but did not

10   get back to her. Ms. Vass-Salgado also had a call with Dr. Quasha regarding this request. Dr.

11   Quasha did not commit to refunding the Salgados on the call, instead repeatedly stating that the

12   procedure was completely safe.

13       233.    That spring, Mr. Salgado's routine Signatera tests started to show increasing

14   cancer DNA. Concerned, the Salgados reached out to Quadrant Clinical Care, which told them

15   that this was possible given that the Signatera test would track dead, as well as living, cancer

16   DNA. Unfortunately, by July, Mr. Salgado's cancer had grown enough to be visible in scans.

17   ONCObind had not lived up to its promise and had exacerbated Mr. Salgado's cancer.

18       234.    In late summer 2024, Ms. Vass-Salgado contacted Mr. Pontzius, Dr. Quasha, and

19   Dr. John and asked again for a refund, noting that Mr. Salgado's cancer had returned and that

20   they had begun to believe the procedure was actively harmful.

21       235.    Mr. Pontzius responded by calling Ms. Vass-Salgado's "threats and demands"

22   "unfounded defamatory statements" that were "inappropriate" and offered the Salgados a $15,000

23   discount off an additional treatment series. The Salgados did not accept the offer.

24       236.    Mr. Salgado remains in treatment for the cancer recurrence that began shortly

25   following the filtration procedure. The threat from Mr. Salgado's cancer is significantly greater

26   than it was before receiving ONCObind.

27

28

**F.    Ingrid Peri (participant) & Ron Peri (spouse)**

237.    Plaintiff Ingrid Peri and her husband, Plaintiff Ron Peri, had been living with Ms. Peri's colon cancer for nearly five years when they first learned about the ONCObind blood filtration procedure.

238.    Ms. Peri's cancer had originally been diagnosed as Stage IIIB, but had metastasized to Ms. Peri's lung and brain in 2021. After surgery, chemotherapy, and radiation, Ms. Peri's brain tumor had been eliminated and her only remaining tumor, the tumor in her lung, was well managed. In fact, by the end of 2023, her treating physicians considered her cancer burden to be relatively low.

239.    But when Ms. Peri's physician connected the Peris with John Preston in early 2024 to learn more about the ONCObind procedure, they were curious about how the new procedure could potentially help Ms. Peri.

240.    Mr. Preston described the treatment as like dialysis with a different filter. He explained that the Seraph 100 filter had been used to treat thousands of patients with sepsis, it was proving very effective at treating COVID-19, and it was being tested for chronic Lyme disease. He explained that the filter "worked even better with cancer." Mr. Preston did not disclose any risks of the procedure.

241.    The Peris were interested. Mr. Preston connected them with Tom Pontzius, who expressed enthusiasm about ONCObind and helped the Peris plan logistics to go to Antigua. Mr. Pontzius informed the Peris that Quadrant Clinical Care had postponed a session in order to upgrade some equipment but that Ms. Peri could go to Antigua for filtration in early March 2024.

242.    When the Peris arrived at the clinic, they observed sanitation and safety issues, such as poor handwashing/glove-changing requirements and that there did not appear to be a physician actively overseeing the procedure. The Peris met Dr. Devon Quasha and Tom Pontzius in passing in the foyer of the clinic as the two were leaving the island.

243.    Ms. Peri received three rounds of ONCObind filtration on March 1, 3, and 5. The first filtration procedure took several extra hours because Ms. Peri's filters repeatedly clogged,

1    and the Peris were at the clinic until late at night. The second filtration procedure also took

2    several extra hours because of clogged filters.

3        244.    After the third filtration procedure, Dr. Joseph "Joey" John removed Ms. Peri's

4    central venous catheter by tugging it repeatedly his hands, causing Ms. Peri tremendous pain.

5        245.    The Peris never received any test results or information about whether the

6    procedure had been successful. Instead, like the other participants, the Peris were told that there

7    had been a shipment issue that prevented the blood tests from being run.

8        246.    The Peris returned to Florida after the filtrations. For a couple of weeks, Ms. Peri's

9    condition seemed to have improved. But when the Peris received the results from Ms. Peri's

10   routine blood tests, the trend was negative. Within a week of returning, Ms. Peri's cancer

11   biomarkers had increased multiple times over the levels approximately two weeks before the

12   journey to Antigua. By early May, those biomarkers more than doubled again.

13       247.    When Mr. Peri reached out to Mr. Preston about the increased cancer biomarkers,

14   Mr. Preston told Mr. Peri that this was normal and merely showed that the procedure had worked:

15   the increased numbers were representative of cancer die off and showed that Ms. Peri's immune

16   system was working to destroy her tumors.

17       248.    These reassurances kept Ms. Peri from rushing to undergo chemotherapy, which

18   the Peris had been told would interfere with the success of the filtration procedure.

19       249.    Mr. Peri reached back out to Mr. Preston after the numbers continued to increase,

20   and he connected the Peris with Dr. Quasha. Dr. Quasha told the Peris, for the first time, that the

21   procedure was experimental so results could not be guaranteed, that cancer numbers normally

22   went up and down, and that it only demonstrated that Ms. Peri needed another filtration.

23       250.    But shortly after these conversations, Ms. Peri had a PET scan, which revealed that

24   Ms. Peri's cancer had become hyperactive and was more resistant to chemotherapy than it had

25   been before.

26       251.    Because of the ONCObind procedure, Ms. Peri had to restart chemotherapy from

27   scratch against a cancer that had spread significantly. She now has three tumors in addition to the

28   lung tumor that she had before the ONCObind procedure (an additional lung tumor and two small

- 55 -

tumors in her brain). Ms. Peri's prognosis now is much worse than had she never undergone

ONCObind.

252.    Mr. Peri has experienced extreme emotional distress as a result of the Defendants'

behavior, including while watching Dr. John physically yank Ms. Peri's central venous catheter

out of her chest without anesthesia and when Dr. Quasha informed Mr. Peri of the risks of the

ONCObind procedure only after Ms. Peri had undergone ONCObind.

**CIVIL CONSPIRACY ALLEGATIONS**

253.    All Defendants engaged in a civil conspiracy and are liable for any of the torts

committed by other Defendants. Therefore, all torts are alleged against all Defendants.

254.    All Defendants knew that ONCObind had not cured individuals of cancer in a

Croatian trial conducted in fall 2023 or had no reason to believe that claims about this trial's

success were true. Nevertheless, in December 2023, ExThera partnered with Alan Quasha and his

investment firm, Quadrant Management, to establish a clinic in Antigua, outside the reach of U.S.

regulators, to provide ONCObind to the lucrative cancer market and serve as a launch pad for a

chain of clinics. In particular, John Preston, then both a member of ExThera's Board of Directors

and an investment team member at Quadrant Management, served as a conduit between Mr.

Quasha, Quadrant Management, and ExThera. To advance the operation, these Defendants

established Quadrant Clinical Care and recruited Mr. Quasha's daughter, Dr. Devon Quasha, to

serve as the Medical Director. These Defendants also selected Quadrant Management investment

team member Tom Pontzius to be Quadrant Clinical Care's president and promote ONCObind to

potential participants. Mr. Preston, Dr. Quasha, Dr. Sanja Ilic (ExThera's former Chief

Regulatory Officer and Vice President for Clinical, Regulatory, and Medical Affairs), and Mr.

Pontzius then misrepresented the results of the Croatian trial to Plaintiffs—claiming it had shown

that ONBObind could cure cancer—in an effort to recruit participants to travel to Antigua to

undergo ONCObind. Dr. Devon Quasha then served as the gatekeeper to the allegedly miraculous

ONCObind procedure, with Dr. Quasha allegedly reviewing medical records to determine who

would be allowed to undergo the procedure. Defendants also misrepresented the facilities and

level of medical supervision available in Antigua despite their first-hand observation of the

clinic's condition. Defendants also consistently lied to Plaintiffs in advising them that any adverse effects of ONCObind were actually proof that the procedure was effective and that further filtration were necessary.

255.    Defendants falsely claimed that Dr. Quasha would develop individual treatment protocols for Plaintiff participants, and Dr. Quasha interfaced with Plaintiffs, whether by email or in-person in Antigua, in an effort to mislead Plaintiffs into believing they were receiving individual case from an esteemed physician.

256.    In reality, all Defendants knew they were actually recruiting individuals for what amounted to human experimentation, and no Defendant disclosed as much to any Plaintiff.

257.    As a result of the civil conspiracy, all Plaintiffs were harmed in the ways detailed above and below.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### RICO, 18 U.S.C. § 1962(c)

258.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

259.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

The Enterprise

260.    ExThera Medical Corporation, Quadrant Management LLC, Quadrant Clinical Care LLC, Alan Quasha, John Preston, and Devon Quasha are "persons" within the meaning of 18 U.S.C. § 1961(3).

261.    ExThera Medical Corporation, Quadrant Management LLC, Quadrant Clinical Care LLC, Alan Quasha, John Preston, and Devon Quasha together constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and will be referred to herein as the "ONCObind RICO Enterprise."

262.    The ONCObind RICO Enterprise engaged in and affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), including but not limited to commerce in California, Florida, Illinois, Canada and Antigua, and between residents of Colorado, Massachusetts, Illinois, Florida, Canada and Antigua.

263.    The ONCObind RICO Enterprise was an ongoing, continuing group or unit of persons and entities associated together for the common purpose of perpetuating fraud, in particular to maximize profits at offshore "medical" clinics by promoting to cancer patients the ONCObind procedure as a safe and effective cancer treatment, when in fact the ONCObind RICO Enterprise knew such claims were false and/or unsupported by evidence.

264.    While the members of the ONCObind RICO Enterprise participated in and are part of the enterprise, each also has an existence separate and distinct from the enterprise.

265.    The ONCObind RICO Enterprise was an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.  For example:  ExThera's officers and John Preston (a board member at ExThera and a member of the Investment Team at Quadrant Management) concealed material information from consumers and promoted the ONCObind filtration service as a low-risk, high-reward treatment for all kinds of advanced stage metastatic cancer that would treat and/or cure such cancers by allowing the immune system to attack primary tumors, that had been tested in a successful Croatian clinical trial and was nearing clinical trials in the United States, when in fact these statements were not true. Alan Quasha and Quadrant Management furthered this fraud by providing funds to set up a clinic in Antigua that would, in essence, conduct human trials on cancer patients recruited by these misrepresentations, facilitating the shipment of the ExThera filters out of the United States and into Antigua for the clinic on Mr. Quasha's private jet, and communicating with then-sympathetic doctors about the promise of the ONCObind technology to cure cancer and to be the basis for a lucrative enterprise. Alan Quasha also personally attended the Quadrant Clinical Care clinic for multiple days and witnessed an ONCObind filtration, and spoke with Mr. Preston and to Dr. Mark Rosenberg about the promise of the ONCObind filtration and the benefits to Dr. Rosenberg and his patients of working with Quadrant Clinical Care. Dr.

1  Devon Quasha was repeatedly represented as reviewing medical records to determine which

2  patients could be scheduled for ONCObind and when they would be scheduled. Devon Quasha

3  likewise perpetuated the fraud by lending her impressive medical credentials to the scheme in

4  order to lure patients into a false sense of safety, allowing Quadrant Clinical Care to represent that

5  she was designing independent protocols for each patient, including on emails she was copied on,

6  assuring participants that various side effects were actually evidence that the treatment was

7  working, and continuing to represent to participants and their spouses that the Quadrant Clinical

8  Care facility would appropriately treat their advanced disease through the treatment and

9  otherwise. Quadrant Clinical Care further provided employees, location, and equipment to carry

10  out the scheme once participants arrived in Antigua. And Quadrant Clinical Care employees,

11  including Dr. Quasha, its Chief Medical Officer, Tom Pontzius, its president, and Dr. Joseph

12  John, its attending physician, continued to carry out the fraud and encourage Plaintiffs to undergo

13  – and pay for – more treatment even as Plaintiffs' condition quickly deteriorated following the

14  ONCObind procedure.

15       266.    At all relevant times, Defendants operated, controlled, or managed the ONCObind

16  RICO Enterprise and profited from the ONCObind RICO Enterprise.  Defendants were

17  responsible for the representations regarding the ONCObind procedure made to Plaintiffs, and for

18  the material omissions alleged herein.

19  The Predicate Acts

20       267.    Defendants' systematic scheme to fraudulently promote the ONCObind procedure

21  as a safe and effective cancer treatment to maximize profits at offshore "medical" clinics, as

22  described above, was facilitated by the use of the United States mail and wires. Defendants'

23  schemes constitute "racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), as acts of

24  mail and wire fraud, under 18 U.S.C. §§ 1341 and 1343.

25       268.    In violation of 18 U.S.C. §§ 1341 and 1343, Defendants conducted and

26  participated in the conduct of the affairs of the ONCObind RICO Enterprise through a pattern of

27  racketeering activity beginning around December 2023 and continuing, on information and belief,

28  to the present.

269.    Defendants' numerous and repeated violations of the federal wire statutes include, but are not limited to: (a) the numerous specific false statements made by Defendants to Plaintiffs alleged herein by phone and email (time and place are identified herein); (b) the material omissions and misrepresentations made by Defendants alleged herein by phone and email (times and places are identified herein); (c) the electronic transmission of information, intake forms, and invoices in furtherance of Defendants' scheme, as alleged herein; (d) the processing of customer payments and payments among and between Defendants, by electronic transmission and by wire, which occurred throughout the relevant time period, and (e) the posting of fraudulent and deceptive information about the ONCObind procedure and the Quadrant Clinical Care clinic on several websites, as alleged herein.

270.    The chart below contains a non-exhaustive list of fraudulent representations made by wire which constitute individual predicate acts in furtherance of Defendants' scheme. While individual Defendants are listed under each claim along with specific paragraphs containing detailed allegations regarding such defendants' assertion of such claim, Plaintiffs allege that these fraudulent claims were made as part of a broader conspiracy and in support of Defendants' joint scheme, carried out over United States wires, to maximize profits at offshore "medical" clinics by promoting to cancer patients the ONCObind procedure as a safe and effective cancer treatment, when in fact the ONCObind RICO Enterprise knew such claims were false and/or unsupported by evidence.

|  | Defendants' Claim | Reality |
|---|---|---|
| i. Croatian study | The ONCObind procedure reduced primary tumor size by a minimum of 49% in a recent trial and, in multiple participants, rendered their cancers undetectable. It also significantly reduced their pain. In | No data has been published corroborating that the Croatian study reduced participants' primary tumor sizes, reduced pain, or rendered cancer undetectable. |

| | Defendants' Claim | Reality |
|---|---|---|
| | other words, ONCObind offered a cure for cancer.<br><br>**ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs represented this to Plaintiffs Ms. Hudlow (¶64 ) and Ms. Baskin (¶64) over the phone. Mr. Preston, an ExThera board member, represented this to Ms. Hudlow (¶¶ 68-69), Ms. Baskin (¶ 68), Mr. Peri (¶¶ 239-240), Ms. Vass Salgado (¶¶ 221-225) and Ms. Chupp (¶ 178) by phone and in some cases by email. Dr. Ilic and/or Mr. Preston also represented this to at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55) over an online video conference call. | |

| | Defendants' Claim | Reality |
|---|---|---|
| | **Quadrant Clinical Care**: President Tom Pontzius represented the efficacy of the procedure to Ms. Bowen over the phone (¶ 151) and said that he had seen "positive results" of the treatment via email (¶ 150). | |
| | **Quadrant Management**: Alan Quasha, the founder of Quadrant Management, represented this to Dr. Mark Rosenberg (¶ 55) over an online video call. John Preston and Tom Pontzius, who made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website. | |
| | **Alan Quasha:** As listed above, Alan Quasha represented this to Dr. Mark Rosenberg by video call. | |
| | **Devon Quasha:** Dr. Quasha's name, credentials, and | |

- 62 -

|  | Defendants' Claim | Reality |
|---|---|---|
|  | involvement were used to promote and legitimize the ONCObind treatment and the study's "results." **John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs via phone as well as to Dr. Mark Rosenberg. |  |
| ii. Immune booster | By filtering the blood, ONCObind supercharges the immune system, harnessing it to attack primary tumors themselves. **ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs represented this by phone to Plaintiffs Ms. Hudlow (¶ 65) and Ms. Baskin (¶ 65). Mr. Preston, an ExThera board member, represented this by phone to Ms. Hudlow (¶ 69), Ms. Baskin (¶ 69), Mr. Peri (¶ 220), and Ms. Chupp (¶ 178). Dr. Ilic and/or Mr. | There is no evidence that ONCObind supercharges the immune system and allows the body to attack primary tumors themselves. |

| | Defendants' Claim | Reality |
|---|---|---|
| | Preston also represented this on a phone or video call with at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55).<br><br>**Quadrant Management**: John Preston and Tom Pontzius, who made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website.<br><br>**Alan Quasha:** As listed above, Alan Quasha represented this to Dr. Mark Rosenberg.<br><br>**Devon Quasha:** Dr. Quasha's name, credentials, and involvement were used to promote and legitimize the ONCObind treatment and the study's "results." | |

- 64 -

|  | Defendants' Claim | Reality |
|---|---|---|
|  | **John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. |  |
| iii. Stops cancer growth and reduces pain | At a minimum, ONCObind will prevent further metastases and reduce pain.<br><br>**ExThera**: Mr. Preston, an ExThera board member, represented this to Ms. Hudlow (¶ 70) and Ms. Baskin (¶ 70) Dr. Ilic and/or Mr. Preston also represented this to at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55).<br><br>**Quadrant Clinical Care**: President Tom Pontzius represented this to Ms. Bowen (¶ 151). Further, the Quadrant Clinical Care website stated that the treatment would lead to "potentially improved quality of life." (¶ 3). | Defendants did not have long-term data that would allow them to determine that ONCObind could prevent further metastases or substantially reduce pain, and, in fact, Plaintiffs' experiences were the opposite. |

| | Defendants' Claim | Reality |
|---|---|---|
| | **Quadrant Management**: John Preston, who made this representation as described above, is also listed as part of the Quadrant Management investment team on the Quadrant Management website.<br><br>**John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. | |
| iv. No risk | With the exception of tumor lysis syndrome and/or swelling (which only some Plaintiffs were warned of, and the potential effects of which Defendants minimized and assured Plaintiffs could be treated successfully at the clinic), there are no serious risks to the ONCObind procedure.<br><br>**ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical | Plaintiffs' experiences (*e.g.*, losing one-third of one's blood supply and in multiple cases dying shortly after the ONCObind procedure) illustrate that ONCObind was not risk free. |

| | Defendants' Claim | Reality |
|---|---|---|
| | Affairs represented this by phone to Plaintiffs Ms. Hudlow (¶ 65) and Ms. Baskin (¶ 6). Mr. Preston, an ExThera board member, represented this to Ms. Hudlow (¶ 71), Ms. Baskin (¶ 71), Mr. Peri (¶ 240), Ms. Vass Salgado (¶ 224) and Ms. Chupp (¶ 178). Dr. Ilic and/or Mr. Preston also represented this to at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55).<br><br>**Quadrant Clinical Care**: President Tom Pontzius represented this to Ms. Bowen (¶ 151) by phone. This was also suggested by the text on the Quadrant Clinical Care website homepage stating that the treatment is "safe." (¶ 3).<br><br>**Quadrant Management**: John Preston and Tom Pontzius, who | |

- 67 -

| | Defendants' Claim | Reality |
|---|---|---|
| | made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website.<br><br>**Devon Quasha:** Dr. Quasha's name, credentials, and involvement were used to promote and legitimize the safety of the ONCObind procedure, and her presence at the Quadrant Clinical Care facility was intended to demonstrate its legitimacy (¶ 23).<br><br>**John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. | |
| v. Stop standard-of-care treatments | The only obstacle to success is continued chemotherapy or radiation treatment and therefore patients should stop such treatment before receiving ONCObind and for some time afterwards. | There is no evidence that discontinuing or refraining from undergoing chemotherapy or radiation was advisable. |

| | Defendants' Claim | Reality |
|---|---|---|
| | **ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs represented this by phone to Plaintiffs Ms. Hudlow (¶ 65) and Ms. Baskin (¶ 65). Mr. Preston, an ExThera board member, represented this to Ms. Hudlow (¶ 69), Ms. Baskin (¶¶ 69, 127), Mr. Peri (¶ 248), and Ms. Chupp (¶ 182). Dr. Ilic and/or Mr. Preston also represented this to two physicians that they later referred participants to, Dr. Mark Rosenberg and Dr. Eduardo Maristany who later discussed it with patients (¶¶ 55, 184). | |
| | **Quadrant Clinical Care**: President Tom Pontzius represented this to Ms. Chupp (¶ 186). | |
| | **Quadrant Management**: John Preston and Tom Pontzius, who | |

| | Defendants' Claim | Reality |
|---|---|---|
| | made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website.<br><br>**Devon Quasha:** Dr. Quasha's name, credentials, and involvement were used to promote and legitimize the ONCObind treatment and the study's "results." Dr. Quasha further represented this when she encouraged Mr. Hudlow to return to the clinic for another round of filtration via email knowing that Mr. Hudlow had been told not to pursue traditional treatments at the same time (¶ 101).<br><br>**John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. Mr. Preston also told Mr. Peri by phone that Ms. Peri should avoid chemotherapy after treatment | |

| | Defendants' Claim | Reality |
|---|---|---|
| | because Ms. Peri's worsening condition suggested that the treatment was working (¶ 247). | |
| vi. Individualized therapy | Dr. Devon Quasha would provide individualized treatment regimens.<br><br>**ExThera**: John Preston, an ExThera board member, represented this to Ms. Baskin by email (¶ 125). Mr. Preston also represented this to at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55).<br><br>**Quadrant Clinical Care**: President Tom Pontzius represented this to Ms. Bowen by email (¶ 155).<br><br>**Quadrant Management**: John Preston and Tom Pontzius, who made this representation as described above, are also listed as part of the Quadrant Management | Defendants planned identical filtration regimens for all patients, each of whom had different kinds of cancer, different tumor burdens, and had been on different medications prior to receiving ONCObind. |

- 71 -

| | Defendants' Claim | Reality |
|---|---|---|
| | investment team on the Quadrant Management website.<br><br>**Devon Quasha:** Dr. Quasha represented this to Ms. Hudlow in an email (¶ 101). Upon information and belief, Dr. Quasha also represented this to Dr. Rosenberg. Dr. Quasha was also copied on several email threads discussing this. (¶¶ 125, 150).<br><br>**John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. | |
| vii. High-quality facility | The Antigua clinic is fully equipped to treat individuals suffering from late-stage cancer, both in terms of facilities and medical personnel.<br><br>**Quadrant Clinical Care:** President Tom Pontzius represented this to Ms. Bowen and Ms. Baskin by email (¶ 151). This | The Antigua clinic was not equipped to treat individuals suffering from late-stage cancer— no oncologist was on staff (nor even was a physician present at all for long stretches of time); the clinic had only two sinks, no available hospital beds until after Ms. Hudlow instructed the clinic to acquire them before treating |

|  | Defendants' Claim | Reality |
|---|---|---|
|  | was also on the Quadrant Clinical Care website homepage. (¶ 3).<br><br>**Devon Quasha:** Dr. Quasha represented this to Ms. Hudlow via email (¶ 101). | additional patients, no CT scanner, limited pain medication, and poor hygiene/sanitation practices. |
| viii. U.S. Clinical Trials | Clinical trials of ONCObind will begin in the United States soon, and individuals who receive ONCObind in Antigua will able to enroll in these U.S.-based trials and receive no-cost filtrations going forward.<br><br>**ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical Affairs represented this to Plaintiffs Ms. Hudlow ((¶¶ 75, 99) and Ms. Baskin (¶ 75) by phone. Mr. Preston, an ExThera board member, represented this to Ms. Hudlow (¶ 75) and Ms. Baskin (¶ 75). Dr. Ilic and/or Mr. Preston | The U.S.-based "trials" participants were promised they could join after receiving ONCObind in Antigua was actually was a single trial for a particular type of pancreatic cancer that no Plaintiff participant had and appears to have only enrolled five participants. |

| | Defendants' Claim | Reality |
|---|---|---|
| | also represented this to at least one physician that they later referred participants to, Dr. Mark Rosenberg, who later discussed it with patients (¶ 55). **Quadrant Management**: John Preston and Tom Pontzius, who made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website. **John Preston:** As listed above, John Preston repeatedly made this representation to Plaintiffs. | |
| ix. More filtrations needed | Any negative test results or adverse events are proof that ONCObind is working and that further filtrations are needed. **ExThera**: Dr. Sanja Ilic, ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory and Medical | Contrary to Defendants' claims, Plaintiff participants' negative test results and adverse events were confirmation that ONCObind was harming them, in some cases leading to death. |

| | Defendants' Claim | Reality |
|---|---|---|
| | Affairs represented this to Plaintiffs Ms. Hudlow (¶¶ 99, 100, 103), Ms. Baskin (¶¶ 137-138) by phone and email, and Ms. Chupp.<br><br>**Quadrant Clinical Care**: Dr. Quasha, Quadrant Clinical Care's Chief Medical Officer, represented this to Ms. Hudlow by planning for Mr. Hudlow to return to the clinic for additional filtration after his condition worsened following his first filtration (¶ 101).<br><br>**Quadrant Management**: John Preston and Tom Pontzius, who made this representation as described above, are also listed as part of the Quadrant Management investment team on the Quadrant Management website.<br><br>**Devon Quasha:** Dr. Quasha represented this to Ms. Hudlow as mentioned above. | |

- 75 -

| | Defendants' Claim | Reality |
|---|---|---|
| | **John Preston:** Mr. Preston also told Mr. Peri by phone that Ms. Peri should avoid chemotherapy after treatment because Ms. Peri's worsening condition suggested that the treatment was working (¶ 247). | |

**Pattern of Racketeering Activity**

271.    In short, through the wire (via email and phone) and on several websites, the ONCObind RICO Enterprise provided Plaintiffs with information about the safety and effectiveness of the ONCObind procedure and the care available at the Antigua facility which Defendants knew to be false or were willfully blind as to the falsity. The ONCObind RICO Enterprise also used the wires to further their scheme by emphasizing the qualifications of the care team, lulling Plaintiffs into a sense of trust and enabling their defraudment. Defendants also used mail and wires to send invoices and collect payments from Plaintiffs under these fraudulent circumstances.

272.    Defendants' conduct established a clear and repeating pattern of racketeering activity.

273.    First, Defendants fraudulently induced each Plaintiff to undergo the ONCObind procedure by repeating the same fraudulent misrepresentations about the efficacy of the ONCObind procedure and safety of receiving the procedure at Defendants' Antigua clinic over the phone or by email. Defendants repeated these misrepresentations to each Plaintiff family, and required many of these families to get referrals through doctors that Defendants had already shared these same fraudulent misrepresentations with – in other words, Defendants set up a process for recruiting patients into their scheme. As described above, each Defendant was

1    involved in perpetuating the fraud on Plaintiffs, including but not limited to through the following

2    acts:

3    &bull;    Quadrant Management funded the scheme and physically delivered the

4         ExThera ONCObind supplies to the Antigua clinic run by Quadrant

5         Clinical Care, and two members of Quadrant Management's Investment

6         Team, John Preston and Tom Pontzius, promoted the scheme to Plaintiffs

7         by phone and email;

8    &bull;    Quadrant Clinical Care held itself out as a safe and legitimate facility for

9         advanced cancer patients by email and on various forms and documents

10        sent via email, as well as on its website;

11   &bull;    Alan Quasha funded the Clinic and sent his own private jet to supply the

12        Quadrant Clinical Care clinic;

13   &bull;    ExThera provided the filtration supplies, and ExThera's Chief Regulatory

14        Office and Vice President of Clinical, Regulatory and Medical Affairs Dr.

15        Sanja Ilic and its board member, John Preston, spoke to most of the

16        Plaintiffs personally over the phone about the promise of the procedure;

17   &bull;    Alan Quasha and John Preston spoke on the phone or on an online video

18        call with a doctor who the Enterprise would use to refer patients;

19   &bull;    Dr. Devon Quasha represented to Plaintiffs, including the first Plaintiff to

20        arrive at the clinic, that she had quit her existing position at a prestigious

21        Boston hospital to oversee the clinic and serve as its Chief Medical

22        Officer. Dr. Quasha also was repeatedly said to be reviewing medical

23        records to determine who could receive ONCObind and when such

24        patients should be scheduled.

25        274.    Second, once Plaintiffs had arrived in Antigua and the ill Plaintiffs began receiving

26   the ONCObind procedure, Defendants worked together to continue perpetuating the fraud by

27   explaining that any adverse effects were merely evidence that the procedure was working, that the

28   clinic could provide adequate medical care (even as Plaintiffs were kept overnight in hastily

emptied supply rooms and when no physician was present in the clinic), and that further
ONCObind procedures would remedy any disease progression. As described above, each
Defendant was involved in perpetuating the fraud on Plaintiffs, including but not limited to
through the following acts:

- Upon information and belief, Quadrant Management and Alan Quasha continued to fund the scheme.

- Quadrant Clinical Care continued to represent to multiple Plaintiffs that the clinic was safe and could effectively handle patient's complex needs, including after Plaintiff Ms. Hudlow raised serious concerns about the clinic's procedures. Quadrant Clinical Care and its representatives including its president Tom Pontzius and its "attending" physician Dr. Joseph John, as well as its Chief Medical Officer Dr. Devon Quasha, represented that the clinic could provide effective care for patients even via phone when no Quadrant Clinical Care physician was in the country of Antigua.

- ExThera continued to represent to Plaintiffs that the ONCObind procedure was low risk and that any negative impacts were actually positive signs that the procedure had been effective, including through its Chief Regulatory Officer and Vice President of Clinical, Regulatory, and Medical Affairs, Dr. Sanja Ilic and its board member John Preston.

- Dr. Devon Quasha falsely represented that she was overseeing the clinic, developing individual protocols for individual participants, and effectively monitoring the success of the procedure.

275.    Finally, Defendants continued the pattern of fraud up until several Plaintiff cancer
patients' final moments, including but not limited to, as described above, through the following
acts:

- Quadrant Clinical Care and its staff continued to encourage Plaintiffs to invest in another round of the ineffective and dangerous ONCObind

procedure, even as Plaintiffs such as Mr. Hudlow and Mr. Chupp were in critical condition and their regular treating physicians advised only hospice care. As described above, President Tom Pontzius and Chief Medical Officer Dr. Devon Quasha either sent or were copied on multiple chains discussing the possibility of Mr. Chupp returning for more ONCObind treatments in the final days before his death. Dr. Quasha and Tom Pontzius also encouraged Ms. Hudlow to return to Antigua for Mr. Hudlow to receive a second round of filtration even after Mr. Hudlow began experiencing rapid decline after his first round of filtration.

- ExThera's Chief Regulatory Officer and Vice President of Clinical, Regulatory, and Medical Affairs, Dr. Sanja Ilic and board member John Preston encouraged Ms. Hudlow to return to the clinic with Mr. Hudlow following his rapid decline. Further, Mr. Preston emailed Ms. Chupp that he was working with Dr. Maristany and Tom Pontzius and Dr. Devon Quasha to get a discount on further services for Mr. Chupp in the days before his death.

- Upon information and belief, Quadrant Management and Alan Quasha continued to fund the scheme. Quadrant Management's website currently lists Quadrant Clinical Care and ExThera Medical as "Spotlight Investments."[15]

276.    As demonstrated in the allegations above concerning email and phone communications (¶ 270, chart) and per the many representations that were publicly available on the Quadrant Clinical Care website, all Defendants were aware of the misrepresentations made to Plaintiffs in furtherance of the fraudulent scheme. Defendants knowingly and fraudulently concealed or omitted material information from Plaintiffs, as evidenced by the fact that they did not disclose the true risks associated with the ONCObind procedure.

---

[15] Quadrant Management website, quadrantmgt.com/acquisition-process, accessed May 29, 2025.

277.    The Defendants also coordinated to prevent Plaintiffs from discovering the truth about the ONCObind procedure by repeatedly representing that the Defendants were best equipped to evaluate the success of the procedure, discouraging Plaintiffs from having traditional cancer tests done, suggesting the traditional tests were misleading or unable to recognize the groundbreaking results of the ONCObind procedure, and discouraging Plaintiffs from pursuing additional treatment prescribed by the Plaintiffs' standard-of-care doctors.

278.    Each Defendant knew or willfully blinded themselves to the fact that the ONCObind procedure was not a safe and effective cancer treatment, nor was the clinic in Antigua properly equipped or staffed for advanced cancer patients to receive treatment. There was a high probability that ONCObind's "miracle cure" was not legitimate, which each Defendant either knew or took deliberate actions to avoid learning the truth by failing to get necessary information including patient results from the Croatian study, to account for the disease acceleration and death of several ONCObind participants including the Plaintiffs in this case, and/or to consider other evidence refuting the Defendants' claims about the filter's effect on patients, including clinically approved and evidence-based testing for cancer progression, such as imaging.

279.    The conduct alleged herein was part of a scheme that Defendants formulated to defraud Plaintiffs and to receive financial and other benefits by quickly opening offshore "medical" clinics using under-studied technology. Defendants perpetrated this scheme with the specific intent to deceive and defraud Plaintiffs, and Defendants did deceive and defraud Plaintiffs.

280.    These acts of racketeering began at latest in the fall of 2023 and are not isolated or long-ago completed events.  Through the conduct of the ONCObind RICO Enterprise, Defendants fraudulently promoted and sold the ONCObind procedure as a cancer treatment to all Plaintiffs and, on information and belief, other members of the public. The ONCObind RICO Enterprise repeatedly targeted cancer patients, including Plaintiffs, to perpetuate their fraudulent scheme.

281.    As a foreseeable and natural consequence of Defendants' scheme, Defendants injured Plaintiffs, including but not limited to in the form of their submission to and payment,

- 80 -

1   out-of-pocket for the ONCObind procedure, which was unreliable, dangerous, and did not hold its

2   promised value. Plaintiffs were first required to pay $45,000 out-of-pocket to receive the

3   treatment, which Defendants knew or should have known would not deliver the advertised results,

4   and to travel to Antigua and pay for room and board on the island. Plaintiffs were also required to

5   pay additional, illegitimate medical bills to the clinic in which the Quadrant Clinical Care facility

6   was set up (and often were told they had to pay such fees in order to leave the island). Further,

7   Plaintiffs were forced to incur additional injury to property as a result of the ONCObind RICO

8   Enterprise's scheme. These additional expenses include the costs of emergency airfare, additional

9   medical procedures, and additional pain management costs. Plaintiffs also suffered harms to their

10  business interests as a result of the ONCObind RICO Enterprise's scheme. Defendants' acts also

11  present a threat of continued racketeering activity, including but not limited to the fact that the

12  ONCObind RICO Enterprise, on information and belief, continues to offer the procedure and

13  Defendants, upon information and belief, remain associated and financially involved with one

14  another.

15                          **SECOND CLAIM FOR RELIEF**
16                          **RICO, 18 U.S.C. § 1962(d)**

17          282.    Plaintiffs incorporate the substantive allegations contained in all prior and

18  succeeding paragraphs as if fully set forth herein.

19          283.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section

20  1962(c), among other provisions. 18 U.S.C. § 1962(d).

21          284.    As set forth above, Defendants, having directed and controlled the affairs of the

22  ONCObind RICO Enterprise, were aware of the nature and scope of the enterprise's unlawful

23  scheme, and they agreed to participate in it by verbal statement, by providing material support, or

24  by their acts.

25          285.    Defendants formed an agreement to commit a violation of Section 1962(d). First,

26  John Preston, an ExThera board member, promoted the ONCObind procedure to Alan Quasha,

27  who then funded the creation of Quadrant Clinical Care through his company Quadrant

28  Management and employed his private jet to bring the necessary ExThera filters to Antigua to

begin providing the ONCObind treatment. Mr. Quasha then hired his daughter, Dr. Devon

Quasha, who agreed to participate in the scheme by serving as the Chief Medical Officer of

Quadrant Clinical Care and determining whether patients could receive ONCObind while either

knowing that there was insufficient data to support the efficacy and safety of the procedure she

was now overseeing or purposefully refusing to seek out such data. Mr. Quasha and Mr. Preston

also promoted the ONCObind treatment based on information they knew to be insufficient to

support their claims, including to physicians such as Dr. Mark Rosenberg via the phone and

internet. Mr. Preston then promoted the ONCObind treatment and the suitability of the Antigua

Quadrant Clinical Care Clinic to Plaintiffs, including by touting Dr. Devon Quasha's credentials.

Dr. Devon Quasha. ExThera's Chief Regulatory Officer and Vice President of Clinical,

Regulatory and Medical Affairs Dr. Sanja Ilic participated in promoting the treatment to Plaintiffs

throughout, including by making fraudulent representations to Plaintiffs and their doctors.  In

sum, all Defendants agreed to participate in the scheme and understood their role in furthering the

scheme.

286.    As a direct and proximate result, Defendants injured Plaintiffs, including but not

limited to in the form of their submission to and payment, out-of-pocket for the ONCObind

procedure, which was unreliable, dangerous, and did not hold its promised value. Plaintiffs were

first required to pay $45,000 out-of-pocket to receive the treatment, which Defendants knew or

should have known would not deliver the advertised results, and to travel to Antigua and pay for

room and board on the island. Plaintiffs were also required to pay additional, illegitimate medical

bills to the clinic in which the Quadrant Clinical Care facility was set up (and often were told they

had to pay such fees in order to leave the island). Further, Plaintiffs were forced to incur

additional injury to property as a result of the ONCObind RICO Enterprise's scheme. These

additional expenses include the costs of emergency airfare, additional medical procedures, and

additional pain management costs. Plaintiffs also suffered harms to their business interests as a

result of the ONCObind RICO Enterprise's scheme.

**THIRD CLAIM FOR RELIEF**
**FRAUD**

287.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

288.    As alleged herein, Defendants engaged in both affirmative misrepresentations about the clinical promise of ONCObind and material omissions of fact about the risks of ONCObind.

289.    Defendants knew the potential to cure cancer via blood filtration was extremely speculative. All Defendants knew that ONCObind had not cured patients of cancer in a Croatian trial conducted in fall 2023 or had no reason to believe that claims about this trial's success were true. To the extent they did not know the ONCObind procedure was not actually a safe and effective cure for cancer, each Defendant took deliberate actions to avoid learning the truth. All Defendants, either individually or through their agents, possessed some level of scientific expertise. All Defendants knew that before they could reasonably make any claims about ONCObind's efficacy, the procedure needed to be tested on a larger group of individuals, and those individuals' outcomes needed to be observed over a significant length of time. In other words, any conclusion regarding efficacy could not be drawn by early 2024 when Defendants marketed ONCObind to Plaintiffs.

290.    As alleged above, all Defendants knew or willfully blinded themselves to the fact that the ONCObind procedure was not a safe and effective cancer treatment, nor was the clinic in Antigua an acceptable place for cancer patients to receive treatment.

291.    To advance the goal of commercializing ONCObind before regulatory approval for testing could be obtained in the United States, Defendants established a clinic in Antigua. Defendants then lied to Plaintiffs to secure their participation in what amounted to unregistered, unmonitored human experimentation at a cost of $45,000 per filtration series. Defendants' false statements are described in detail throughout this complaint and many are repeated in the chart contained in paragraph (¶ 270), above. That chart further contains specific citations to paragraphs containing the time, content, and manner of each fraudulent statement.

292.    Defendants also failed to disclose the true risks of ONCObind, including that the filtration treatment could increase their pain, lead to significant blood loss, and actually accelerate

their cancers. Further, Defendants failed to advise Plaintiffs that, in January 2024, ExThera's then-Medical Director, Dr. Chow, had warned ExThera executives that the Antigua clinic was operating an unethical and unsafe human medical experiment.

293.    Defendants expected Plaintiffs, who were late-stage cancer patients or their spouses in desperate search of effective therapies, to rely on their false promises and their failures to disclose ONCObind's risks.

294.    Plaintiffs indeed relied on Defendants' misrepresentations and omissions, paying $45,000 per round of ONCObind and traveling to Quadrant Clinical Care's clinic in Antigua to receive ONCObind, an entirely unproven procedure. Plaintiffs discontinued or did not begin chemotherapy and radiation in reliance on Defendants' misrepresentations and omissions.

295.    Plaintiffs were justified in their reliance for multiple reasons. Defendants had represented groundbreaking results regarding what Plaintiffs had no reason to believe was not an authentic clinical trial. Plaintiffs were, in fact, told that the results of the Croatian trial would be published soon. Defendants themselves marketed ONCObind through a lens of scientific expertise with highly credentialed individuals—e.g., Dr. Devon Quasha, a Harvard-trained physician practicing in the world-renowned Mass General Brigham medical system, and John Preston, an MIT physicist. Further, Defendants had repeatedly dissuaded Plaintiffs from relying on other information sources, such as additional testing or standard-of-care physician advice, to determine whether Defendants' representations about ONCObind were accurate.

296.    As a result of the fraud, all Plaintiffs were harmed. All lost money, and all lost much more. All Plaintiff participants suffered severe emotional distress and serious pain, whether from ONCObind itself or the failure of the Antigua clinic to provide appropriate palliative care. All Plaintiff spouses suffered severe emotional distress while tending to their suffering husbands and, in some cases, after their deaths. Contrary to Defendants' promises, Plaintiff participants' cancers were actually accelerated. Some died painful deaths shortly after receiving ONCObind. One family struggled to find a means of returning to the United States from Antigua so that the Plaintiff participant could die at home. One Plaintiff spouse was told her husband simply needed further ONCObind filtration just as he was about to die after his return to Canada. For those who

1    survived, they face greater risk from their cancers. For them, ONCObind will forever be a dark

2    cloud hanging over their lives.

3                              **FOURTH CLAIM FOR RELIEF**
                                      **NEGLIGENCE**

4

5        297.    Plaintiffs incorporate the substantive allegations contained in all prior and

6    succeeding paragraphs as if fully set forth herein.

7        298.    At all times, Defendants had a duty of care not to engage in affirmative

8    misconduct or cause foreseeable harm to Plaintiffs. In particular, Defendants owed a duty of care

9    to Plaintiffs, which here meant not engaging in conduct that would put Plaintiff participants at

10   risk of increased pain and accelerated cancer or would cause Plaintiff spouses emotional distress.

11       299.    Defendants breached their duty of care by recklessly encouraging Plaintiff

12   participants to discontinue or fail to begin evidence-based chemotherapy and/or radiation

13   treatment. Defendants also breached their duty of care by luring Plaintiffs to the island of Antigua

14   with the false promise of future, no-cost access to medical trials within the United States;

15   engaging in what amounted to an unregistered, unmonitored blood filtering experiment in

16   Antigua; and failing to provide a clinical facility equipped for severely ill individuals. As alleged

17   above, Defendants knew or should have known that the Croatian trial touted to Plaintiffs as

18   evidence of ONCObind's promise had not tracked participants long enough to draw conclusions

19   as to ONBObind's efficacy.

20       300.    As a proximate cause of Defendants' negligent or reckless acts, Plaintiffs suffered

21   damages, including, but not limited to, economic and non-economic damages, including severe

22   emotional distress.

23                              **FIFTH CLAIM FOR RELIEF**
                    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

24

25       301.    Plaintiffs incorporate the substantive allegations contained in all prior and

26   succeeding paragraphs as if fully set forth herein.

27       302.    Defendants engaged in extreme and outrageous conduct, including by

28   (i) misleading Plaintiffs into believing that ONCObind could cure or treat metastatic cancers; (ii)

- 85 -

1    misrepresenting that chemotherapy or radiation treatment would actually cause further harm to

2    Plaintiffs rather than treat Plaintiffs' cancer; (iii) luring Plaintiffs to a poorly equipped and often

3    unsupervised clinic in Antigua where Plaintiff participants underwent painful, dangerous, and

4    ineffective treatments under the guise of life-saving treatment; (iv) falsely assuring Plaintiffs that

5    ONCObind was working and traditional tests were merely failing to show the success of the

6    treatments; and (v) claiming that dying victims would improve rapidly if they were to pay

7    Defendants again and return for further filtration.

8        303.    Defendants undertook these actions intentionally and/or with reckless disregard of

9    the probability of causing severe and extreme emotional distress to Plaintiffs.

10       304.    Defendants' actions caused Plaintiffs to suffer extreme emotional distress. Because

11   of Defendants' actions, Plaintiffs were forced to either undergo or watch their loved ones undergo

12   painful and exhausting procedures with no demonstrated medical purpose, in some cases

13   accelerating Plaintiffs participants' disease progression and/or deaths.

14       305.    While emotional distress is common during cancer treatment, the severe emotional

15   distress Plaintiffs suffered as the result of Defendants' misconduct is of a different nature. The

16   emotional distress here stemmed not only from the disease's toll, but from the deceit perpetuated

17   by individuals who held themselves out as scientific experts offering a cutting-edge cure for

18   cancer that was in fact a dangerous medical experiment aimed at launching a commercial

19   enterprise. If not for Defendants' wrongful, extreme, and outrageous conduct, Plaintiffs would not

20   have suffered extreme and severe emotional distress of this nature.

21                        **SIXTH CLAIM FOR RELIEF**
                              **BATTERY**
22

23       306.    Plaintiffs incorporate the substantive allegations contained in all prior and

24   succeeding paragraphs as if fully set forth herein.

25       307.    This claim is brought by Plaintiffs against all Defendants because, as described

26   above, all engaged in a civil conspiracy, the purpose of which was to enroll Plaintiff participants

27   in what amounted to a medical experiment without their informed consent.

28

308.    Defendants' touching of Plaintiff participants—through use of ONCObind—was extremely offensive because Defendants misrepresented what the medical procedure was. Specifically, Defendants did not disclose that the procedure amounted to human experimentation for which there was no clinical proof of efficacy at treating cancer and for which substantial risks existed, and, in fact, Defendants stated just the opposite. No Plaintiff signed a consent form, and any verbal consent given was not—and could not have been—*informed consent*. Therefore, use of the procedure constituted unwelcome touching, which, here, caused severe injury.

309.    Defendants inserted large catheters into major veins and removed blood from Plaintiff participants' bodies, all of which amounts to offensive touching in the context of undisclosed human experimentation aimed at advancing a commercial enterprise.

310.    Defendants' contact with Plaintiffs was made with willful disregard of Plaintiffs' rights to be free from such contact, given that Plaintiffs had been deprived of information required to consent to such contact.

311.    Defendants' contact with Plaintiffs caused significant harm, including physical and emotional pain; extreme side effects, including, but not limited to, vomiting, lethargy, kidney failure, and blood loss; advancement of disease; and, in some cases, death.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**PRODUCT LIABILITY (FAILURE TO WARN)**

312.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

313.    ExThera Medical manufactures the Seraph 100 filters and developed the ONCObind Extracorporeal Blood Filter Procedure using the Seraph 100 filters, which the company markets on its website.

314.    In coordination with all other Defendants, Quadrant Clinical Care became a distributor of Seraph 100 filters and provided them to its clinic in Antigua.

315.    Defendants knew or should have known of the risks that the Seraph 100 filters and their use in the ONCObind filtration procedure could be harmful when used in what amounted to

1    an experiment on individuals with late-stage cancer. In particular, Defendants knew the procedure

2    had not yet undergone rigorous clinical testing in cancer patients.

3        316.    The Seraph 100 filters as used in the ONCObind filtration procedure posed

4    substantial risks. For example, individuals could become ill with tumor lysis syndrome (about

5    which only one Plaintiff participant received a mild warning about before the procedure—a

6    warning that while tumor lysis syndrome was highly treatable and would be tested for and treated

7    at the Quadrant Clinical Care clinic, that would cost Plaintiffs additional money), develop

8    heparin-induced thrombocytopenia, or lose significant amounts of blood to clotted filters.

9    Defendants also did not have enough information to rule out the possibility that ONCObind could

10   increase the speed of tumor metastasis or lead to death.

11       317.    These risks were not obvious to ordinary consumers, who relied and trusted both

12   ExThera (a medical device manufacturer) and Quadrant Clinical Care (a medical device

13   distributor) to advise them of any risks.

14       318.    The Seraph 100 filters came with no warnings, and because manufacturer ExThera

15   Medical sold the Seraph 100 filters to Quadrant Clinical Care for distribution and use in the

16   ONCObind procedure by its own personnel in Antigua, rather than through independent medical

17   offices or physicians, Plaintiffs could not receive warnings through any other source.

18       319.    Had Plaintiffs received adequate warnings, Plaintiff participants would not have

19   undergone the ONCObind procedure. However, because they did undergo the procedure, they

20   experienced significant harm, including, but not limited to, severe emotional distress, extreme

21   pain, loss of blood, tumor lysis syndrome, kidney failure, rapid progression of cancer metastasis,

22   and, in three cases, death.

### EIGHTH CLAIM FOR RELIEF
#### WRONGFUL DEATH

25       320.    Plaintiffs incorporate the substantive allegations contained in all prior and

26   succeeding paragraphs as if fully set forth herein.

27       321.    This claim is brought by Plaintiff spouses Kimberley Hudlow, Stacey Bowen, and

28   Vanessa Chupp and the Estates of David Hudlow, John Bowen, and Kyle Chupp.

322.    As alleged above, Defendants established a dangerous clinic in Antigua where they subjected victims suffering from advanced cancer to blood filtrations with ONCObind. The clinic's ONCObind procedure recklessly endangered the lives of all individuals treated there and caused (or hastened) the deaths of David Hudlow, John Bowen, and Kyle Chupp. The majority of these Plaintiffs were in stable condition and/or had other standard-of-care treatments available to them before Defendants told them to stop (or not start) standard cancer treatments, instead promising a miracle cure through the ONCObind procedure.

323.    Each Defendant engaged in affirmative misconduct, as described above, or, at a minimum, acted negligently by establishing the Quadrant Clinical Care clinic in Antigua; encouraging Plaintiff participants to discontinue and/or fail to start chemotherapy and/or radiation; encouraging Plaintiffs to travel to Antigua to receive ONCObind; and administering ONCObind to Plaintiff participants.

324.    After receiving ONCObind, as well as foregoing traditional chemotherapy and radiation per Defendants' instructions, Mr. Hudlow, Mr. Bowen, and Mr. Chupp each experienced rapid and unexpected progression of their disease. Each died painful deaths within weeks of leaving Antigua, in substantial part because of complications caused by ONCObind and by Defendants' instruction to cease other treatment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, and seek:

i.    An award of past and future noneconomic damages—*e.g.*, pain and suffering, emotional distress, loss of consortium, loss of society;

ii.    An award of past and future economic damages, including, but not limited to, past and future medical expenses and past and future loss of earnings and impaired earning capacity;

iii.    An award of treble damages for economic harm to Plaintiffs' business or property interests;

iv.    An award of punitive or exemplary damages;

v.    An award of attorney's fees, costs, and expenses, to the extent allowable by law;

vi.    An award of pre- and post-judgment interest;

vii.   An order prohibiting Defendants from continuing to market ONCObind in the United States without regulatory approval; and

viii.   Such other and further relief as the Court deems appropriate.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: May 30, 2025

By: */s Robert J. Nelson*
Robert J. Nelson

Robert J. Nelson (Cal. Bar No. 132797)
*rnelson@lchb.com*
Michael Levin-Gesundheit (Cal. Bar No. 292930)
*mlevin@lchb.com@lchb.com*
Courtney J. Liss (Cal. Bar No. 339493)
*cliss@lchb.com*
Annie M. Wanless (Cal. Bar No. 339635)
*awanless@lchb.com*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000

*Attorney for Plaintiffs*